## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OCEANIC EXPLORATION COMPANY and PETROTIMOR COMPANHIA DE PETROLEOS, S.A.R.L., <br><br> *Plaintiffs,* <br><br> v. <br><br> CONOCOPHILLIPS, INC., *et al.,* <br><br> *Defendants.* | Case No(s).: 1:04-cv-00332-EGS |

### CONOCOPHILLIPS DEFENDANTS' MOTION TO DISMISS

The ConocoPhillips Defendants (consisting of ConocoPhillips and current and former ConocoPhillips affiliates ConocoPhillips Company; Tokyo Timor Sea Resources Inc.; Phillips Petroleum Company ZOC; Phillips Petroleum Company Indonesia; Phillips Petroleum (96-20), Inc.; Phillips Petroleum Production Indonesia, Inc.[**]; Phillips Indonesia, Inc.; Phillips International Investment, Inc.; ConocoPhillips (03-21) Pty Ltd; ConocoPhillips (03-12) Pty Ltd; ConocoPhillips (03-13) Pty Ltd; ConocoPhillips (03-19) Pty Ltd; ConocoPhillips (03-16) Pty Ltd; ConocoPhillips (03-20) Pty Ltd; ConocoPhillips Australia Pty Ltd; ConocoPhillips Australia Gas Holdings Pty Ltd; ConocoPhillips JPDA Pty Ltd (f/k/a and also sued as Phillips Petroleum Company ZOC Pty Ltd); ConocoPhillips Pipeline Australia Pty Ltd; ConocoPhillips STL Pty Ltd; ConocoPhillips WA-248 Pty Ltd; Darwin LNG Pty Ltd; and Tokyo Timor Sea Resources Pty Ltd) hereby move to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) for the reasons more fully stated in the accompanying ConocoPhillips Defendants' Memorandum of Law in Support of Motion to Dismiss. The ConocoPhillips subsidiary defendants (consisting of all of the aforementioned defendants except ConocoPhillips and ConocoPhillips Corporation) also

move to dismiss under Fed. R. Civ. P. 12(b)(2) for the reasons more fully stated in the

accompanying ConocoPhillips Defendants' Memorandum of Law in Support of Motion to

Dismiss

Dated: June 14, 2004

_____

| | |
|---|---|
| Martin D. Beirne (D.D.C. Bar # TX0025) | Thomas D. Yannucci, P.C. (D.C. Bar # 358989) |
| Jeffrey T. Nobles* | Michael D. Jones (D.C. Bar # 417681) |
| W. Bruce Stanfill* | Christopher Landau (D.C. Bar # 425319) |
| David A. Pluchinsky * | Brant W. Bishop (D.C. Bar # 459255) |
| BEIRNE, MAYNARD & PARSONS, L.L.P. | Susan Engel |
| 1300 Post Oak Blvd., 25th Floor | KIRKLAND & ELLIS LLP |
| Houston, TX 77056 | 655 Fifteenth Street, NW |
| (713) 623-0887 | Washington, DC 20005 |
| (713) 960-1527 – facsimile | (202) 879-5000 |
| | (202) 879-5200 – facsimile |

\* Pro hac vice applications filed

Russell D. Howell (*Of Counsel*)
CONOCOPHILLIPS COMPANY
McLean Building
600 North Dairy Ashford Road
P.O. Box 4783
Houston, TX 77210-4783

*Counsel for Defendants ConocoPhillips; ConocoPhillips Company; Tokyo Timor Sea Resources Inc.; Phillips Petroleum Company ZOC; Phillips Petroleum Company Indonesia; Phillips Petroleum (96-20), Inc.; Phillips Petroleum Production Indonesia, Inc.; Phillips Indonesia, Inc.; Phillips International Investment, Inc.; ConocoPhillips (03-21) Pty Ltd; ConocoPhillips (03-12) Pty Ltd; ConocoPhillips (03-13) Pty Ltd; ConocoPhillips (03-19) Pty Ltd; ConocoPhillips (03-16) Pty Ltd; ConocoPhillips (03-20) Pty Ltd; ConocoPhillips Australia Pty Ltd; ConocoPhillips Australia Gas Holdings Pty Ltd; ConocoPhillips JPDA Pty Ltd (f/k/a and also sued as Phillips Petroleum Company ZOC Pty Ltd); ConocoPhillips Pipeline Australia Pty Ltd; ConocoPhillips STL Pty Ltd; ConocoPhillips WA-248 Pty Ltd; Darwin LNG Pty Ltd; and Tokyo Timor Sea Resources Pty Ltd*

\*\* Phillips Petroleum Production Indonesia, Inc. ("PPPI, Inc.") was sold, effective December 31, 1992, to Louisiana Land & Exploration Company. In February of 1993, PPPI, Inc. was dissolved in Delaware. Because PPPI, Inc. appears to have been sued herein in respect of activities before its 1993 sale, the ConocoPhillips defendants have joined the present motion in PPPI, Inc.'s name, as well, to preserve any of its defenses and to the extent any action against a corporation dissolved in 1993 is still viable.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OCEANIC EXPLORATION COMPANY and PETROTIMOR COMPANHIA DE PETROLEOS, S.A.R.L.,     *Plaintiffs,*     v.     CONOCOPHILLIPS, INC., *et al.,*     *Defendants.* | **Case No. 1:04-cv-00332-EGS** |

## CONOCOPHILLIPS DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO DISMISS

Martin D. Beirne (D.D.C. Bar # TX0025)
Jeffrey T. Nobles*
W. Bruce Stanfill*
David A. Pluchinsky*
BEIRNE, MAYNARD & PARSONS, LLP
1300 Post Oak Blvd., 25th Floor
Houston, TX 77056
(713) 623-0887
(713) 960-1527 (facsimile)

* *Pro hac vice* applications pending

Thomas D. Yannucci, P.C. (D.C. Bar # 358989)
Michael D. Jones (D.C. Bar # 417681)
Christopher Landau (D.C. Bar # 425319)
Brant W. Bishop (D.C. Bar # 459255)
Susan Engel
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
(202) 879-5000
(202) 879-5200 (facsimile)

Russell D. Howell (*Of Counsel*)
CONOCOPHILLIPS COMPANY
McLean Building
600 North Dairy Ashford Road
P.O. Box 4783
Houston, TX 77210

*Counsel for Defendants ConocoPhillips; ConocoPhillips Company; Tokyo Timor Sea Resources Inc.; Phillips Petroleum Company ZOC; Phillips Petroleum Company Indonesia; Phillips Petroleum (96-20), Inc.; Phillips Petroleum Production Indonesia, Inc.; Phillips Indonesia, Inc.; Phillips International Investment, Inc.; ConocoPhillips (03-21) Pty Ltd; ConocoPhillips (03-12) Pty Ltd; ConocoPhillips (03-13) Pty Ltd; ConocoPhillips (03-19) Pty Ltd; ConocoPhillips (03-16) Pty Ltd; ConocoPhillips (03-20) Pty Ltd; ConocoPhillips Australia Pty Ltd; ConocoPhillips Australia Gas Holdings Pty Ltd; ConocoPhillips JPDA Pty Ltd (f/k/a and also sued as Phillips Petroleum Company ZOC Pty Ltd); ConocoPhillips Pipeline Australia Pty Ltd; ConocoPhillips STL Pty Ltd; ConocoPhillips WA-248 Pty Ltd; Darwin LNG Pty Ltd; and Tokyo Timor Sea Resources Pty Ltd*

June 14, 2004

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|

TABLE OF AUTHORITIES .................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 3

    A.    Portuguese colonial rule in East Timor .................................................... 4

    B.    Conflicting claims to the Timor Sea seabed .......................................... 4

    C.    The Portuguese colonial concession .................................................... 5

    D.    The Portuguese withdrawal and the Indonesian occupation and annexation .......... 6

    E.    United States policy regarding the Indonesian occupation and annexation of East Timor ................................................................................................ 7

    F.    The Timor Gap Treaty ........................................................................ 8

    G.    United Nations administration ............................................................ 10

    H.    East Timorese independence and the Timor Sea Treaty ....................... 11

    I.    Petrotimor's Australian lawsuit ......................................................... 13

    J.    This lawsuit ..................................................................................... 13

ARGUMENT ......................................................................................................................... 14

I.    PETROTIMOR'S CLAIM TO OWNERSHIP OF THE DISPUTED DRILLING RIGHTS PRESENTS NON-JUSTICIABLE POLITICAL QUESTIONS ..................... 15

    A.    The Seabed Boundary Between East Timor And Australia Presents A Non-Justiciable Political Question ..................................................... 16

    B.    The Validity Of The Indonesian Annexation of East Timor Presents A Non-Justiciable Political Question ..................................................... 21

II.    PETROTIMOR'S CLAIMS MUST BE DISMISSED UNDER THE ACT OF STATE DOCTRINE ......................................................................................... 24

    A.    Petrotimor's Claim To Ownership Of The Disputed Drilling Rights Necessarily Challenges The Validity Of The Sovereign Acts Of Australia, Indonesia, and East Timor. .......................................... 25

    B.    Petrotimor's Claim To The Alleged Expropriation Of Trade Secrets Necessarily Challenges The Validity Of The Sovereign Acts Of Indonesia. ........30

III.    PETROTIMOR'S CLAIMS ARE MANIFESTLY TIME-BARRED. ............................32

    A.    Petrotimor's RICO Claims Are Time-Barred. ........................................33

    B.    Petrotimor's Robinson-Patman Act Claim Is Time-Barred. ..................................34

    C.    Petrotimor's Lanham Act Claim Is Time-Barred. .................................36

    D.    Petrotimor's Common-Law Claims Are Time-Barred. .........................................37

IV.    PETROTIMOR'S ROBINSON-PATMAN ACT CLAIM FAILS AS A MATTER OF LAW. ............................................................................................................38

V.    PETROTIMOR'S LANHAM ACT CLAIM FAILS AS A MATTER OF LAW. ............40

VI.    THIS COURT LACKS PERSONAL JURISDICTION OVER THE CURRENT AND FORMER CONOCOPHILLIPS SUBSIDIARY DEFENDANTS. ........................41

CONCLUSION ....................................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**United States Cases**

*A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.,*
  62 F.3d 1454 (D.C. Cir. 1995) ...................................................................... 37

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.,*
  483 U.S. 143 (1987) ............................................................................. 33, 34

*AMAF Int'l Corp. v. Ralston Purina Co.,*
  428 A.2d 849 (D.C. 1981) ........................................................................... 43

*American Auto. Ass'n v. Spiegel,*
  205 F.2d 771 (2d Cir. 1953) ....................................................................... 41

*Asahi Metal Indus. Co. v. Superior Ct. of Cal.,*
  480 U.S. 102 (1987) ............................................................................. 43, 45

*Asociacion de Reclamantes v. United Mexican States,*
  735 F.2d 1517 (D.C. Cir. 1984) ................................................................... 3

*Atlantigas Corp. v. Nisource, Inc.,*
  290 F. Supp. 2d 34 (D.D.C. 2003) ............................................................. 42

*Baker v. Carr,*
  369 U.S. 186 (1962) ................................................................. 16, 20, 22, 23

*Banco Nacional de Cuba v. Sabbatino,*
  376 U.S. 398 (1964) ................................................................. 24, 25, 31

*Brown v. Twentieth Century Fox Film Corp.,*
  799 F. Supp. 166 (D.D.C. 1992),
  *aff'd for the reasons given by the district court,*
  15 F.3d 1159 (D.C. Cir. 1994) ................................................................... 41

*Callejo v. Bancomer,*
  764 F.2d 1101 (5th Cir. 1985) ............................................................. 25, 29

*Clayco Petroleum Corp. v. Occidental Petroleum Corp.,*
  712 F.2d 404 (9th Cir. 1983) ..................................................................... 30

*Coffee v. Groover,*
  123 U.S. 1 (1887) ............................................................................. 17, 18

*Connors v. Hallmark & Son Coal Co.*,
    935 F.2d 336 (D.C. Cir. 1991) ................................................................. 35

*Crane v. Carr*,
    814 F.2d 758 (D.C. Cir. 1987) ................................................................. 42

\* *Dayton v. Czechoslovak Socialist Republic*,
    834 F.2d 203 (D.C. Cir. 1987) ................................................................. 31

*Del Commercial Props., Inc. v. Commissioner*,
    251 F.3d 210 (D.C. Cir. 2001) ................................................................... 4

*District Cablevision Ltd. P'ship v. Bassin*,
    828 A.2d 714 (D.C. 2003) ...................................................................... 36

*DSMC, Inc. v. Convera Corp.*,
    273 F. Supp. 2d 14 (D.D.C. 2002) .......................................................... 43

*El-Fadl v. Central Bank of Jordan*,
    75 F.3d 668 (D.C. Cir. 1996) ................................................................... 43

*Everett v. Nissan Motor Corp.*,
    628 A.2d 106 (D.C. 1993) ...................................................................... 43

*F. Hoffman-LaRoche Ltd. v. Empagran S.A.*,
    ___ U.S. ___, 2004 WL 1300131 (U.S. Jun. 14, 2004) ............................ 40

*Federal Prescription Serv., Inc. v. American Pharm. Ass'n*,
    663 F.2d 253 (D.C. Cir. 1981) ................................................................. 39

*Ford Motor Co. v. Catalanotte*,
    342 F.3d 543 (6th Cir. 2003) ................................................................... 36

*Foster v. Neilson*,
    27 U.S. (2 Pet.) 253 (1829) ..................................................................... 17

*Freeman v. Chicago Title & Trust Co.*,
    505 F.2d 527 (7th Cir. 1974) ................................................................... 39

*Garcia v. Lee*,
    37 U.S. (12 Pet.) 511 (1838) ................................................................... 17

*Gorman v. Ameritrade Holding Corp.*,
    293 F.3d 506 (D.C. Cir. 2002) ........................................................... 42, 43

*Grand Rapids Plastics, Inc. v. Lakian*,
    188 F.3d 401 (6th Cir. 1999) ................................................................... 35

*GTE New Media Servs. Inc. v. Bell South Corp.*,
  199 F.3d 1343 (D.C. Cir. 2000) .................................................. 42

*Harris v. Duty Free Shoppers Ltd. P'ship*,
  940 F.2d 1272 (9th Cir. 1991) ................................................... 38

\* *Helicopteros Nacionales de Colombia, S.A. v. Hall*,
  466 U.S. 408 (1984).................................................................. 44

*Hinderlider v. La Plata River & Cherry Creek Ditch Co.*,
  304 U.S. 92 (1938)..................................................................... 17

*Holmes v. Laird*,
  459 F.2d 1211 (D.C. Cir. 1972) ................................................. 22

*Honduras Aircraft Registry, Ltd. v. Government of Honduras*,
  129 F.3d 543 (11th Cir. 1997) ................................................... 27

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
  191 F.3d 813 (7th Cir. 1999) ..................................................... 36

*International Ass'n of Machinists v. OPEC*,
  649 F.2d 1354 (9th Cir. 1981) ............................................. 26, 27

*International Café, S.A.L. v. Hard Rock Café Int'l (U.S.A.), Inc.*,
  252 F.3d 1274 (11th Cir. 2001) ................................................. 40

*International Order of Job's Daughters v. Lindeburg & Co.*,
  633 F.2d 912 (9th Cir. 1980) ..................................................... 40

*International Shoe Co. v. Washington*,
  326 U.S. 310 (1945).................................................................. 43

*Island Insteel Sys., Inc. v. Waters*,
  296 F.3d 200 (3d Cir. 2002)....................................................... 36

*Japan Whaling Ass'n v. American Cetacean Soc'y*,
  478 U.S. 221 (1986)................................................................... 15

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
  304 F.3d 829 (9th Cir. 2002) ..................................................... 36

\* *Jones v. United States*,
  137 U.S. 202 (1890)............................................................. 22, 23

*Kingman Park Civic Ass'n v. Williams*,
  348 F.3d 1033 (D.C. Cir. 2003) ................................................. 37

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
 313 U.S. 487 (1941) ................................................................... 37

*Klehr v. A.O. Smith Corp.*,
 521 U.S. 179 (1997) ........................................................ 33, 34, 35

*L'Aiglon Apparel v. Lana Lobell, Inc.*,
 214 F.2d 649 (3rd Cir. 1954) ...................................................... 41

*Liu v. Republic of China*,
 892 F.2d 1419 (9th Cir. 1989) .................................................... 30

*Lyons P'ship, L.P. v. Morris Costumes, Inc.*,
 243 F.3d 789 (4th Cir. 2001) ...................................................... 36

*Marbury v. Madison*,
 5 U.S. (1 Cranch) 137 (1803) ................................................ 1, 16

*Material Supply Int'l, Inc. v. Sunmatch Indus. Co.*,
 146 F.3d 983 (D.C. Cir. 1998) .................................................... 37

*McSurely v. McClellan*,
 753 F.2d 88 (D.C. Cir. 1985) ...................................................... 37

*Menominee Indian Tribe of Wis. v. Thompson*,
 161 F.3d 449 (7th Cir. 1998) ........................................................ 4

*Mingtai Fire & Marine Ins. Co. v. UPS*,
 177 F.3d 1142 (9th Cir. 1999) .................................................... 23

*MOL, Inc. v. People's Republic of Bangladesh*,
 736 F.2d 1326 (9th Cir. 1984) .................................................... 27

*Morris v. WMATA*,
 781 F.2d 218 (D.C. Cir. 1986) .................................................... 29

*National City Bank of New York v. Republic of China*,
 348 U.S. 356 (1955) ................................................................... 22

∗ *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.*,
 331 F. Supp. 92 (C.D. Cal. 1971)
 *aff'd for the reasons given by the district court*,
 461 F.2d 1261 (9th Cir. 1972) .......................................... 19, 21, 22

∗ *Occidental v. A Certain Cargo of Petroleum*,
 577 F.2d 1196 (5th Cir. 1978) ...................... 15, 16, 17, 18, 19, 20

*Oetjen v. Central Leather Co.*,
    246 U.S. 297 (1918) ................................................................................. 25, 31

*Pittsburgh v. West Penn Power Co.*,
    147 F.3d 256 (3d Cir. 1998) .......................................................................... 39

*Poole v. Fleeger*,
    36 U.S. (11 Pet.) 185 (1837) ..................................................................... 17, 18

*PT United Can Co. v. Crown Cork & Seal Co.*,
    138 F.3d 65 (2d Cir. 1998) ........................................................................... 43

*Republic of Iraq v. First Nat'l City Bank*,
    353 F.2d 47 (2d Cir. 1965) ........................................................................... 30

*Ricaud v. American Metal Co.*,
    246 U.S. 304 (1918) ..................................................................................... 31

*Riddell v. Riddell Washington Corp.*,
    866 F.2d 1480 (D.C. Cir. 1989) ................................................................... 33

*Riggs Nat'l Corp. v. Commissioner*,
    163 F.3d 1363 (D.C. Cir. 1999) ................................................................... 24

*Rotella v. Wood*,
    528 U.S. 549 (2000) ..................................................................................... 33

*Rush-Presbyterian-St.Luke's Med. Ctr. v. Hellenic Republic*,
    877 F.2d 574 (7th Cir. 1989) ....................................................................... 26

*Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distrib. Pty. Ltd.*,
    647 F.2d 200 (D.C. Cir. 1981) ..................................................................... 42

*Underhill v. Hernandez*,
    168 U.S. 250 (1897) ................................................................................. 24, 31

*Union City Barge Line, Inc. v. Union Carbide Corp.*,
    823 F.2d 129 (5th Cir. 1987) ....................................................................... 39

*United States v. Klintock*,
    18 U.S. (5 Wheat.) 144 (1820) ..................................................................... 20

*United States v. Pink*,
    315 U.S. 203 (1942) ..................................................................................... 23

*Vieth v. Jubelirer*,
    124 S. Ct. 1769 (2004) ................................................................................... 1

*W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp.*,
    493 U.S. 400 (1990) ................................................................. 24, 25, 30

*Williams v. Suffolk Ins. Co.*,
    38 U.S. (13 Pet.) 415 (1839) .................................................... 22, 23

*Wood v. Carpenter*,
    101 U.S. 135 (1879) ................................................................. 34

\* *World Wide Minerals Ltd. v. Republic of Kazakhstan*,
    116 F. Supp. 2d 98 (D.D.C. 2000),
    *aff'd in part*, 296 F.3d 1154 (D.C. Cir. 2002) ........................... 43

*World Wide Minerals, Ltd. v. Republic of Kazakhstan*,
    296 F.3d 1154 (D.C. Cir. 2002) ........................... 24, 26, 30, 31

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    401 U.S. 321 (1971) ................................................................. 35

**Foreign and International Cases**

*Australia v. WMC Res. Ltd.*,
    194 C.L.R. 1, 1998 WL 1672151 (Austl. Feb. 2, 1998) ............. 27

*East Timor (Port. v. Austl.)*,
    1995 I.C.J. 90 (June 30) ........................................................... 9

*Petrotimor v. Australia*,
    126 F.C.R. 354, 2003 WL 259335 (Austl. Feb. 3, 2003) ........... 13

**Constitutions**

E. Timor Const. § 139(1) ................................................................. 11, 27

E. Timor Const. § 158(3) ................................................................. 11, 27

**Statutes and Rules**

15 U.S.C. § 1125 ............................................................................. 40

15 U.S.C. § 13(c) ............................................................................. 38

15 U.S.C. § 15b ............................................................................... 34

15 U.S.C. § 22 ................................................................................. 42

18 U.S.C. § 1965(b) ................................................................................................ 42

28 U.S.C. § 1367 .................................................................................................... 37

D.C. Code Ann. § 12-301 ....................................................................................... 37

D.C. Code Ann. § 13-334(a) ................................................................................... 43

D.C. Code Ann. § 28-3904(r) .................................................................................. 36

Fed. R. Civ. P. 12(b)(1) ........................................................................................... 15

Fed. R. Civ. P. 12(b)(6) ............................................................................................. 3

Fed. R. Evid. 201 ...................................................................................................... 3

## Treaties

Agreement Establishing Certain Seabed Boundaries
    in the Area of the Timor and Arafura Seas,
    Oct. 9, 1972, Austl.-Indon., 1973 Austl. T.S. No. 32 ....................................... 5

Agreement Establishing Certain Seabed Boundaries,
    May 18, 1971, Austl.-Indon., 1973 Austl. T.S. No. 31 ..................................... 5

Exchange of Notes,
    Feb. 10, 2000, Austl.-U.N.T.A.E.T., 2000 Austl. T.S. No. 9 ......................... 10

Exchange of Notes,
    May 20, 2002, Austl.-E.Timor, 2002 Austl. T.S. No. 11 ................................ 11

Timor Sea Treaty,
    May 20, 2002, Austl.-E.Timor, 2003 Austl. T.S. No. 13 ................................ 11

Treaty on the Zone of Cooperation in an Area
    between the Indonesian Province of East Timor
    and Northern Australia,
    Dec. 11, 1989, Austl.-Indon., 1991 Austl. T.S. No. 9 ...................................... 9

## Executive and Legislative Materials

East Timor, Indonesia and U.S. Policy: Hearing Before the Senate Foreign
    Relations Comm., 102nd Cong. Annx. 9 (1992) (Statement by Kenneth M. Quinn, Dep.
    Ass't Sec'y of State for East Asian & Pacific Affairs) ..................................... 8

Economic and Military Assistance in Asia and the Pacific: Hearing Before the Subcomm. on
    Asian & Pacific Affairs of the House Comm. on Int'l Relations, 95th Cong. (1977)

(Statement of Robert B. Oakley, Dep. Ass't Sec'y of State for East Asian & Pacific Affairs) ............................................................................................................. 7

Human Rights in East Timor: Hearings Before the Subcomm. on Int'l Orgs. of the House Comm. on Int'l Relations, 95th Cong. (1977) (Test. of George H. Aldrich, Dep. Legal Adviser, Dep't of State) ........................................................................ 7

Recent Developments in East Timor: Hearing Before the Subcomm. on Asian & Pacific Affairs of the House Comm. on Foreign Affairs, 97th Cong. (1982) (Statement of John H. Holdridge, Ass't Sec'y of State for East Asian & Pacific Affairs) .................................. 8

U.S. Dep't of State Telegram, *Ford-Suharto Meeting* (Dec. 6, 1975) ..................................... 7, 8

U.S. Dep't of State, *Background Note: East Timor,* http://www.state.gov/r/pa/ei/bgn/26246.htm (last visited June 7, 2004) .......................... 11

U.S. Relations with Indonesia: Hearing Before the Subcomm. on East Asian & Pacific Affairs of the Senate Foreign Relations Comm. (Statement of Winston Lord, Ass't Sec'y of State for East Asian & Pacific Affairs), reprinted in 7 *U.S. Dept of State Dispatch* No. 38, 465, 1996 WL 10106206 (Sept. 16, 1996) ................................................................................. 8

**United Nations Materials**

G.A. Res. 1514 (XV), U.N. GAOR, 15th Sess., Supp. No. 16, at 66-67, U.N. Doc. A/4684 (1960) ................................................................................................. 4

G.A. Res. 1541(XV), U.N. GAOR, 15th Sess., Supp. No. 16, at 29-30, U.N. Doc. A/4684 (1960) ................................................................................................. 4

G.A. Res. 31/53 Vote, U.N. GAOR, 31st Sess., 85th plen. mtg., at 1298-99 (item 81), U.N. Doc. A/31/PV.79-109 (1978) ............................................................................... 8

G.A. Res. 31/53, U.N. GAOR, 31st Sess.., Supp. No. 39, at 125, U.N. Doc. A/31/39 (1977) ................................................................................................. 8

G.A. Res. 32/34 Vote, U.N. GAOR, 32nd Sess., 83rd plen. mtg., at 1419-21 (item 135), U.N. Doc. A/32/PV.77-111 (1978) ............................................................................... 8

G.A. Res. 32/34, U.N. GAOR, 32nd Sess., Supp. No. 45, at 169-70, U.N. Doc. A/32/45 (1978) ................................................................................................. 8

G.A. Res. 33/39 Vote, U.N. GAOR, 33rd Sess., 81st plen. mtg., at 1401 (item 146), U.N. Doc. A/33/PV.77-108 (1981) ............................................................................... 8

G.A. Res. 33/39, U.N. GAOR, 33rd Sess., Supp. No. 45, at 181-82, U.N. Doc. A/33/45 (1979) ................................................................................................. 8

G.A. Res. 34/40 Vote, U.N. GAOR, 34th Sess., 75th plen. mtg., at 31-33,
U.N. Doc. A/34/PV.75 (prov. ed. 1979) ...................................................................... 8

G.A. Res. 34/40, U.N. GAOR, 34th Sess., Supp. No. 46, at 206,
U.N. Doc. A/34/36 (1980) ........................................................................................... 8

G.A. Res. 35/27 Vote, U.N. GAOR, 35th Sess., 57th plen. mtg., at 34-36,
U.N. Doc. A/35/PV.55 (prov. ed. 1980) ...................................................................... 8

G.A. Res. 35/27, U.N. GAOR, 35th Sess., Supp. No. 48, at 219-20,
U.N. Doc. A/35/48 (1981) ........................................................................................... 8

G.A. Res. 36/50 Vote, U.N. GAOR, 36th Sess., 70th plen. mtg., at 28-30,
U.N. Doc. A/36/PV.70 (prov. ed. 1981) ...................................................................... 8

G.A. Res. 36/50, U.N. GAOR, 36th Sess., Supp. No. 51, at 200,
U.N. Doc. A/36/51 (1982) ........................................................................................... 8

G.A. Res. 37/30 Vote, U.N. GAOR, 37th Sess., 77th plen. mtg., at 71-73,
U.N. Doc. A/37/PV.75 (prov. ed. 1982) ...................................................................... 8

G.A. Res. 37/30, U.N. GAOR, 37th Sess., Supp. No. 51, at 227-28,
U.N. Doc. A/37/51 (1983) ........................................................................................... 8

*Question of East Timor: Report of the Secretary-General*, U.N. SCOR,
53rd Sess., U.N. Doc. S/1999/513 (1999)...................................................................... 10

S.C. Res. 1272, U.N. SCOR , 53rd Sess., 4057th mtg.,
U.N. Doc. S/RES/1272 (1999) ...................................................................................... 10

**Other Authorities**

Central Intelligence Agency, *The World Factbook*,
Map of Oceania,
<http://www.cia.gov/cia/publications/factbook/reference_maps/oceania.html>
(last visited June 7, 2004) ............................................................................................ 4

Central Intelligence Agency, *The World Factbook*,
Map of Southeast Asia,
<http://www.cia.gov/cia/publications/factbook/reference_maps/southeast_asia.html>
(last visited June 7, 2004) ............................................................................................ 4

Ramos-Horta, Jose,
*Suit a Distraction for East Timor's Nation Building*,
Aust. Fin. Rev. (Apr. 17, 2004) ........................................................................ 2, 7, 32

Timor Sea Office, Office of the Prime Minister, Government of Timor-Leste,
    Map of the Timor Gap, <http://www.timorseaoffice.gov.tp/gapmap.htm>
    (last visited June 9, 2004) ............................................................................................. 5

Welcome Statement by East Timor Prime Minister Mari Alkatiri at Maritime
    Boundary Negotiations (Apr. 19, 2004) ........................................................................ 12

## INTRODUCTION

This case is governed by the straightforward proposition that the United States Constitution places the power over foreign affairs in the political branches, not the courts. Plaintiffs Petrotimor Companhia de Petroleos, S.A.R.L. and Oceanic Exploration Co. (collectively "Petrotimor") are asking this Court to validate their claim to ownership of oil and gas drilling rights located halfway around the world, in the Timor Sea between Australia and the island of Timor. The basic problem for Petrotimor is that its claim is political, not legal, in nature. Ownership of the area where the disputed rights are located has been a hotly contested issue between sovereign nations for the past generation, first between Australia and Portugal (colonial ruler of East Timor until the 1970s), then between Australia and Indonesia (which annexed East Timor after the Portuguese withdrawal in 1975), and now between Australia and East Timor (which has been independent since 2002). Petrotimor asks this Court to ignore this political and diplomatic background, not to mention international treaties specifically addressing the development of natural resources in the disputed area, and treat this like an ordinary commercial dispute over the ownership of property. This, under first principles of American jurisprudence, the Court cannot do.

As the Supreme Court recently underscored, while "'it is emphatically the province and duty of the judicial department to say what the law is,' [s]ometimes … the law is that the judicial department has no business entertaining the claim of unlawfulness." *Vieth v. Jubelirer*, 124 S. Ct. 1769, 1776 (2004) (plurality opinion) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)). If there is any area where the American judiciary has no business, it is in drawing the boundaries of foreign nations, and/or adjudicating the validity of the official acts of foreign sovereigns within their territory. That is precisely what Petrotimor asks this Court to do here.

Petrotimor's claim to ownership of the disputed drilling rights hinges on the initial and continued validity of a concession granted by Portugal in the waning days of colonial rule over East Timor in the mid-1970s. Essentially, Petrotimor—which never extracted an ounce of oil or gas from that concession, and allowed a generation to pass before bringing this lawsuit—wants this Court to declare that the Portuguese colonial concession was not only valid when granted (even though from the beginning Australia challenged the concession on the ground that it lies within the Australian continental shelf) but remains valid in perpetuity (even though later governments in East Timor—both Indonesian and now independent East Timorese—have signed treaties with Australia negating the Portuguese colonial concession, and jointly granting and/or ratifying supervening concessions to other companies, including ConocoPhillips defendants). Indeed, this lawsuit is nothing if not cynical: now that ConocoPhillips companies have invested vast sums of money in the project in justifiable reliance on concessions jointly granted and/or ratified by Australia and Indonesia and Australia and East Timor, respectively, and are finally beginning to extract oil and gas from the disputed area, Petrotimor has emerged from the shadows to stake its claim to ownership. Not surprisingly, East Timor's Foreign Minister, Jose Ramos-Horta (who won the Nobel Peace Prize in 1996 for his efforts to secure independence for his country), has denounced this lawsuit as "a frustrating distraction from our task of nation building," and noted that "[v]ery much unlike ConocoPhillips, Oceanic Exploration has not conducted petroleum activities in almost a decade," and specializes in asserting rights in "areas subject to long-standing international maritime boundary disputes." Jose Ramos-Horta, *Suit a Distraction for East Timor's Nation Building*, Aust. Fin. Rev., Apr. 17, 2004, at 62 (attached at Tab 1). "I cannot fathom the immorality that motivated the Petrotimor-Oceanic Exploration action." *Id.*

Petrotimor's quarrel, thus, is not with ConocoPhillips companies, but with the sovereign nations that negated the validity of Petrotimor's alleged rights, and granted ConocoPhillips companies supervening rights. This is not, in short, a private dispute amenable to adjudication in an American courtroom, but rather a public dispute with Australia, Indonesia, and East Timor over their joint development of natural resources in the Timor Sea. For just this reason, an Australian court dismissed Petrotimor's claims two years ago as non-justiciable when Petrotimor first brought this lawsuit there.

None of this is to say that Petrotimor is not entitled to seek redress for its alleged grievances. Petrotimor has simply chosen the wrong forum. Petrotimor is perfectly free to pursue redress through diplomatic and political channels. But a United States court, under basic separation-of-powers principles, has no authority to pretend that this is a run-of-the-mill commercial dispute between private parties. Accordingly, this lawsuit should be dismissed.

## BACKGROUND

This lawsuit is based on Petrotimor's contention that "Australia, Indonesia and ConocoPhillips, with varying efforts at different times, stole Plaintiffs' oil and natural gas rights granted by Portugal, on behalf of its East Timor province." Am. Compl. ¶ 3. To understand why that contention is not subject to adjudication by this Court, it is necessary to understand its historical and diplomatic context.[1]

---

[1] With respect to the grounds on which defendants move to dismiss for lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1), this Court is free to make its own factual findings, and "need not accept as true the plaintiffs' version of controverted jurisdictional facts." *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1519 n.1 (D.C. Cir. 1984) (Scalia, J.). And even with respect to the grounds on which defendants move to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), this Court can take judicial notice of facts "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Judicial

A.      **Portuguese colonial rule in East Timor**

As Petrotimor notes, "the saga from which this lawsuit emanates began in 1642," when Portugal colonized Timor, an island in the South Pacific Ocean 300 miles north of Australia. Am. Compl. ¶ 55; *see also* Maps (attached at Tab 2).   In 1749, Timor was divided between Portugal (which continued to occupy the eastern part of the island) and the Netherlands (which took control of the western portion of the island).  *See* Am. Compl. ¶ 55.  When the Dutch East Indies became the independent nation of Indonesia in 1949, western Timor became part of that country, while East Timor remained a Portuguese colony.

In 1960, the United Nations General Assembly (with the United States voting in support) declared colonialism to be inconsistent with the U.N. Charter, and proclaimed the necessity of speedily ending colonialism.  *See* G.A. Res. 1514(XV) (attached at Tab 3).  The next day, the General Assembly specifically identified Timor as one of the colonial administrations of Portugal that should be speedily ended.  *See* G.A. Res. 1541(XV) (attached at Tab 3).

B.      **Conflicting claims to the Timor Sea seabed**

The seabed boundary between Australia and the islands to its north has long been unsettled.  As early as 1953, Australia asserted sovereignty over its "continental shelf," which extended to the mid-point of the Timor Trough, an underwater geological feature separating the land masses of Australia on the south and Timor on the north.  Am. Compl. ¶ 60.

---

notice applies, among other things, to "historical documents, documents contained in the public record, and reports of administrative bodies," *Menominee Indian Tribe of Wis. v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998), "the public acts of the legislature and executive, although those acts are not formally put in evidence, nor in accord with the pleadings," *Jones v. United States*, 137 U.S. 202, 214 (1890), and relevant provisions of foreign law and foreign treaties, *see, e.g.*, *Del Commercial Props., Inc. v. Commissioner*, 251 F.3d 210, 215-16 (D.C. Cir. 2001).  And a "court may consider judicially noticed documents without converting a motion to dismiss into a motion for summary judgment."  *Menominee*, 161 F.3d at 456.

That position put Australia on a collision course with both Indonesia (which controlled western Timor) and Portugal (which controlled East Timor). In the early 1970s, Australia and Indonesia resolved their differences on this score by entering into a series of agreements that established the seabed boundary between the two nations. *See* Agreement, May 18, 1971, Austl.-Indon., 1973 Austl. T.S. No. 31 (attached at Tab 4); Agreement, Oct. 9, 1972, Austl.-Indon., 1973 Austl. T.S. No. 32 (attached at Tab 5); Am. Compl. ¶ 61. That boundary generally reflects the Australian land mass' prolongation into the seabed, to the point where it begins to drop into the Timor Trough. *See* Map (attached at Tab 6)<. That boundary, however, was not continuous, because the territory of East Timor interrupts the adjacency of Australia and Indonesia, creating the so-called "Timor Gap." *See* Am. Compl. ¶ 61.

Australia and Portugal asserted conflicting claims to the Timor Gap. Australia "sought unsuccessfully to negotiate with Portugal" to draw the seabed boundary, *id.* at ¶ 4, and "express[ed] disapproval to Portugal as to [Portugal's] assertion of sovereignty for the offshore sea area to the equidistant point between Australia and East Timor," *id.* at ¶ 64. In 1973, "the Australian Department of Foreign Affairs wrote to Portugese [*sic*] Ambassador Wemans, proposing that negotiations between Australia and Portugal should commence early thereafter to negotiate maritime boundaries in the Timor Sea," and "[t]he Australian Minister for Minerals and Energy … advised Parliament … that discussions with Portugal relating to the seabed would likely commence later that year." *Id.*; *see also id.* at ¶¶ 73-74, 90 (describing Australian policy on negotiations with Portugal over Timor Gap).

## C.    The Portuguese colonial concession

In 1968, Petrotimor petitioned Portugal (then ruled by military dictator Antonio de Oliveira Salazar) for a concession to exploit oil and natural gas in the Timor Sea. *See id.* at ¶ 57. In August 1972, "the Portuguese Ministry of Overseas granted a provisional concession to

[Petrotimor] …, but indicated that a final approval awaited the investigation of a special subcommittee to determine the legality of the concession." *Id.* at ¶ 63. In January 1974, Portugal "issued Decree No. 25-74, Article I, which authorized the Portugese [*sic*] Ministry of Overseas to grant the concession to [Petrotimor]." *Id.* at ¶ 65. This action by Portugal sparked "a strong diplomatic protest from Australia. Australian Prime Minister Gough Whitlam, on March 25, 1974, stated in a television interview that the Australian government has formally protested Portugal's 'encroachment' into offshore resources." *Id.*

In April 1974, the 48-year military dictatorship in Portugal was overthrown, and "Portugal began a rapid and disorganized decolonization process in most of its overseas territories, including East Timor." U.S. Dep't of State, *Background Note: East Timor* (attached at Tab 7), at 2.

Notwithstanding its imminent withdrawal from East Timor (and Australia's protests), Portugal formally granted the Petrotimor concession in December 1974. *See* Am. Compl. ¶ 66. That concession, according to the amended complaint, "awarded Plaintiffs the exclusive rights to explore for and extract any oil, natural gas or other hydrocarbon products in a 14.8 million acre area of the south shore of East Timor in the Timor Gap." *Id.* According to the amended complaint, Petrotimor "undertook extensive research and study, including gathering seismic information and preparing detailed prospect maps in preparation for exploratory drilling in the Timor Sea." *Id.* at ¶ 57; *see also id.* at ¶ 72.

### D. The Portuguese withdrawal and the Indonesian occupation and annexation

The Portuguese withdrawal from East Timor was, to put it mildly, chaotic. Competing factions vied for control until, on November 28, 1975, the leftist Fretilin faction seized control and proclaimed independence. U.S. Dep't of State, *Background Note* (Tab 7), at 2.

Ten days later, on December 7, 1975, Indonesian forces moved into East Timor. Am. Compl. ¶ 97. According to the amended complaint, "[m]embers of the Indonesian military removed, under threat of violence and death, Plaintiffs' highly proprietary and confidential data collected during its exploration in the Timor Sea" from Petrotimor's offices in Dili. *Id.* at ¶ 98.

By proclamation dated July 17, 1976, Indonesia formally annexed East Timor into its territory as its twenty-seventh province. *Id.* at ¶ 101. According to East Timor's Foreign Minister, Nobel Peace Laureate Jose Ramos-Horta, "Petrotimor did not seek to enforce its concession during East Timor's years of Indonesian occupation, or to challenge that occupation in any manner." Ramos-Horta, *Suit a Distraction* (Tab 1), at 2.

### E. United States policy regarding the Indonesian occupation and annexation of East Timor

From the beginning, and through both Republican and Democratic administrations, the U.S. government accepted the Indonesian annexation of East Timor. Indeed, President Gerald Ford and Secretary of State Henry Kissinger were visiting Indonesia on the day before the invasion, were told of the impending action, and expressed no opposition. *See* U.S. Dep't of State Telegram, *Ford-Suharto Meeting* (Dec. 6, 1975) (attached at Tab 8).

That position did not change under the Carter, Reagan, George H.W. Bush, or Clinton Administrations: "The [Ford] administration accepted this situation [Indonesia's annexation of East Timor]. It was not questioned so far as the U.S. Government was concerned at that time. This is a decision that is not being contested by the present [Carter] administration—*Timor has effectively became a part of Indonesia*." Statement of Robert B. Oakley, Deputy Ass't Sec'y of State for East Asian & Pacific Affairs (Mar. 17, 1977) (attached at Tab 9), at 43 (emphasis added); *see also* Test. of George H. Aldrich, Deputy Legal Adviser, U.S. Dep't of State (July 19, 1977) (attached at Tab 10), at 64 ("As a political matter, the United States has recognized the

annexation of East Timor *and the legality of the exercise of sovereignty there by the Indonesian Government*.") (emphasis added); Statement of John H. Holdridge, Ass't Sec'y of State for East Asian & Pacific Affairs (Sept. 14, 1982) (attached at Tab 11), at 48, 54 ("U.S. Policy with regard to East Timor has been consistent through three administrations. *We accept the incorporation of East Timor into Indonesia*, without recognizing that a valid act of self-determination has taken place there.") (emphasis added); *see also* Statement by Kenneth Quinn, Deputy Ass't Sec'y of State for East Asian & Pacific Affairs (March 6, 1992) (attached at Tab 12), at A53 ("Previous administrations fashioned a policy which has been followed consistently on a bipartisan basis: We accept Indonesia's incorporation of East Timor, without maintaining that a valid act of self-determination has taken place."); Statement of Winston Lord, Ass't Sec'y of State for East Asian & Pacific Affairs (Sept. 16, 1996) (attached at Tab 13) ("As you are aware, the United States accepts the incorporation of East Timor without maintaining that a valid act of self-determination has taken place."). The United States underscored this bipartisan policy at the United Nations, by consistently opposing General Assembly resolutions that "[r]eject[ed] the claim that East Timor has been integrated into Indonesia … [and] call[ed] upon the Government of Indonesia to withdraw all its forces from the Territory." G.A. Res. 31/53 (Dec. 1, 1976); 32/34 (Nov. 28, 1977), 33/39 (Dec. 13, 1978), 34/40 (Nov. 21, 1979), 35/27 (Nov. 11, 1980), 36/50 (Nov. 24, 1981), 37/30 (Nov. 23, 1982) (attached at Tab 14); Votes (attached at Tab 15).

### F.     The Timor Gap Treaty

As noted above, Australia and Portugal had previously disputed their seabed boundary in the Timor Gap, and that dispute had not been resolved before Indonesia's annexation of East Timor. After several years of unsuccessful discussions, Australia and Indonesia also proved unable to close the "Timor Gap." They did, however, agree on an arrangement to cooperate in the development of natural resources in the disputed areas.

Thus, in December 1989, Indonesia and Australia signed the Timor Gap Treaty, which took effect on February 9, 1991. *See* Treaty on the Zone of Cooperation, Dec. 11, 1989, Austl.-Indon., 1991 Austl. T.S. No. 9 (attached at Tab 16); Am. Compl. ¶¶ 133, 136. That Treaty negated the validity of all previous unilateral concessions in the disputed area—including not only the Portuguese colonial concession but also concessions granted by Australia—by establishing a "Zone of Cooperation" in the disputed area under the control of a Joint Authority with the exclusive authority to grant concessions for the development of natural resources (with royalties to be divided equally between Australia and Indonesia). Treaty art. 2(2)(a); Annex B, art. 4(1); Am. Compl. ¶¶ 133, 135. Under the Treaty, the Joint Authority awarded concessions pursuant to competitive bidding to, among others, various ConocoPhillips entities and their partners. *Id.* at ¶ 144. According to the amended complaint, Pertamina—the Indonesian state-owned petroleum company—"provided to ConocoPhillips the survey and geological data previously prepared by Plaintiffs and stolen by the Indonesian military from Timor Oil's office in Dili in 1975." *Id.* at ¶ 145.

In 1991, Portugal brought suit against Australia in the International Court of Justice (ICJ), challenging Australia's entry into the Timor Gap Treaty with Indonesia on the ground that the Indonesian invasion and annexation of East Timor was unlawful. *East Timor (Port. v. Austl.*), 1995 I.C.J. 90 (June 30) (attached at Tab 17). The ICJ, however, dismissed Portugal's claim on the ground that it "would necessarily have to rule upon the lawfulness of Indonesia's conduct as a prerequisite for deciding on Portugal's contention that Australia violated its obligation to respect Portugal's status as administering Power," and Indonesia was not a party before the court. *See id.* Australia subsequently withdrew from the ICJ's jurisdiction with respect to maritime boundary disputes. *See* Am. Compl. ¶¶ 10, 191.

### G. United Nations administration

Indonesia's longtime President Suharto was deposed in 1998, and the new Indonesian regime for the first time expressed a willingness to accept self-determination for East Timor. Am. Compl. ¶¶ 155-57.  In May 1999, Portugal and Indonesia agreed for elections to be held to allow the East Timorese people to decide the future status of their territory.  *See Question of East Timor: Report of the Secretary General* (attached at Tab 18).  Popular elections were held in August 1999, and a decisive majority of the people of East Timor voted for independence.  *See* Am. Compl. ¶¶ 105, 160.  In October 1999, the United Nations Security Council adopted Resolution 1272, establishing the United Nations Transitional Administration in East Timor ("UNTAET") and endowing that agency with plenary sovereignty over East Timor, including "all legislative and executive authority, including the administration of justice," during a transition period to independence.  *See* U.N. Sec. Council Resolution 1272  (attached at Tab 19).

One of the most important issues facing the emerging nation was the status of the Timor Gap Treaty.  While East Timorese leaders took the position that the Indonesian invasion was unlawful, and hence the Timor Gap Treaty was null and void, *see* Am. Compl. ¶¶ 164-67, they did not want to halt the ongoing oil and gas projects that offered a glimmer of economic hope for their otherwise destitute country.  They managed to address these competing concerns through a diplomatic masterstroke: an Exchange of Notes and Memorandum of Understanding between the UNTAET (acting on behalf of East Timor) and Australia.  *See* Exchange of Notes, Feb. 10, 2000, Austl.-U.N.T.A.E.T., 2000 Austl. T.S. No. 9 (attached at Tab 20); Am. Compl. ¶ 170.  By not continuing the Timor Gap Treaty itself, the Exchange of Notes accommodated the East Timorese insistence that the Treaty was illegal.  But by ratifying *the terms* of the Treaty and actions taken in furtherance thereof, the Exchange of Notes accommodated the Australian diplomatic position and the financial interests of both nations and the commercial parties who

10

had already invested substantial sums in reliance on the Treaty. Thereafter, Australia passed the Timor Gap Treaty (Transitional Arrangements) Act of 2000, "which formalized recognition that the area covered by the former Timor Gap Treaty would be outside of Indonesia's jurisdiction and that the Timor Gap Treaty would cease to be in force as between Australia and Indonesia." Am. Compl. ¶ 171. The Act "also formally recognized continuing the structure of the Joint Authority, replacing Indonesia with [UNTAET]." *Id.*

### H. East Timorese independence and the Timor Sea Treaty

East Timor formally celebrated its independence on May 20, 2002. *See* U.S. Dep't of State, *Background Note: East Timor* (Tab 7), at 3. The Constitution of East Timor, which entered into force on that day, provides that "[t]he resources of the soil, the subsoil, the territorial waters, the continental shelf and the exclusive economic zone, which are essential to the economy, shall be owned by the State and shall be used in a fair and equitable manner in accordance with national interests." E. Timor Const. (attached at Tab 21) § 139(1). And, following up on that provision, the Constitution specifically nullifies any previous concessions not ratified by the new independent government: "The Democratic Republic of East Timor shall not recognize any acts or contracts concerning the natural resources referred to in item 1 of Section 139 entered into or undertaken prior to the entry into force of the Constitution which are not confirmed by the competent bodies after the Constitution enters into force." E. Timor Const. (Tab 21) § 158(3).

Pursuant to these provisions, on the very day of independence, the new East Timorese government and Australia signed both the Timor Sea Treaty and an Exchange of Notes continuing existing arrangements until that Treaty entered into force. *See* Timor Sea Treaty, May 20, 2002, Austl.-E.Timor, 2003 Austl. T.S. No. 13 (attached at Tab 22); Exchange of Notes, May 20, 2002, Austl.-E.Timor, 2002 Austl. T.S. No. 11 (attached at Tab 23); Am. Compl. ¶ 199.

Like the Timor Gap Treaty between Australia and Indonesia, that Treaty did not resolve the disputed seabed boundary. Rather, the Treaty created a "Joint Petroleum Development Area" in the disputed zone, and established the Timor Sea Designated Authority to oversee the exploration and development of mineral resources in that area, with revenues from that area to be allocated 90/10 in East Timor's favor. *See* Timor Sea Treaty; Am. Compl. ¶ 206.[2] The Designated Authority, in turn, "confirmed ConocoPhillips as the single-largest private company to participate in development of the Timor Sea resources." Am. Compl. ¶ 9. In particular, the Treaty provided that "[c]ontracts shall be offered to those corporations holding, immediately before entry into force of the Treaty, contracts numbered 91-12, 91-13, 95-19 and 96-20 in the same terms as those contracts modified to take into account the administrative structure under this Treaty, or as otherwise agreed by Australia and East Timor." Timor Sea Treaty (Tab 22) Annex F.

Because the Timor Sea Treaty did not resolve the underlying issue of the seabed boundary between Australia and East Timor, "East Timor has continued to press for commencement of negotiations concerning establishing permanent sea boundaries." Am. Compl. ¶ 209. Such negotiations are in fact now underway. *See* Statement by Prime Minister Alkatiri (Apr. 19, 2004) (attached at Tab 24).

Although Petrotimor pressed its case with the new government of independent East Timor, and "offered to fund an East Timor litigation at the International Court of Justice to

---

[2] The amended complaint does not mention the fact that the Treaty thus allocates the revenue disproportionately in East Timor's favor, and instead asserts that Australia "pressured East Timor to accept, *in effect*, only 30% of the proceeds of the *entire Timor Sea*, with 70% going to Australia." Am. Compl. ¶ 9 (emphasis added). That assertion is misleading at best, because the Timor Sea Treaty only allocates revenue from the Joint Petroleum Development Area and does not address the allocation of revenue from elsewhere in disputed areas of the Timor Sea.

pursue East Timor's seabed rights," the government refused to ratify the unilateral Portuguese colonial concession.  Thus, the amended complaint alleges that "[t]he East Timor Prime Minister refused to listen to any suggestion that the Plaintiffs' concession be recognized or that ConocoPhillips' interests should be displaced."  Am. Compl. ¶ 10; *see also id.* at ¶¶ 82, 191.

## I.       Petrotimor's Australian lawsuit

In 2001, as East Timor moved toward independence after a generation of Indonesian rule, Petrotimor suddenly emerged from the shadows by filing a lawsuit in Australia against certain ConocoPhillips entities, Australia, and the Joint Authority established under the Timor Gap Treaty, alleging that these entities had deprived Petrotimor of its rights under the Portuguese colonial concession.

The Australian court, however, dismissed that claim as presenting a nonjusticiable political question.  In particular, the court explained that, in order for the claim to succeed, "the applicants necessarily must prove that the concessions were granted to them validly by the Portuguese government.  If they were not, there could be neither expropriation nor anything of value to compensate the applicants for.  In our view, the court has no jurisdiction to determine the validity of the grant of the concessions by the Portuguese government."  *Petrotimor v. Australia*, 126 F.C.R. 354, 369, 2003 WL 259335 (Feb. 3, 2003) (attached at Tab 25) ¶ 44. Petrotimor originally filed for leave to appeal from that judgment to the High Court of Australia, but subsequently withdrew that application before it was decided.  *See* Notice of Discontinuance of Application for Special Leave to Appeal, Nos. S68 of 2003 & S212 of 2003 (Feb. 5, 2004) (attached at Tab 26).

## J.       This lawsuit

Undaunted by the failure of their Australian lawsuit, plaintiffs have now filed this lawsuit in, of all places, Washington, D.C.  The 104-page amended complaint lays out a conspiratorial

tale whereby the ConocoPhillips defendants, aided and abetted by Australia, Indonesia, and East Timor, "stole Plaintiffs' oil and natural gas rights granted by Portugal." Am. Compl. ¶ 3. The amended complaint separately names twenty-four (24) ConocoPhillips entities (including both current and former subsidiaries), *see id.* at ¶¶ 14-41, as well as the Timor Gap Joint Authority created by the Timor Gap Treaty (an entity no longer in existence), *see id.* at ¶¶ 42-45, the Timor Sea Designated Authority (which currently oversees the development of natural resources in the disputed area), *see id.* at ¶¶ 46-49, two Indonesian state-owned petroleum companies, PT Pertamina and BP MIGAS, *see id.* at ¶¶ 50-52, and fifty "Doe" defendants, *see id.* at ¶¶ 53-54.

In various permutations, the amended complaint accuses these defendants of violating and conspiring to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO") and at least seven "predicate offense" statutes (Counts I and II), violating the Robinson-Patman Act (Count III) and the Lanham Act (Count IV), misappropriating trade secrets (Count V), intentionally interfering with contract (Count VI) and prospective economic advantage (Count VII), conversion (Count VIII), unjust enrichment (Count IX), and unfair competition (Count X). By way of relief, the amended complaint seeks damages of at least $10.5 billion—plus trebling of damages under RICO and antitrust statutes or doubling of damages under District of Columbia law—and punitive damages in an unspecified amount. *See id.* at ¶¶ 291-300. The amended complaint also asks for disgorgement and the imposition of a constructive trust over all improperly obtained revenue, *id.* ¶¶ 296-97, and for interest and costs, *id.* ¶¶ 299-300.

This motion to dismiss follows.

## ARGUMENT

This Court should dismiss this entire case under Rule 12(b) for three fundamental reasons: (1) the resolution of plaintiffs' claim to ownership of the disputed drilling rights would necessarily require this Court to adjudicate nonjusticiable political questions (as an Australian

court has already held in dismissing these same claims); (2) the resolution of plaintiffs' claims also would require this Court to invalidate the official acts of foreign sovereigns performed within their jurisdictions, including provisions of the East Timorese Constitution and several international treaties; and (3) in any event, all of plaintiffs' claims are time-barred. In addition, both the Robinson-Patman and Lanham Act claims fail as a matter of law for a variety of reasons, and this Court lacks personal jurisdiction over the current and former ConocoPhillips subsidiary defendants. These issues are addressed in turn below.

## I. PETROTIMOR'S CLAIM TO OWNERSHIP OF THE DISPUTED DRILLING RIGHTS PRESENTS NON-JUSTICIABLE POLITICAL QUESTIONS.

As a threshold matter, Petrotimor's claim that ConocoPhillips companies (aided and abetted by Australia, Indonesia, and East Timor) "stole" Petrotimor's drilling rights in the Timor Sea hinges on the resolution of nonjusticiable political questions. Because this Court lacks jurisdiction to adjudicate such questions, it should dismiss Petrotimor's claim for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1). *See, e.g., Occidental v. A Certain Cargo of Petroleum*, 577 F.2d 1196, 1201 (5th Cir. 1978).

The political question doctrine is a limit on the subject-matter jurisdiction of the federal courts. As the Supreme Court has explained, the doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 230 (1986). The Court has outlined a number of factors relevant to determining the existence of a political question: "[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department, [2] a lack of judicially discoverable and manageable standards for resolving it, [3] the impossibility of deciding without an initial policy determination of a kind clearly for

nonjudicial discretion, [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government, [5] an unusual need for unquestioning adherence to a political decision already made, and [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Baker v. Carr*, 369 U.S. 186, 217 (1962). A dispute that presents a nonjusticiable political question is simply not a "case or controversy" within the meaning of Article III, so that a court lacks jurisdiction to adjudicate it. *Marbury*, 5 U.S. at 164-66; *Occidental*, 577 F.2d at 1203.

To resolve Petrotimor's claim that it—rather than ConocoPhillips—rightfully owns the disputed drilling rights, this Court would necessarily have to resolve not only one but two questions of sovereignty—sovereignty over the disputed seabed area in the Timor Sea and sovereignty over the territory of East Timor itself—that are not susceptible to judicial resolution. Each of these is discussed in turn below.

### A. The Seabed Boundary Between East Timor And Australia Presents A Non-Justiciable Political Question.

Petrotimor's claim that it, rather than ConocoPhillips companies, is the legitimate owner of the disputed drilling rights is nonjusticiable, first and foremost, because it asks this Court to draw the seabed boundary between East Timor and Australia, and American courts are simply not in the business of drawing international boundaries. That claim, which underlies virtually every count of the amended complaint,[3] hinges on the allegation that, in light of the Portuguese

---

[3]    *See* Am. Compl. ¶ 227 (Count I, RICO); *id.* at ¶ 241 (Count II, RICO conspiracy); *id.* at ¶ 249 (Count III, Robinson-Patman Act); *id.* at ¶ 255 (Count IV, Lanham Act); *id.* at ¶ 272 (Count VI, intentional interference with contract); *id.* at ¶ 275 (Count VII, intentional interference with prospective economic advantage); *id.* at ¶ 280 (Count VIII, conversion); *id.* at ¶ 286 (Count IX, unjust enrichment); *id.* at ¶ 288 (Count X, unfair competition).

Indeed, the only counts in the amended complaint that even arguably do not, in whole or in part, hinge on Petrotimor's asserted ownership of the disputed drilling rights are three counts

colonial concession, Petrotimor owns the "exclusive rights to explore for and extract any oil, natural gas or other hydrocarbon products in a 14.8 million acre area of the south shore of East Timor in the Timor Gap."  Am. Compl. ¶ 66.  If Portugal did not enjoy sovereignty over this area in the first place, then it had no right to grant the concession, and Petrotimor correspondingly has no right to enforce the concession.  *See, e.g., Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 106 (1938); *Coffee v. Groover*, 123 U.S. 1, 23-31 (1887); *Garcia v. Lee*, 37 U.S. (12 Pet.) 511, 521-22 (1838); *Poole v. Fleeger*, 36 U.S. (11 Pet.) 185, 210 (1837).  Petrotimor, in short, can claim to own no greater right than Portugal had to give.

Accordingly, the resolution of Petrotimor's claims depends on a determination of the seabed boundary between East Timor and Australia—a question beyond the ken of an American court.  As the Supreme Court explained almost two centuries ago, "[a] question like this respecting the boundaries of nations, is, as has been truly said, more a political than a legal question."  *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 309 (1829) (Marshall, C.J.); *see also Occidental,* 577 F.2d at 1202-03 ("The resolution of a territorial dispute between sovereigns … is a political question which [courts] are powerless to decide.").  Indeed, sovereignty over the Timor Sea seabed was hotly disputed at the time Portugal granted the concession—a point Petrotimor itself acknowledges in the amended complaint.  *See* Am. Compl. ¶¶ 61, 74, 90.  Needless to say, "as a matter of international law"—not to mention common sense—"one who receives an interest in land which is in dispute between sovereigns takes subject to the dispute."

---

that allege the theft of trade secrets from Petrotimor by the Indonesian military in 1975.  *See* Am. Compl. ¶ 255 (Count IV, Lanham Act); *id.* at ¶ 265 (Count V, misappropriation of trade secrets); *id.* at ¶ 280 (Count VIII, conversion).  To the extent that ownership of these alleged trade secrets is not itself derivative from ownership of the disputed drilling rights, the counts involving trade secrets nonetheless must be dismissed for the reasons described in subsequent sections of this brief.

*Occidental*, 577 F.2d at 1202 (citing *Coffee*, 123 U.S. at 29-30; *Poole*, 36 U.S. 185). In light of the open and notorious dispute over the seabed boundary at the time Petrotimor received the concession (a dispute that continues to this day), Petrotimor certainly cannot claim a vested right with respect to the concession, or even a disruption of reasonable commercial expectations.

Petrotimor's claims thus require this Court to determine whether Portugal had the right to grant the colonial concession in the first place, which in turn requires this Court to determine the seabed boundary between East Timor and Australia. Under settled law, that determination presents a nonjusticiable political question. Indeed, it is hard to think of an issue more alien to the American judicial function than determining the boundary between foreign nations.

The Fifth Circuit made precisely this point in *Occidental*. That case, like this one, involved a dispute between two oil companies (Occidental and Buttes) over competing maritime concessions. In 1969, Occidental contracted with the sheikdom of Umm al Qaywayn for exclusive oil exploration rights within the sheikdom's territorial waters in the Persian Gulf. Likewise, Buttes contracted with the nearby sheikdom of Sharjah for an oil concession within that sheikdom's territorial waters. 577 F.2d at 1199-1200. A dispute later arose when Sharjah purported to extend the Buttes concession to the Abu Musa waters within the Occidental concession area, over which both Umm al Qaywayn and Sharjah (not to mention Iran) claimed sovereignty. *Id.* After Buttes began drilling in these waters, Occidental sued Buttes for tortious conversion. *Id.* at 1200-02.

The Fifth Circuit dismissed the case on political question grounds. The court explained that "to successfully maintain its tortious conversion action, [Occidental] would have to establish its right to possess the oil at the time of conversion." *Id.* at 1202. This Occidental could only do by proving that Umm al Qaywayn had "undisputed possession" of the area where the oil was

extracted.  *Id.*   Because sovereignty over that area was disputed, "in order to resolve [Occidental's] right to possess the oil, we would have to resolve the dispute over Abu Musa.  *The resolution of a territorial dispute between sovereigns, however, is a political question which we are powerless to decide.*"   *Id.* at 1203 (emphasis added).   The fact that the foreign sovereigns themselves were not parties to the case was immaterial: "[a]lthough sovereigns are not directly involved, a judicial pronouncement on the sovereignty of [the foreign nations with competing maritime claims] would be unavoidable."   *Id.*   In short, "[t]he ownership of lands disputed by foreign sovereigns is a political question of foreign relations, the resolution or neutrality of which is committed to the executive branch by the Constitution."   *Id.*;  *see also Occidental Petroleum Corp. v. Buttes Gas & Oil Co.*, 331 F. Supp. 92, 103 (C.D. Cal. 1971) (noting, in an earlier lawsuit between Occidental and Buttes, that "[i]n our system, the questions of what are a country's boundaries … are not for the judiciary to decide; they are political questions"), *aff'd for the reasons given by the district court*, 461 F.2d 1261 (9th Cir. 1972) (*per curiam*).

Here, as in *Occidental*, resolution of Petrotimor's claim to the disputed drilling rights would require this Court to resolve the underlying territorial dispute over the Timor Gap—a dispute originally between Australia and Portugal, then between Australia and Indonesia, and now between Australia and East Timor.   To resolve that dispute without the consent of the disputing nations, however, would be a usurpation of their sovereignty, and impermissibly intrude into the political branches' control over foreign policy.   Indeed, in light of that intractable dispute, both Australia and Indonesia, and later Australia and East Timor, set up *joint* authorities to develop natural resources in the disputed area.   For Petrotimor now to come along and ask this Court to upset this delicate political compromise, by giving effect to Portugal's unilateral concession (granted in the waning days of colonial rule in the face of vehement Australian

opposition) is wholly unwarranted. Because the United States government has never taken a position on this contentious issue, any "decision in this case … would seriously impinge on executive neutrality." *Occidental*, 577 F.2d at 1204; *see also Petrotimor v. Australia*, 126 F.C.R. at 362, 2003 WL 259335 ¶ 13 ("[T]he judiciary should ordinarily follow the Executive in matters of sovereignty over disputed territory.") (*citing Baker*, 369 U.S. at 212). "Just as the judiciary will follow an executive determination as to which nation has sovereignty over a disputed area, so must the judiciary refuse to decide the dispute in the absence of executive action because of that absence of direction." *Occidental*, 577 F.2d at 1203-04 (citing *United States v. Klintock*, 18 U.S. (5 Wheat.) 144, 149 (1820)).

"The issue of sovereignty is [also] political … because judicial or manageable standards are lacking for its determination." *Id.* at 1204. To decide the ownership of Petrotimor's concession area in the Timor Gap, this Court would need to resolve "the proper territorial water limit" and "the proper allocation of continental shelf" between Australia and East Timor. *Id.* As in *Occidental*, however, "there is no law" binding Australia and East Timor, and "no method exists to judicially resolve their disagreements." *Id.* at 1205. Petrotimor's assertion that "[u]nder any application of International Law, Australia had no claim" over the disputed seabed, Am. Compl. ¶ 183, is addressed to the wrong forum; this American Court does not sit to tell foreign nations what their boundaries are under international law.[4] "Authoritative judicial resolution of

---

[4] The 1958 Convention on the Continental Shelf, which provides that "*[i]n the absence of agreement, and unless another boundary line is justified by special circumstances*, the boundary is the median line" between two nations, Convention, Article 6 (emphasis added), does not provide a basis for adjudication. That Convention establishes a mechanism for *sovereign states* to determine their maritime boundaries, not for domestic courts to resolve international boundary disputes. *See also Occidental*, 577 F.2d at 1205 ("No manageable law exists to resolve disputed continental shelf ownership…. Resolution of disputed continental shelf can only occur by the political action of the sovereigns themselves."). The Convention does not define what are "special circumstances," and Australia takes the position that the median line is *not* the proper

international boundary disputes is a function not of domestic courts, but of international tribunals, acting upon the consent of the contestant states." *Occidental*, 331 F. Supp. at 103. Because resolution of Petrotimor's claims would require this Court to draw the seabed boundary between East Timor and Australia, this Court should dismiss those claims as non-justiciable.

### B. The Validity Of The Indonesian Annexation of East Timor Presents A Non-Justiciable Political Question.

Above and beyond the fundamental point that resolution of Petrotimor's claim to ownership of the disputed drilling rights would require this Court to draw the seabed boundary between Australia and East Timor, those claims are non-justiciable for a separate and independent reason: resolution of those claims would require this Court to determine the validity of Indonesia's exercise of sovereignty over East Timor from 1975 until 1999. Even assuming that Portugal had the right to grant Petrotimor the colonial concession in the first instance (which as explained above, presents a political question), that does not mean that any rights granted by Portugal are inviolate and perpetual. To the contrary, after Indonesia occupied and annexed East Timor, Indonesia exercised sovereignty over that territory, including the sovereign power to revoke the colonial concession and award a new concession for development of public resources.

Petrotimor's claims hinge on the premise that the Indonesian occupation and annexation of East Timor was unlawful *ab initio*, and that Portugal rather than Indonesia exercised lawful sovereign authority over East Timor until the United Nations assumed control in 1999, even

---

boundary. To be sure, East Timor disputes that position. But even East Timor recognizes that the boundary must be drawn by an international tribunal with the consent of the sovereigns. As East Timor's Prime Minister stated at the outset of the latest round of negotiations with Australia on the boundary issue, "We are so confident of the legal correctness of our position that we are prepared to have any impartial court—the International Court of Justice, the International Tribunal for the Law of the Sea, or an international arbitral tribunal—decide the matter on the merits." Statement by Prime Minister Alkatiri (Tab 24). The Prime Minister tellingly did not suggest that an *American domestic court* could or should resolve the dispute.

though Portugal withdrew in 1975. *See* Am. Compl. ¶ 3 ("Portuguese sovereignty over East Timor was recognized by the United Nations until the establishment of a United Nations Transitional Administration in 1999."); *id.* at ¶ 101 ("The United Nations refused to recognize this incorporation and took the position consistently for twenty-five years that Portugal remained the administrating power."); *id.* at ¶ 103 (same). That premise, however, *itself* presents a political question—and takes a position on that question that conflicts with a generation of United States foreign policy.

Indeed, the validity of Indonesia's exercise of sovereignty over East Timor between 1975 and 1999 presents just as much a political question as the validity of Portugal's exercise of sovereignty over the disputed seabed in the Timor Sea. "[W]ho is the sovereign, *de jure* or *de facto*, of a territory, is not a judicial, but a political, question, the determination of which by the legislative and executive departments of any government conclusively binds" the courts. *Jones v. United States*, 137 U.S. 202, 212 (1890); *see also Holmes v. Laird*, 459 F.2d 1211, 1215 n.26 (D.C. Cir. 1972) (same). The Constitution commits to the Executive Branch alone the decision whether to recognize a foreign nation's assertion of sovereignty over a particular territory. *See, e.g.*, *Baker*, 369 U.S. at 212 ("[T]he judiciary ordinarily follows the executive as to which nation has sovereignty over disputed territory."); *National City Bank of New York v. Republic of China*, 348 U.S. 356, 358 (1955) (recognition of a foreign sovereign "is a matter for determination by the Executive and is outside the competence of this Court"); *Williams v. Suffolk Ins. Co.*, 38 U.S. (13 Pet.) 415, 420 (1839) (position of executive branch regarding sovereignty of foreign nation over territory "is conclusive on the judicial department"); *Occidental*, 331 F. Supp. at 103 ("In our system, the questions … of what nation has sovereignty over a certain piece of territory, are not for the judiciary to decide; they are political questions."). Determination of which nation

exercised sovereignty over East Timor after 1975, Portugal or Indonesia, is thus a matter for the political branches of the United States government. Petrotimor's suggestion that the position of the *United Nations* is binding here, *see* Am. Compl. ¶¶ 3, 101, has no basis in principle or precedent. To the contrary, the position of the *United States* government is binding on this Court, and "'it is not material to inquire, nor is it the province of the court to determine, whether the executive be right or wrong.'" *Jones*, 137 U.S. at 213 (quoting *Williams*, 38 U.S. (13 Pet.) at 420); *see also United States v. Pink*, 315 U.S. 203, 229 (1942) ("Objections to the underlying policy as well as objections to the recognition are to be addressed to the political department and not to the courts.").[5]

Not only are questions of sovereignty committed to the political branches of the United States government, but the question posed by Petrotimor's complaint in fact long since has been answered by the Executive Branch. "As a political matter, the United States has recognized the annexation of East Timor *and the legality of the exercise of sovereignty there by the Indonesian Government*." Aldrich Test. (Tab 10). This Court thus could not declare the annexation unlawful "without expressing lack of the respect due coordinate branches of the government," and without "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Baker*, 369 U.S. at 217; s*ee also Mingtai Fire & Marine Ins. Co. v. UPS*, 177 F.3d 1142, 1145-47 (9th Cir. 1999) (holding that "whether China is the sovereign, *de jure* or *de facto*, of the territory of Taiwan is a political question," and "recogniz[ing] and defer[ring] to political departments' position that Taiwan is not bound by China's adherence to

---

[5]    In any event, Petrotimor's reliance on the position of the United Nations is ironic, because UNTAET (the United Nations entity that exercised sovereignty in East Timor between 1999 and 2002) *ratified* the concessions granted by the Timor Gap Joint Authority created by Australia and Indonesia, including the ConocoPhillips concessions at issue here, and hence *negated* the validity of the Portuguese colonial concession.

the Warsaw Convention"). For this Court to hold that Indonesia's exercise of sovereignty over East Timor between 1975 and 1999 was unlawful would thus contradict the longstanding and consistent position of the Executive Branch. The United States government must speak with one voice on political questions, and it is the voice of the political branches, not the courts.

## II. PETROTIMOR'S CLAIMS MUST BE DISMISSED UNDER THE ACT OF STATE DOCTRINE.

Just as Petrotimor's claim to ownership of the disputed drilling rights fails as a jurisdictional matter because it would require this Court to adjudicate non-justiciable political questions, all of Petrotimor's claims also fail on the merits for the separate (albeit related) reason that they would require this Court to invalidate the official acts of foreign sovereigns within their jurisdictions. Because the act of state doctrine requires this Court to accept the validity of such acts, Petrotimor has not stated a claim upon which relief can be granted, and the amended complaint should be dismissed under Rule 12(b)(6). *See, e.g., World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1164-67 (D.C. Cir. 2002); *Riggs Nat'l Corp. v. Commissioner*, 163 F.3d 1363, 1367-68 & n.5 (D.C. Cir. 1999).

The act of state doctrine, like the political question doctrine, reflects core separation-of-powers concerns: any challenge to the validity of the official acts of a foreign sovereign within its jurisdiction belongs exclusively to the political branches of the United States government, not the courts. *See, e.g., W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp.*, 493 U.S. 400, 404 (1990); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964). As the Supreme Court has explained, "'[e]very sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory.'" *Sabbatino*, 376 U.S. at 416 (quoting *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897)). The act of state doctrine thus provides that

"the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid," *Kirkpatrick*, 493 U.S. at 409, and "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory," *Sabbatino*, 376 U.S. at 401. The doctrine, which applies even where the foreign sovereign is not a party, *see, e.g., Callejo v. Bancomer*, 764 F.2d 1101, 1113 (5th Cir. 1985), fosters the policies of "international comity, respect for the sovereignty of foreign nations on their own territory, and the avoidance of embarrassment to the Executive Branch in its conduct of foreign relations," *Kirkpatrick*, 493 U.S. at 408; *see also Oetjen v. Central Leather Co.*, 246 U.S. 297, 304 (1918) ("To permit the validity of the acts of one sovereign State to be reexamined and perhaps condemned by the courts of another would very certainly imperil the amicable relations between governments and vex the peace of nations.").

To resolve Petrotimor's claims, this Court would necessarily have to invalidate multiple sovereign acts of state, including (1) the acts of Australia, Indonesia, and East Timor in nullifying the Portuguese colonial concession on which Petrotimor bases its claims and granting and/or ratifying a supervening concession to ConocoPhillips companies, and (2) the alleged acts of Indonesia in expropriating Petrotimor's trade secrets and giving them to ConocoPhillips companies. Each of these points is discussed in turn below.

### A. Petrotimor's Claim To Ownership Of The Disputed Drilling Rights Necessarily Challenges The Validity Of The Sovereign Acts Of Australia, Indonesia, and East Timor.

As noted above, most counts in the amended complaint hinge on the proposition that Petrotimor, rather than ConocoPhillips, is the rightful owner of the disputed drilling rights at issue here. *See supra* n.3. Validating Petrotimor's claim to rightful ownership, however, necessarily would involve invalidating the sovereign acts of Australia, Indonesia, and East Timor nullifying that claim and granting and/or ratifying ConocoPhillips companies' petroleum

production rights. Indeed, the amended complaint is quite explicit on this score, lumping ConocoPhillips companies together with Australia, Indonesia, and East Timor as co-conspirators in the "theft" of rights granted to Petrotimor by Portugal. *See, e.g.*, Am. Compl. ¶ 3 ("[O]ver a thirty-year period …, Australia, Indonesia and ConocoPhillips, with varying efforts at different times, stole Plaintiffs' oil and natural gas rights granted by Portugal, on behalf of its East Timor province."); *id.* at ¶¶ 8, 176-79, 190-95, 201-02 (alleging that independent East Timor ratified ConocoPhillips' drilling rights as the result of bribery). The act of state doctrine, however, requires this Court to accept the validity of the sovereign acts of Australia, Indonesia, and East Timor, and their official agencies and instrumentalities, in nullifying the Portuguese colonial concession, and granting and/or ratifying the supervening ConocoPhillips concession.

As the D.C. Circuit recently explained in *World Wide Minerals*, a foreign government's act of granting (or revoking) the right to develop natural resources within its territory is inherently sovereign in nature, and hence cannot be invalidated by an American court. 296 F.3d at 1164-67. In that case, a private company sued the government of Kazakhstan for allegedly breaching a contract by refusing to issue a uranium export license. This Court dismissed the lawsuit, and the D.C. Circuit affirmed, explaining that the claims necessarily challenged the validity of the Kazakhstani government's exercise of sovereignty over its natural resources. *See id.* at 1165 (noting "'the principle of supreme state sovereignty over natural resources'") (quoting *International Ass'n of Machinists v. OPEC*, 649 F.2d 1354, 1361 (9th Cir. 1981)); *id.* ("'[N]atural resources, to the extent they are affected with the public interest, are goods in which only the sovereign may deal.'") (quoting *Rush-Presbyterian-St.Luke's Med. Ctr. v. Hellenic Republic*, 877 F.2d 574, 578 (7th Cir. 1989)); *id.* ("'[L]icensing the exploitation of natural resources is a sovereign activity.'") (quoting *MOL, Inc. v. People's Republic of Bangladesh*, 736

F.2d 1326, 1328 (9th Cir. 1984)).  The act of state doctrine thus precludes an American court from "instructing a foreign sovereign to alter its chosen means of allocating and profiting from its own valuable natural resources."  *OPEC*, 649 F.2d at 1361.

As Petrotimor itself recognizes, "[t]he oil and natural gas located in the Timor Sea are, without question, the most significant natural resource in the area."  Am. Compl. ¶ 8.  The decisions by East Timor, Australia, and Indonesia about how best to develop those natural resources thus represent quintessential acts of state.[6]  As noted above, the East Timorese Constitution vests the ownership of maritime drilling rights in the State, *see* E. Timor Const. (Tab 21) § 139(1), and specifically nullifies "any acts or contracts" regarding such rights "entered into or undertaken prior to the entry into force of the Constitution which are not confirmed by the competent bodies after the Constitution enters into force," *id.* § 158(3).  Pursuant to these provisions, the government of independent East Timor nullified the Portuguese colonial concession by entering into the Timor Sea Treaty with Australia, which ratified the concessions granted under the Timor Gap Treaty between Australia and Indonesia, including the ConocoPhillips concessions at issue here.  Pursuant to these treaties, the *only* valid concessions in the area are those granted through the treaty framework—not only the Portuguese colonial concession, but previous unilateral concessions granted by Australia were nullified (and, indeed, Australia was sued in its own courts for just this reason*, see Australia v. WMC Res. Ltd.*, 194 C.L.R. 1, 1998 WL 1672151 (Austl. Feb. 2, 1998) (attached at Tab 27)).  To accept Petrotimor's

---

[6]   Precisely because the relevant acts of state at issue here are clearly sovereign in nature, this Court need not decide whether the act of state doctrine contains a "commercial activity" exception.  *See, e.g., World Wide Minerals*, 296 F.3d at 1166 & n.20 ("The existence of such an exception is an unsettled question that this court has never addressed."); *cf. Honduras Aircraft Registry, Ltd. v. Government of Honduras*, 129 F.3d 543, 550 (11th Cir. 1997) ("[T]here is no commercial exception to the act of state doctrine as there is under the [Foreign Sovereign Immunities Act]."); *OPEC*, 649 F.2d at 1360 (same).

claims thus would be to invalidate not only provisions of East Timor's Constitution but also the Timor Gap and Timor Sea Treaties, and to hold that the sovereign nations of East Timor, Indonesia, and Australia are powerless to nullify the last-minute Portuguese colonial concession. The act of state doctrine, however, requires this Court to accept the validity of these official acts of foreign sovereigns.

The Timor Gap and Timor Sea Treaties established bilateral entities—the Timor Gap Joint Authority ("Joint Authority") and the Timor Sea Designated Authority ("Designated Authority"), respectively—to exercise the signatory nations' sovereign power over natural resources in the disputed area. The Joint Authority in fact exercised such power in 1991 by granting the ConocoPhillips concessions pursuant to a competitive bidding process. *See* Am. Compl. ¶¶ 42, 133-44. When the United Nations assumed sovereignty over East Timor after the pro-independence vote in 1999, the United Nations Transitional Authority in East Timor ("UNTAET") and Australia "signed an Exchange of Notes on February 10, 2000 which provided for an interim agreement to continue the terms of the Timor Gap Treaty previously entered into with Indonesia." *Id.* at ¶ 170. Thereafter, Australia passed the Timor Gap Treaty (Transitional Arrangements) Act of 2000, "continuing the structure of the Joint Authority, replacing Indonesia with [UNTAET]." *Id.* ¶ 171. And, after East Timorese independence, the Designated Authority created by the Timor Sea Treaty exercised sovereign authority in 2002-03 by "confirm[ing] ConocoPhillips as the single-largest private company to participate in development of the Timor Sea resources." Am. Compl. ¶ 9; *see also id.* at ¶¶ 46, 201.

Petrotimor cannot "plead around" the legal point that Australia, Indonesia, and East Timor thereby exercised sovereign power over natural resources by simply characterizing the Joint Authority and the Designated Authority as "separate and distinct non-governmental

business entit[ies]."  Am. Compl. ¶ 206; *see also id.* at ¶¶ 6, 138, 141 (describing the Joint Authority as a "commercial entity" and a "business entity"); *id.* at ¶ 9 (characterizing the Designated Authority as "a non-governmental, commercial entity … similar to the entity previously formed by Australia and Indonesia").  As explained in *World Wide Minerals*, the granting (or revoking) of licenses to develop natural resources is an inherently sovereign function.  *See* 296 F.3d at 1165.  The fact that both the Joint Authority and the Designated Authority exercised the sovereign power of multiple nations (Australia and Indonesia, and Australia and East Timor, respectively) in granting the ConocoPhillips concession does not negate the sovereign nature of the acts: countries (just like States) can exercise their sovereignty through joint entities.  *See, e.g., Morris v. WMATA*, 781 F.2d 218, 222 (D.C. Cir. 1986).  Here, Australia, on the one hand, and Indonesia and East Timor, on the other, agreed to disagree about their boundary in the Timor Sea, and established the Joint Authority and the Designated Authority to exercise the sovereign functions that a single nation would exercise unilaterally if the area were within its exclusive and unquestioned dominion.  These nations simply chose to defuse a potentially explosive situation by exercising their sovereignty jointly pursuant to duly ratified international treaties, rather than unilaterally (as did Portugal).

For much the same reasons, the relevant acts of state here took place "within the territory" of the foreign sovereigns.  That doctrinal requirement reflects the fact that the act of state doctrine shields the official acts of foreign sovereigns *within their spheres of sovereignty*. *See, e.g.*, *Callejo*, 764 F.2d at 1121-22.  Here, the relevant foreign sovereigns carried out joint official acts precisely because they could not agree on the precise contours of their respective jurisdictions.  Wherever the boundary separating Australia, on the one hand, from Indonesia and East Timor, on the other, may ultimately be deemed to lie, there is no question that the disputed

official acts at issue took place within the territory of at least one of the relevant nations. There is no question here, in other words, of a foreign nation seeking to *extend* its sovereignty beyond its borders, *see, e.g., Liu v. Republic of China*, 892 F.2d 1419, 1433 (9th Cir. 1989); *Republic of Iraq v. First Nat'l City Bank*, 353 F.2d 47, 51 (2d Cir. 1965); rather, the nations here exercised joint sovereignty over a disputed area precisely because the boundary is unclear.

Moreover, like *World Wide Minerals*, "this is plainly a case in which the policies underlying the [act of state] doctrine 'justify its application.'" 296 F.3d at 1165 (quoting *Kirkpatrick*, 493 U.S. at 409). Through the Timor Gap and Timor Sea Treaties, Australia, Indonesia, and East Timor worked out a diplomatic compromise to address their respective boundary disputes and jointly develop the natural resources in the Timor Sea. The Executive Branch of the U.S. Government has never expressed any doubt as to the validity of those Treaties, or the concessions awarded thereunder. For this Court effectively to invalidate the Treaties, and the careful compromises they reflect, by enforcing the Portuguese colonial concession as if the Treaties did not exist "would both disrupt international comity and interfere with the conduct of foreign relations by the Executive Branch." *Id.* "'It is clear that judicial scrutiny of sovereign decisions allocating the benefits of oil development would embarrass the political branches of our government in the conduct of foreign policy.'" *Id.* at 1165-66 (quoting *Clayco Petroleum Corp. v. Occidental Petroleum Corp.*, 712 F.2d 404, 408 (9th Cir. 1983)).

### B. Petrotimor's Claim To The Alleged Expropriation Of Trade Secrets Necessarily Challenges The Validity Of The Sovereign Acts Of Indonesia.

To the extent that some counts of the amended complaint hinge in whole or in part on the proposition that Petrotimor, rather than ConocoPhillips companies, is the rightful owner of trade secrets allegedly stolen from Petrotimor by the Indonesian military in 1975, *see supra* n.3, those counts are also barred by the act of state doctrine. Validating Petrotimor's claim to rightful

ownership, after all, necessarily would invalidate the sovereign acts of Indonesia in allegedly expropriating those trade secrets during its occupation of East Timor.

Again, the amended complaint is quite specific on this score, alleging that (1) "*[m]embers of the Indonesian military* removed, under threat of violence and death, Plaintiffs' highly proprietary and confidential data collected during its exploration in the Timor Sea" from Petrotimor's offices in Dili, Am. Compl. ¶ 98 (emphasis added), and (2) the Indonesian government subsequently gave this expropriated property to ConocoPhillips, *see id.* at ¶¶ 7, 145. The act of state doctrine, however, requires this Court to accept an act of expropriation by agents of a foreign government (regardless of whether it had yet been recognized by the United States) within its own territory. *See, e.g., Ricaud v. American Metal Co.*, 246 U.S. 304, 309 (1918) (deeming acts of revolutionary general, fighting on behalf of faction that later took power, to be official acts of a foreign sovereign that must be deemed valid under the act of state doctrine); *Oetjen*, 246 U.S. at 302-03 (same); *Underhill*, 168 U.S. at 252-53 (same). Indeed, "expropriation of property is the *classic* act of state addressed in the case law." *World Wide Minerals*, 296 F.3d at 1166 (emphasis added); *see also Dayton v. Czechoslovak Socialist Republic*, 834 F.2d 203, 206 (D.C. Cir. 1987) (expropriation claims involve the "*paradigmatic* setting for the act of state doctrine," and "present a *prime* case for invocation of the doctrine") (emphasis added). Thus, "the Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government." *Sabbatino*, 376 U.S. at 428.

Petrotimor cannot avoid this point by simply contesting the validity of the Indonesian occupation of East Timor, and thus arguing that the challenged acts did not take place "within the territory" of Indonesia. For the reasons discussed in detail above, whether or not Indonesia

validly exercised sovereignty over East Timor from 1975 until 1999 presents a non-justiciable political question.  The Executive Branch made its position on this point abundantly clear: "As a political matter, the United States has recognized the annexation of East Timor *and the legality of the exercise of sovereignty there by the Indonesian Government*."  Aldrich Test. (Tab 10) (emphasis added).  This Court cannot now, by accepting Petrotimor's claims, rewrite history with respect to United States policy toward the Indonesian annexation of East Timor.

## III.    PETROTIMOR'S CLAIMS ARE MANIFESTLY TIME-BARRED.

Even assuming, *arguendo*, that Petrotimor could surmount the non-justiciability and act-of-state hurdles described above, the amended complaint should still be dismissed because all of Petrotimor's claims are time-barred.  Given that Indonesia occupied East Timor in 1975, that the Timor Gap Treaty between Indonesia and Australia became effective in 1991, and that ConocoPhillips companies were awarded supervening concessions that same year, any applicable statutes of limitations for Petrotimor's claims ran many years before the original complaint was filed in March 2004.  As East Timor's Foreign Minister, Nobel Peace Laureate Jose Ramos-Horta recently noted, "Petrotimor did not seek to enforce its concession during East Timor's years of Indonesian occupation, or to challenge that occupation in any manner.  Indeed, nothing was heard from Petrotimor or Oceanic until August 21, 2001, when they filed a claim in an Australian court."  Ramos-Horta, *Suit a Distraction* (Tab 1), at 2.  Although the amended complaint alleges that plaintiffs "pursue[d] recognition of and enforcement of their rights to the oil and gas underneath the Timor Sea" during the years of the Indonesian occupation, Am. Compl. ¶ 77, it cannot and not does allege that they ever took any *legal* action.

Having allowed a generation to pass before bringing this lawsuit, during which time ConocoPhillips companies made an enormous investment in developing the disputed oil fields, plaintiffs cannot show up—now that the ConocoPhillips companies' investment is finally

bearing fruit—to allege true ownership. Indeed, although the amended complaint is over 100 pages long, it tellingly provides *no reason whatsoever* to justify Petrotimor's remarkable delay. Accordingly, this Court should dismiss the claims under Rule 12(b)(6) for failure to state a claim on which relief can be granted.

### A.  Petrotimor's RICO Claims Are Time-Barred.

Petrotimor's efforts to state claims under RICO, *see* Am. Compl. ¶¶ 225-45, fail as a threshold matter because any such claims are manifestly untimely. The statute of limitations for civil RICO claims is four years. *See Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987). That statute starts to run (at the very latest) on discovery of the *injury* on which the claim is based—neither upon knowledge of the alleged "pattern" of RICO activity, *see Rotella v. Wood*, 528 U.S. 549, 554-61 (2000), nor upon the occurrence of the "last predicate act," *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 186-91 (1997); *cf. Rotella*, 528 U.S. at 554 n.2 (noting that the Supreme Court has not decided whether *occurrence* of injury or *discovery* of injury triggers limitations period); *Klehr*, 521 U.S. at 198 (Scalia, J., concurring) (advocating *occurrence* of injury rule); *Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1489-90 (D.C. Cir. 1989) (assuming, but not deciding, that injury *discovery* rule applies).

Here, it makes no difference whether an injury *occurrence* rule or the more generous injury *discovery* rule applies, because Petrotimor manifestly knew, or should have known, of its alleged injuries before March 1, 2000—four years before it filed the original complaint. As noted above, the amended complaint alleges two distinct injuries: (1) the deprivation of alleged trade secrets and (2) the deprivation of the Portuguese colonial concession. *See supra* n.3. Petrotimor undoubtedly knew, or had reason to know, about the first deprivation in 1975. *See* Am. Compl. ¶¶ 97-98. And Petrotimor undoubtedly knew, or had reason to know, about the second deprivation no later than 1991, when Australia and Indonesia nullified the Portuguese

colonial concession through the Timor Gap Treaty, and the Joint Authority granted supervening concessions to ConocoPhillips companies, among others. *See id.* at ¶¶ 133-36, 144. The knowledge standard is objective, not subjective, so even if Petrotimor were somehow to claim actual ignorance of its injuries, that would not matter, because any such ignorance would be objectively unreasonable. *Klehr*, 521 U.S. at 193.

Nor has Petrotimor suggested any legal doctrine that might toll the limitations period, and any such suggestion would be implausible, given that Petrotimor undoubtedly had full knowledge of the injuries alleged in the amended complaint no later than 1991. Any allegation that defendants "fraudulently concealed" their misconduct from the plaintiffs would thus be legally irrelevant, because (to say the least) Petrotimor could have discovered its alleged injuries through the exercise of due diligence. *See, e.g., id.* at 193-96 ("[A] plaintiff who is not reasonably diligent may not assert fraudulent concealment."); *Wood v. Carpenter*, 101 U.S. 135, 143 (1879). Indeed, Petrotimor itself acknowledges in the amended complaint that, "[b]eginning in 1976," it attempted "to get the appropriate Indonesian authorities to acknowledge Oceanic's interest in and rights to the oil and gas resources under the Timor Sea," Am. Compl. ¶ 78, but gives no justification for its delay in filing this lawsuit until 2004.

**B.    Petrotimor's Robinson-Patman Act Claim Is Time-Barred.**

Petrotimor's efforts to state a claim under the Robinson-Patman Act, *see* Am. Compl. ¶¶ 246-50, also fail as a threshold matter because any such claim is manifestly untimely. The statute of limitations for Robinson-Patman Act claims (like the statute of limitations for civil RICO claims) is four years, *see* 15 U.S.C. § 15b—indeed, the Supreme Court "borrowed" the RICO statute of limitations from the Clayton Act provision applicable to Robinson-Patman Act claims, *see Agency Holding*, 483 U.S. at 150-56. The Robinson-Patman statute of limitations "begins to run when a defendant *commits* an act that injures a plaintiff's business," not when the

plaintiff *discovers* any such injury. *Klehr*, 521 U.S. at 188 (emphasis added; citing, *inter alia*, *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971); *Connors v. Hallmark & Son Coal Co.*, 935 F.2d 336, 342 n.10 (D.C. Cir. 1991)).

Thus, Petrotimor's Robinson-Patman Act claim is untimely unless defendants committed an act that injured Petrotimor in its business at some point on or after March 1, 2000—four years before it filed the original complaint. Again, Petrotimor cannot possibly meet this standard. As noted above, Petrotimor's alleged injuries (both from the alleged deprivation of trade secrets and the Portuguese colonial concession) were complete no later than 1991.

Petrotimor cannot avoid this straightforward point by relying on a "continuing violation" theory. *See Zenith*, 401 U.S. at 338. "Even when a plaintiff alleges a continuing violation, an overt act by the defendant is required to restart the statute of limitations …. An overt act that restarts the statute of limitations is characterized by two elements: (1) it must be a *new and independent act* that is not merely a reaffirmation of a previous act; and (2) it must inflict *new and accumulating injury* on the plaintiff." *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 406 (6th Cir. 1999) (emphasis added; internal quotation omitted). Here, Petrotimor does not, and cannot, allege that any post-March 1, 2000 acts (1) are "new and independent" acts (to the contrary, Petrotimor specifically alleges that all the alleged wrongdoing at issue here is part of an ongoing "pattern," *see* Am. Compl. ¶¶ 227-29, 240), or (2) inflicted "new" injury, as opposed to the same injury as the original challenged deprivations. And, even if Petrotimor were able to meet this standard, the fact remains that "the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period," *Klehr*, 521 U.S. at 189 (citing, *inter alia*, *Zenith*, 401 U.S. at 338). Thus, even if Petrotimor were able to show *some* "new" injury that occurred after March 1, 2000, it

could only recover damages for that injury, as opposed to the 1975 and 1991 deprivations alleged the amended complaint.

###### C.     Petrotimor's Lanham Act Claim Is Time-Barred.

Petrotimor's efforts to state a claim under the Lanham Act, *see* Am. Compl. ¶¶ 251-60, again fail as a threshold matter because any such claim is manifestly untimely.  Because the Lanham Act lacks an explicit statute of limitations, courts have applied differing approaches to determining whether a Lanham Act claim is timely.  Some courts "borrow" the statute of limitations from the most analogous state-law claim.  *See, e.g., Island Insteel Sys., Inc. v. Waters*, 296 F.3d 200, 206 (3d Cir. 2002); *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 796 (4th Cir. 2001).  Other courts apply the equitable doctrine of laches.  *See, e.g., Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 549-50 (6th Cir. 2003); *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835-36 (9th Cir. 2002); *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820-21 (7th Cir. 1999).  As a practical matter, these approaches converge, since even those courts applying laches hold that a claim is presumptively untimely if not filed within the limitations period of the most analogous forum statute.  *See, e.g., Catalanotte*, 342 F.3d at 550; *Jarrow*, 304 F.3d at 837; *Hot Wax*, 191 F.3d at 820-21.

Here, the District of Columbia offense most analogous to Petrotimor's Lanham Act claim is a violation of the Consumer Protection Procedures Act, D.C. Code Ann. § 28-3904(r), the District's unfair trade practices statute, which is governed by a three-year statute of limitations, *see District Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 718 (D.C. 2003).  Because, for the reasons noted above, Petrotimor knew or should have known of its claim more than three years before filing suit, its Lanham Act claim is also untimely.

### D. Petrotimor's Common-Law Claims Are Time-Barred.

Like the federal claims discussed above, Petrotimor's common-law claims are also time-barred. In determining what law applies to common-law claims within its supplemental jurisdiction under 28 U.S.C. § 1367, a federal court looks to the choice-of-law rules of the forum (just as in diversity cases). *See, e.g., McSurely v. McClellan*, 753 F.2d 88, 110 (D.C. Cir. 1985); *cf. Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Because the forum here, the District of Columbia, treats statutes of limitations as procedural, not substantive, D.C. law provides the statute of limitations applicable to Petrotimor's pendent common-law claims *regardless* of the substantive law applicable to such claims. *See, e.g.*, *Material Supply Int'l, Inc. v. Sunmatch Indus. Co.,* 146 F.3d 983, 991-92 (D.C. Cir. 1998); *A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1458 (D.C. Cir. 1995).

Here, all of Petrotimor's common-law claims (misappropriation of trade secrets (Count V), intentional interference with contract (Count VI) and prospective economic advantage (Count VII), conversion (Count VIII), unjust enrichment (Count IX), and unfair competition (Count X)) are time-barred. District of Columbia law provides no more than a three-year statute of limitations for such claims, *see* D.C. Code Ann. § 12-301 (setting forth relevant statutes of limitations), and, for the reasons stated above, Petrotimor either knew or should have known of these claims more than three years before filing suit.[7]

---

[7] In the alternative, this Court could dismiss Petrotimor's pendent common-law claims under 28 U.S.C. § 1367 without even deciding whether they are untimely after deciding that all the federal claims are time-barred. *See, e.g., Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1043 (D.C. Cir. 2003).

## IV. PETROTIMOR'S ROBINSON-PATMAN ACT CLAIM FAILS AS A MATTER OF LAW.

Above and beyond the foregoing defects (which cut across all claims), Petrotimor's specific claim under the Robinson-Patman Act, *see* Am. Compl. ¶¶ 246-50, fails as a matter of law for the simple reason that the transactions at issue here do not involve "the sale or purchase of goods, wares, or merchandise." 15 U.S.C. § 13(c).[8] Although the amended complaint alleges that "the ConocoPhillips defendants provided items of value as a commission brokerage or other compensation to Indonesia, Pertamina, East Timor, and/or Mari Alkatiri or their respective agents, representatives or other intermediaries *in connection with the sale or purchase of goods, wares or merchandise*," Am. Compl. ¶ 248 (emphasis added), it tellingly fails to identify any such "sale or purchase of goods, wares or merchandise." That is no oversight, since the granting of a concession to explore for and/or exploit oil (or the alleged theft of trade secrets) does not involve the "sale or purchase of goods, wares or merchandise." Because the alleged deprivation of the Portuguese colonial concession and the trade secrets has nothing to do with the "sale or purchase" of *tangible* "goods, wares, or merchandise," but rather involves *intangible* rights, this case is simply not within the scope of the Robinson-Patman Act. *See, e.g., Harris v. Duty Free Shoppers Ltd. P'ship*, 940 F.2d 1272, 1274 (9th Cir. 1991); *Union City Barge Line, Inc. v. Union*

---

[8] Section 2(c) of the Robinson-Patman Act provides as follows:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with *the sale or purchase of goods, wares, or merchandise*, either to the other party to such transaction or to an agent, representative or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control of any party to such transaction other than the person by whom such compensation is so granted or paid.

15 U.S.C. § 13(c) (emphasis added).

*Carbide Corp.*, 823 F.2d 129, 140-41 (5th Cir. 1987); *Freeman v. Chicago Title & Trust Co.*, 505 F.2d 527, 529-31 (7th Cir. 1974) (*per curiam*).

In any event, Petrotimor's Robinson-Patman Act claim fails for the separate and independent reason that Petrotimor cannot establish causation as a matter of law. The claim is based on the theory that Petrotimor was deprived of its rights in the Portuguese colonial concession as a result of ConocoPhillips' alleged bribery of Timorese and Indonesian officials. *See* Am. Compl. ¶ 249. Even taking those reckless and unfounded allegations at face value, the fact remains that the supervening ConocoPhillips concession was not granted *unilaterally* by either East Timor or Indonesia, but granted *jointly* by those nations and Australia through their treaty framework. In the absence of consent by Australia, Petrotimor would have been deprived of the Portuguese colonial concession *regardless* of the alleged bribes. And Petrotimor has not alleged that Australia would have recognized the Portuguese colonial concession but for the alleged bribes to Timorese and Indonesian officials; to the contrary, the amended complaint emphasizes that Australia opposed the Portuguese colonial concession for its own reasons of state, long before and entirely apart from the alleged bribery. *See, e.g.,* Am. Compl. ¶¶ 60-64, 73-74, 83-95. Accordingly, Petrotimor cannot establish that the alleged bribery caused its deprivation as a matter of law. *See, e.g., City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 268 (3d Cir. 1998); *Federal Prescription Serv., Inc. v. American Pharm. Ass'n*, 663 F.2d 253, 268 (D.C. Cir. 1981).

Finally, Petrotimor's Robinson-Patman Act claim fails for the separate and independent reason that the Act does not apply extraterritorially to the conduct at issue here. Petrotimor contends that it "had no meaningful opportunity to obtain contracts with the named entities or even to meaningfully communicate with them in pursuit of such contracts" as a result of the

alleged bribery. Am. Compl. ¶ 249. But the challenged conduct and the resulting injury took place overseas. The American antitrust laws simply do not reach alleged anticompetitive conduct anywhere in the world, in the absence of any direct adverse effect on competition in the United States. *See, e.g.*, *F. Hoffman-LaRoche Ltd. v. Empagran S.A.*, ___ U.S. ___, 2004 WL 1300131, at *6-11 (U.S. Jun. 14, 2004).

## V. PETROTIMOR'S LANHAM ACT CLAIM FAILS AS A MATTER OF LAW.

Petrotimor's specific claim alleging a violation of the Lanham Act, *see* Am. Compl. ¶¶ 251-60, also fails as a matter of law for the simple reason that the Lanham Act does not cover the wrongdoing alleged here. In particular, Petrotimor alleges that (1) "[d]efendants engaged in acts of competition contrary to honest practices in industrial and commercial matters," *id.* at ¶ 255, (2) these acts "violate[d] the Paris Convention's prohibitions against unfair competition," *id.*, and (3) "Petrotimor is entitled to bring suit against defendants, and invoke the remedies of the Lanham Act, for defendants' violations of the Paris Convention," *id.* at ¶¶ 256-57. The problem for Petrotimor, however, is that "[t]he rights articulated in the Paris Convention do not exceed the rights conferred by the Lanham Act." *International Café, S.A.L. v. Hard Rock Café Int'l (U.S.A.), Inc.*, 252 F.3d 1274, 1278 (11th Cir. 2001) (*per curiam*) (citing cases). And, contrary to Petrotimor's suggestion, the Lanham Act itself does not create an all-purpose federal law of unfair competition; rather, it only protects against the forms of unfair competition related to trademark infringement, false designation of origin, product disparagement, service mark infringement, illegal cyber-squatting, false advertising, dilution, and other related theories. *See* 15 U.S.C. § 1125; *see generally International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 915-16 (9th Cir. 1980). Because the alleged deprivation of Petrotimor's colonial

concession and trade secrets does not remotely fall within the scope of the Lanham Act, this

claim should be dismissed.[9]

## VI. THIS COURT LACKS PERSONAL JURISDICTION OVER THE CURRENT AND FORMER CONOCOPHILLIPS SUBSIDIARY DEFENDANTS.

Finally, the amended complaint should be dismissed with respect to the current and

former ConocoPhillips subsidiary defendants[10] for lack of personal jurisdiction, because they

lack the requisite contacts with the District of Columbia and the exercise of jurisdiction in this

forum would offend traditional notions of fair play and substantial justice.  This lawsuit has

nothing to do with the District of Columbia.  Because the amended complaint does not allege any

claims arising out of conduct in this forum, Petrotimor must establish that each defendant is

subject to *general*—as opposed to *specific*—jurisdiction here.  This distinction is critical: a

---

[9]    In addition, plaintiff Oceanic—a U.S. citizen—cannot state a claim under the Lanham Act against any of the U.S. defendants, because the Lanham Act does not provide a cause of action by a U.S. citizen against a U.S. citizen for an alleged violation of an international convention.  *See, e.g., Brown v. Twentieth Century Fox Film Corp.*, 799 F. Supp. 166, 173 n.10 (D.D.C. 1992), *aff'd for the reasons given by the district court*, 15 F.3d 1159 (D.C. Cir. 1994) (*per curiam*); *L'Aiglon Apparel v. Lana Lobell, Inc.*, 214 F.2d 649, 652 (3rd Cir. 1954); *American Auto. Ass'n v. Spiegel*, 205 F.2d 771, 774-75 (2d Cir. 1953) (L. Hand, J.).

[10]    The current and former ConocoPhillips subsidiary defendants are all of the ConocoPhillips defendants with the exception of the two parent companies, ConocoPhillips and ConocoPhillips Corporation (which do not in this case challenge the exercise of personal jurisdiction in this forum).  In particular, the current and former ConocoPhillips subsidiary defendants include fifteen Australian entities—(1) ConocoPhillips (03-21) Pty Ltd; (2) ConocoPhillips (03-12) Pty Ltd; (3) ConocoPhillips (03-13) Pty Ltd; (4) ConocoPhillips (03-19) Pty Ltd; (5) ConocoPhillips (03-16) Pty Ltd; (6) ConocoPhillips (03-20) Pty Ltd; (7) ConocoPhillips Australia Pty Ltd; (8) ConocoPhillips Australia Gas Holdings Pty Ltd; (9) ConocoPhillips JPDA Pty Ltd (a company formerly known as "Phillips Petroleum Company ZOC," which the amended complaint incorrectly identifies as a separate company); (10) ConocoPhillips Pipeline Australia Pty Ltd; (11) ConocoPhillips STL Pty Ltd; (12) ConocoPhillips WA-248 Pty Ltd; (13) Darwin LNG Pty Ltd; and (14) Tokyo Timor Sea Resources Pty Ltd; and (15) Phillips Petroleum Company ZOC Pty Ltd—as well as six American entities—(1) Timor Sea Resources, Inc.; (2) Phillips Petroleum Company Indonesia; (3) Phillips Petroleum (96-20), Inc.; (4) Phillips Petroleum Production Indonesia, Inc.; (5) Phillips Indonesia, Inc.; and (6) Phillips International Investments, Inc.

defendant subject to general jurisdiction can be haled into court in the forum in any and every case, which is why general jurisdiction is much harder to establish. *See, e.g., Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 509-10 (D.C. Cir. 2002); *Crane v. Carr*, 814 F.2d 758, 763 (D.C. Cir. 1987). The notion that the current and former ConocoPhillips subsidiary defendants can be sued in the District of Columbia in any case (even cases—like this one— wholly unrelated to any activity here) is simply untenable.

This Court's authority to exercise general jurisdiction over defendants is governed by a combination of federal statutes, state statutes, and the federal Constitution. While some federal statutes have been interpreted to provide for nationwide contacts to suffice, where they do not, the court looks to the long-arm statute of the forum jurisdiction, with constitutional due process always providing a minimum floor. *See, e.g., Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distrib. Pty. Ltd.,* 647 F.2d 200, 204 (D.C. Cir. 1981). In this case, the three federal statutes invoked by Petrotimor (RICO, the Robinson-Patman Act, and the Lanham Act) do not authorize a nationwide contacts analysis.[11] Accordingly, this Court must look to the long-arm

---

[11] The Lanham Act has no provision relating to personal jurisdiction at all. The Clayton Act (which provides the jurisdictional provisions for the Robinson-Patman Act) authorizes nationwide service of process *only* where the defendant is sued in a district "wherein it may be found or transacts business." 15 U.S.C. § 22. As the D.C. Circuit and this Court have recognized, this provision effectively requires conventional forum-based contacts. *See GTE New Media Servs. Inc. v. Bell South Corp.*, 199 F.3d 1343, 1351 (D.C. Cir. 2000); *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 42 (D.D.C. 2003). And RICO's provision for nationwide service of process applies only if it has been shown that (1) "the ends of justice require that other parties residing in any other district be brought before the court," and (2) "process for that purpose may be served in any judicial district of the United States by the marshal thereof." 18 U.S.C. § 1965(b). This provision does not apply by its terms to the current and former ConocoPhillips subsidiary defendants, which either do not reside in "any judicial district of the United States" (with respect to the Australian entities), or were not served "in any judicial district of the United States by the marshal thereof" (with respect to all subsidiary defendants). Accordingly, RICO's nationwide service of process provision has no application here. *See, e.g., World Wide Minerals Ltd. v. Republic of Kazakhstan*, 116 F. Supp. 2d 98, 108 (D.D.C. 2000),

statute of the District of Columbia, which authorizes the exercise of general jurisdiction over non-residents who are "doing business in the District," and are served with process here. D.C. Code Ann. § 13-334(a). Aside from the fact that Petrotimor cannot claim the statute's jurisdictional benefit without complying with its service provisions, *see DSMC, Inc. v. Convera Corp.*, 273 F. Supp. 2d 14, 21-22 (D.D.C. 2002) (Sullivan, J.) (Section 13-334 inapplicable where "service of process was not effectuated within the District of Columbia"); *Everett v. Nissan Motor Corp.,* 628 A.2d 106, 108 (D.C. 1993) (same), that standard, as the D.C. Circuit has noted, is a stringent one: "§ 13-334(a) requires a 'continuing corporate presence in the forum … directed at advancing the corporation's objectives.'" *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 675 (D.C. Cir. 1996) (quoting *AMAF Int'l Corp. v. Ralston Purina Co.*, 428 A.2d 849, 851 (D.C. 1981) (*per curiam*)). Even assuming arguendo that this statute authorized the exercise of general jurisdiction to the full extent permitted by due process, *see, e.g., Gorman*, 293 F.3d at 510, Petrotimor cannot meet that standard.

The Constitution authorizes the exercise of personal jurisdiction only where the defendant has purposefully availed itself of the benefits and protections of the forum state by establishing "minimum contacts" with that state and the exercise of jurisdiction over the nonresident would not offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation omitted); *Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 113 (1987).

Plaintiffs have not identified any "minimum contacts" by which any of the ConocoPhillips subsidiary defendants purposely availed themselves of the benefits of the District

---

*aff'd in part*, 296 F.3d 1154 (D.C. Cir. 2002); *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 71 (2d Cir. 1998).

of Columbia, much less the continuous and systematic contacts that would be required to satisfy the stringent standards of "general jurisdiction." *See generally Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984). Isolated or incidental contacts will not suffice to confer general jurisdiction under that stringent standard. In *Helicopteros*, for example, the Supreme Court invalidated a Texas court's assertion of general jurisdiction over a Colombian corporation, holding as a matter of law that the rigorous constitutional standard had not been met. *See* 466 U.S. at 416-18. The Court focused in particular on the fact that the defendant had no place of business in Texas and was not licensed to do business there. *See id.* at 416. The Court held that defendants' purchase of 80 percent of its helicopter fleet in Texas, and repeated trips there for training, technical consultation, and to maintain business relationships did not justify general (as opposed to specific) jurisdiction. *See id.* at 416-18.

Here, as in *Helicopteros*, plaintiffs cannot make the stringent showing necessary to justify the exercise of general jurisdiction. Indeed, nothing in the amended complaint identifies or hints at the kind of substantial, continuous and systematic contacts with the District that would be necessary—or *any* contacts with the District, for that matter. In fact, the traditional hallmarks of general jurisdiction are completely absent here, as the current and former ConocoPhillips subsidiary defendants are not organized or registered to do business under the laws of the District of Columbia, and have no places of business or other presence in this forum. *See* Decls. of J. Ellingsen (attached at Tabs 28, 29), S. Baba (attached at Tab 30), H. Nishizawa (attached at Tab 31), D. Bridges (attached at Tab 32), M. Gist (attached at Tab 33). Simply put, the current and former ConocoPhillips subsidiary defendants do not have the minimum contacts that could justify personal jurisdiction over a case that does not arise out of any conduct relating to the District of Columbia.

Even if minimum contacts were present, moreover, any assertion of personal jurisdiction would not comport with traditional notions of fairness, which counsel strongly against extending the long arm of personal jurisdiction into the international realm. *See Asahi*, 480 U.S. at 113. Plaintiffs seek to impose on the current and former ConocoPhillips subsidiary defendants (as well as this Court) the burden, expense, and inconvenience of litigating claims arising literally halfway around the world. In short, "traditional notions of fair play and substantial justice" dictate that the current and former ConocoPhillips subsidiary defendants not be subjected to personal jurisdiction—much less "general" personal jurisdiction—in the District of Columbia. *Asahi*, 480 U.S. at 113; *International Shoe*, 326 U.S. at 316-17.

## CONCLUSION

For the foregoing reasons, the amended complaint should be dismissed.

Dated: June 14, 2004

Martin D. Beirne (D.D.C. Bar # TX0025)
Jeffrey T. Nobles*
W. Bruce Stanfill*
David A. Pluchinsky*
BEIRNE, MAYNARD & PARSONS, LLP
1300 Post Oak Blvd., 25th Floor
Houston, TX   77056
(713) 623-0887
(713) 960-1527 (facsimile)


* *Pro hac vice* applications pending

Thomas D. Yannucci, P.C. (D.C. Bar # 358989)
Michael D. Jones (D.C. Bar # 417681)
Christopher Landau (D.C. Bar # 425319)
Brant W. Bishop (D.C. Bar # 459255)
Susan Engel
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC   20005
(202) 879-5000
(202) 879-5200 (facsimile)

Russell D. Howell (*Of Counsel*)
CONOCOPHILLIPS COMPANY
McLean Building
600 North Dairy Ashford Road
P.O. Box 4783
Houston, TX   77210

*Counsel for Defendants ConocoPhillips; ConocoPhillips Company;  Tokyo Timor Sea Resources Inc.; Phillips Petroleum Company ZOC; Phillips Petroleum Company Indonesia; Phillips Petroleum (96-20), Inc.; Phillips Petroleum Production Indonesia, Inc.; Phillips Indonesia, Inc.; Phillips International Investment, Inc.; ConocoPhillips (03-21) Ptpy Ltd; ConocoPhillips (03-12) Pty Ltd; ConocoPhillips (03-13) Pty Ltd; ConocoPhillips (03-19) Pty Ltd; ConocoPhillips (03-16) Pty Ltd; ConocoPhillips (03-20) Pty Ltd; ConocoPhillips Australia Pty Ltd; ConocoPhillips Australia Gas Holdings Pty Ltd; ConocoPhillips JPDA Pty Ltd (f/k/a and also sued as Phillips Petroleum Company ZOC Pty Ltd); ConocoPhillips Pipeline Australia Pty Ltd; ConocoPhillips STL Pty Ltd; ConocoPhillips WA-248 Pty Ltd; Darwin LNG Pty Ltd; and Tokyo Timor Sea Resources Pty Ltd*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

OCEANIC EXPLORATION COMPANY and
PETROTIMOR COMPANHIA DE PETROLEOS
S.A.R.L.,

      Plaintiffs

           v.

CONOCOPHILLIPS, INC., et al.

      Defendants

No. 1:04-cv-00332-EGS

# [PROPOSED] ORDER ON CONOCOPHILLIPS
## DEFENDANTS' MOTION TO DISMISS

It is hereby ORDERED that the Motion to Dismiss filed by the ConocoPhillips

Defendants (consisting of ConocoPhillips and current and former ConocoPhillips affiliates

ConocoPhillips Company; Tokyo Timor Sea Resources Inc.; Phillips Petroleum Company ZOC;

Phillips Petroleum Company Indonesia; Phillips Petroleum (96-20), Inc.; Phillips Petroleum

Production Indonesia, Inc.; Phillips Indonesia, Inc.; Phillips International Investment, Inc.;

ConocoPhillips (03-21) Pty Ltd; ConocoPhillips (03-12) Pty Ltd; ConocoPhillips (03-13) Pty

Ltd; ConocoPhillips (03-19) Pty Ltd; ConocoPhillips (03-16) Pty Ltd; ConocoPhillips (03-20)

Pty Ltd; ConocoPhillips Australia Pty Ltd; ConocoPhillips Australia Gas Holdings Pty Ltd;

ConocoPhillips JPDA Pty Ltd (f/k/a and also sued as Phillips Petroleum Company ZOC Pty

Ltd); ConocoPhillips Pipeline Australia Pty Ltd; ConocoPhillips STL Pty Ltd; ConocoPhillips

WA-248 Pty Ltd; Darwin LNG Pty Ltd; and Tokyo Timor Sea Resources Pty Ltd) is GRANTED, and all claims against the ConocoPhillips Defendants are DISMISSED.

SO ORDERED, this _____ day of _____, 2004.

_____
United States District Judge