# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OCEANIC EXPLORATION COMPANY, a Delaware corporation, 7800 East Dorado Place, Suite 250, Englewood, Colorado 80111; and PETROTIMOR COMPANHIA DE PETROLEOS, S.A.R.L., a corporation organized under the laws of Portugal, 7800 East Dorado Place, Suite 250, Englewood, Colorado 80111, <br><br><br> Plaintiffs, <br><br> v. <br><br> CONOCOPHILLIPS, a Delaware Corporation; CONOCOPHILLIPS COMPANY, a Delaware corporation; TOKYO TIMOR SEA RESOURCES INC., a Delaware corporation; PHILLIPS PETROLEUM COMPANY ZOC, a Delaware corporation; PHILLIPS PETROLEUM COMPANY INDONESIA, a Delaware corporation; PHILLIPS PETROLEUM (96-20), INC., a Delaware corporation; PHILLIPS PETROLEUM PRODUCTION INDONESIA, INC., a Delaware corporation; PHILLIPS INDONESIA, INC., a Delaware corporation; PHILLIPS INTERNATIONAL INVESTMENT, INC., a Delaware corporation, CONOCOPHILLIPS (03-21) PTY. LTD., an Australian private company organized under the laws of the Commonwealth of Australia; CONOCOPHILLIPS (03-12) PTY. LTD., an Australian private company organized under the laws of the Commonwealth of Australia; CONOCOPHILLIPS (03-13) PTY. LTD., an Australian private company organized under the laws of the Commonwealth of Australia; CONOCOPHILLIPS (03-19) PTY. LTD., an Australian private company organized under the laws of the Commonwealth of Australia; CONOCOPHILLIPS (03-16) PTY. LTD., an | Civil Action No. 04 CV 00332 EGS <br> RACKETEERING <br><br> SECOND AMENDED COMPLAINT |

Australian private company organized under the laws of the Commonwealth of Australia; CONOCOPHILLIPS (03-20) PTY. LTD., an Australian private company organized under the laws of the Commonwealth of Australia; CONOCOPHILLIPS AUSTRALIA PTY. LTD., an Australian private company organized under the laws of the Commonwealth of Australia; CONOCOPHILLIPS AUSTRALIA GAS HOLDINGS PTY. LTD., an Australian private company organized under the laws of the Commonwealth of Australia; CONOCOPHILLIPS JPDA PTY. LTD., an Australian private company organized under the laws of the Commonwealth of Australia; CONOCOPHILLIPS PIPELINE AUSTRALIA PTY. LTD., an Australian private company organized under the laws of the Commonwealth of Australia; CONOCOPHILLIPS STL PTY. LTD., an Australian private company organized under the laws of the Commonwealth of Australia; CONOCOPHILLIPS WA-248 PTY. LTD., an Australian private company organized under the laws of the Commonwealth of Australia; DARWIN LNG PTY. LTD., an Australian private company organized under the laws of the Commonwealth of Australia; TOKYO TIMOR SEA PTY. LTD., an Australian private company organized under the laws of the Commonwealth of Australia; PHILLIPS PETROLEUM COMPANY ZOC PTY. LTD., an Australian private company organized under the laws of the Commonwealth of Australia; TIMOR SEA DESIGNATED AUTHORITY FOR THE JOINT PETROLEUM DEVELOPMENT AREA, an unincorporated entity; and DOES 1 through 50, unknown persons or entities,

          Defendants.

## SECOND AMENDED COMPLAINT

**TABLE OF CONTENTS**

                                                                                    **Page**

I.      PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.    PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        A.      Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        B.      The ConocoPhillips Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        C.      The ConocoPhillips Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        D.      The Designated Authority Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        E.      Doe Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        F.      Non-Defendant Co-Conspirators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

                1.      The Pertamina Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

                2.      The Joint Authority Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV.     BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        A.      The Timor Gap . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        B.      Oceanic Exploration Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

III.    COMMON ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        A.      Oceanic's Activities in the Timor Sea . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        B.      Indonesian Invasion of East Timor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        C.      ConocoPhillips' Corruption in Indonesia . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        D.      As a Result of ConocoPhillips' Corruption in Indonesia, ConocoPhillips
                Gained Favored Status with the Joint Authority . . . . . . . . . . . . . . . . . . . . 19

        E.      East Timor Gains Its Independence and Vitiates All Prior Interests in the
                Timor Sea . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# TABLE OF CONTENTS
**(Continued)**

    F.    ConocoPhillips Bribes East Timor's Prime Minister Mari Alkatiri . . . . . . . . . . 26

    G.    Oceanic's Efforts to Obtain New Interests in the Timor Sea or New
           Recognition of its Prior Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

           DEFENDANTS' CONTACTS WITH THE UNITED STATES . . . . . . . . . . . . . 39

V.    DEFENDANTS' CONCEALMENT OF INHERENTLY SECRET WRONGFUL
       ACTS AND PLAINTIFFS' DISCOVERY OF SUCH ACTS . . . . . . . . . . . . . . . . . . . . . 45

FIRST CLAIM
       RACKETEER INFLUENCED AND CORRUPT
       ORGANIZATIONS ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

SECOND CLAIM
       CONSPIRACY TO VIOLATE RACKETEER INFLUENCED
       AND CORRUPT ORGANIZATIONS ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

THIRD CLAIM
       VIOLATION OF THE ROBINSON-PATMAN ACT . . . . . . . . . . . . . . . . . . . . . . . 54

FOURTH CLAIM
       VIOLATION OF THE LANHAM ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

FIFTH CLAIM
       INTENTIONAL INTERFERENCE WITH
       PROSPECTIVE ECONOMIC ADVANTAGE
       (Against the ConocoPhillips Defendants) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

SIXTH CLAIM
       UNJUST ENRICHMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

SEVENTH CLAIM
       UNFAIR COMPETITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

# I.    PRELIMINARY STATEMENT

1.    Plaintiffs Oceanic Exploration Company and Petrotimor Companhia de Petroleos, S.A.R.L. (collectively "Oceanic") bring this action to recover damages for the loss of the opportunity in the post-independence period for East Timor to compete or bid for rights to explore for and produce oil and natural gas from the seabed between East Timor and Australia. If the ConocoPhillips defendants had not bribed East Timor's Prime Minister, Mari Alkatiri, and others, then Oceanic would have had the opportunity to bid terms more favorable to East Timor and would have been awarded the right to explore for and extract oil and natural gas from the Timor Gap.

2.    In 1974, Portugal, then sovereign of East Timor, awarded Oceanic a concession to explore for and produce oil and natural gas in the Timor Gap.  Indonesia's invasion of East Timor the following year thwarted Oceanic's efforts to capitalize on the Portuguese concession.  While the Indonesian army occupied East Timor, Indonesia and Australia created the commercial Joint Authority to develop, produce and market the oil and natural gas in the Timor Gap.  The Joint Authority entered into production sharing contracts with the ConocoPhillips defendants that gave them the rights to explore for and produce oil and natural gas in the Timor Gap.  The ConocoPhillips defendants' secured these interests from the Joint Authority as a result of 30 years of corruption and bribery in Indonesia.  The ConocoPhillips defendants' rights conflicted with the rights that Portugal had given to Oceanic.

3.    Upon East Timor's independence, East Timorese political leaders, including Mari Alkatiri, were adamant that East Timor would not recognize any interests that had been awarded in the Timor Gap while Indonesia occupied East Timor, including the ConocoPhillips defendants' production sharing contracts.

4.     A ConocoPhillips executive characterized as a "disaster of major proportions" the company's exposure to the loss of the production sharing contracts and related investment in the Timor Gap as a result of East Timor's independence.  To avoid this perceived "disaster of major proportions," beginning in 2000, ConocoPhillips bribed, among others, Mari Alkatiri, the official responsible for East Timor natural resources and later the Prime Minister of East Timor.  As a direct result of those bribes, Oceanic was given no opportunity to bid for exploration and production rights in the Timor Gap.  As a direct result of those bribes, Mari Alkatiri reversed his position and influenced the Timor Sea Designated Authority, in 2003, to reinstate ConocoPhillips' production sharing contracts in the Timor Gap on terms more favorable to ConocoPhillips than those that applied when Indonesia occupied East Timor.

5.     With East Timor's independence, Oceanic had positioned itself to compete for and bid for the exploration and production rights that would be awarded in the Timor Gap. Oceanic petitioned the interim United Nations mission and the East Timor government for exploration and production rights in the Timor Gap; advocated the construction of a natural gas pipeline from the Timor Gap to East Timor; advocated the construction of a liquid natural gas processing facility on the southern shore of East Timor (as opposed to the northern shore of Australia) and presented that option to representatives of the East Timor government; and, after obtaining the favorable opinion of recognized international seabed boundary legal experts, offered to finance a claim by East Timor in the International Court of Justice to support East Timor's expanded seabed boundary claims in its dispute with Australia and to establish expanded boundaries for East Timor.  Such expanded seabed boundaries, under applicable international law, would have tripled East Timor's seabed hydrocarbon reserves.

6.      ConocoPhillips' bribery of East Timorese officials deprived Oceanic of any opportunity to meaningfully compete for, or even to bid for, rights to explore for or produce oil and natural gas in the Timor Gap.  Had Oceanic not been deprived of this opportunity, Oceanic would have been the successful bidder for rights to explore for and produce oil and natural gas in the Timor Gap.

## II.    JURISDICTION AND VENUE

7.      The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1330, 1331, 1337, 1338; 18 U.S.C. §§ 1964(c), 1956; 15 U.S.C. §§ 15, 1121 and supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)-(d), (f), 1400(a); 18 U.S.C. § 1965; and 15 U.S.C. § 15.  The venue provision of the Foreign Sovereign Immunities Act provides that this District is the appropriate forum for actions against an agency or instrumentality of a foreign state when that entity cannot generally be reached elsewhere, a condition that exists for the Timor Sea Designated Authority.  28 U.S.C. § 1391(f)(4).  The general venue statute permits a civil action that is not founded solely on diversity of citizenship to be brought "in a judicial district where any defendant may be found, if there is no district in which the action may otherwise be brought."  28 U.S.C. § 1391(b)(3).  Defendants ConocoPhillips and ConocoPhillips Company may both be "found" in this District.  Venue is also proper in this District because "[a]n alien may be sued in any district."  28 U.S.C. § 1391(d).

9.      Defendant ConocoPhillips has a corporate office located at 1776 I Street, #700, Washington, D.C.  Defendant ConocoPhillips Company has registered to do business in this District.  In addition, James Godlove, a ConocoPhillips employee and a significant participant in the events that give rise to this action, resides in or near this District and works in

the District.  Because defendants ConocoPhillips and ConocoPhillips Company may be found

here, venue for the RICO and antitrust claims is proper here.  The Clayton Act permits an

antitrust suit to be brought "in any district court of the United States in the district in which the

defendant resides or is found or has an agent . . . ."  15 U.S.C. § 15.  The venue provision in the

RICO statute similarly supports venue in this District.  It provides that a RICO claim against a

person "may be instituted in the district court of the United States for any district in which such

person resides, is found, has an agent, or transacts his affairs."  18 U.S.C. § 1965(a).  Once a

RICO claim is asserted against one defendant under 18 U.S.C. § 1965(a), additional defendants

residing in other districts may be brought before the same court where the "ends of justice

require" such a result.  18 U.S.C. § 1965(b).

## III.    PARTIES

### A.    Plaintiffs

10.    Plaintiff Oceanic Exploration Company ("Oceanic") is a corporation

organized under the laws of the State of Delaware with a principal place of business in

Englewood, Colorado.

11.    Plaintiff Petrotimor Companhia de Petroleos, S.A.R.L ("Petrotimor") is a

corporation organized under the laws of Portugal.  Oceanic Exploration Company controls

Petrotimor and owns at least 1,191 shares out of 1,200 outstanding shares of Petrotimor.  As a

formality, the Portuguese government required Oceanic to create Petrotimor as a Portuguese

subsidiary to administer the concession it awarded to Oceanic in 1974.  Oceanic and Petrotimor

shall be referred to collectively as "Oceanic."

### B. The ConocoPhillips Defendants

12.     Defendant ConocoPhillips is a corporation organized under the laws of the State of Delaware with a principal place of business in Houston, Texas.  ConocoPhillips is the successor in interest to both Phillips Petroleum Company and Conoco, Inc.  The merger of the two companies took place in 2002.  ConocoPhillips has a corporate office located at 1776 I Street N.W., #700, Washington, D.C. 20006.  Among other things, ConocoPhillips has registered with the United States government a number of registered federal lobbyists operating out of that office, including James Godlove, a significant participant in the events that give rise to this action.

13.     Defendant ConocoPhillips Company is a corporation organized under the laws of the State of Delaware.  ConocoPhillips Company has registered to do business in the District of Columbia and has a registered agent for service of process in the District of Columbia.

14.     Defendant Tokyo Timor Sea Resources, Inc., formerly known as Phillips Petroleum Timor Sea, Inc., is a corporation organized under the laws of the State of Delaware and registered to do business in the State of Delaware.

15.     Defendant Phillips Petroleum Company ZOC is a corporation organized under the laws of the State of Delaware.

16.     Defendant Phillips Petroleum Company Indonesia is a corporation organized under the laws of the State of Delaware and registered to do business in the State of Delaware.

17.     Defendant Phillips Petroleum (96-20), Inc. is a corporation organized under the laws of the State of Delaware.

18.     Defendant Phillips Petroleum Production Indonesia, Inc. is a corporation organized under the laws of the State of Delaware and registered to do business in the State of Delaware.

19.     Defendant Phillips Indonesia, Inc. is a corporation organized under the laws of the State of Delaware and registered to do business in the State of Delaware.

20.     Defendant Phillips International Investments, Inc. is a corporation organized under the laws of the State of Delaware and registered to do business in the State of Delaware.

21.     Defendant ConocoPhillips (03-21) Pty. Ltd., formerly known as ConocoPhillips (00-21) Pty. Ltd., is an Australian private company organized under the laws of the Commonwealth of Australia.

22.     Defendant ConocoPhillips (03-12) Pty. Ltd., formerly known as ConocoPhillips (91-12) Pty. Ltd., is an Australian private company organized under the laws of the Commonwealth of Australia.

23.     Defendant ConocoPhillips (03-13) Pty. Ltd., formerly known as ConocoPhillips (91-13) Pty. Ltd., is an Australian private company organized under the laws of the Commonwealth of Australia.

24.     Defendant ConocoPhillips (03-19) Pty. Ltd., formerly known as ConocoPhillips (95-19) Pty. Ltd., is an Australian private company organized under the laws of the Commonwealth of Australia.

25.     Defendant ConocoPhillips (03-16) Pty. Ltd., formerly known as ConocoPhillips (96-16) Pty. Ltd., is an Australian private company organized under the laws of the Commonwealth of Australia.

26. Defendant ConocoPhillips (03-20) Pty. Ltd., formerly known as ConocoPhillips (96-20) Pty. Ltd., is an Australian private company organized under the laws of the Commonwealth of Australia.

27. Defendant ConocoPhillips Australia Pty. Ltd. is an Australian private company organized under the laws of the Commonwealth of Australia. Its sole shareholder is Phillips Investment Company located in the Bahamas.

28. Defendant ConocoPhillips Australia Gas Holdings Pty. Ltd. is an Australian private company organized under the laws of the Commonwealth of Australia.

29. Defendant ConocoPhillips JPDA Pty. Ltd. is an Australian private company organized under the laws of the Commonwealth of Australia.

30. Defendant ConocoPhillips Pipeline Australia Pty. Ltd. is an Australian private company organized under the laws of the Commonwealth of Australia.

31. Defendant ConocoPhillips STL Pty. Ltd. is an Australian private company organized under the laws of the Commonwealth of Australia.

32. Defendant ConocoPhillips WA-248 Pty. Ltd. is an Australian private company organized under the laws of the Commonwealth of Australia.

33. Defendant Darwin LNG Pty. Ltd., formerly known as Phillips Petroleum LNG Pty. Ltd., is an Australian private company organized under the laws of the Commonwealth of Australia.

34. Defendant Tokyo Timor Sea Pty. Ltd., formerly known as Phillips Petroleum Timor Sea Pty. Ltd., is an Australian private company organized under the laws of the Commonwealth of Australia.

35.    Defendant Phillips Petroleum Company ZOC Pty. Ltd. is an Australian private company organized under the laws of the Commonwealth of Australia.

36.    Collectively, defendants ConocoPhillips; ConocoPhillips Company; Tokyo Timor Sea Resources, Inc.; Phillips Petroleum Company ZOC; Phillips Petroleum Company Indonesia; Phillips Petroleum (03-20), Inc.; Phillips Petroleum Production Indonesia, Inc.; Phillips Indonesia, Inc.; Phillips International Investment, Inc.; ConocoPhillips (03-21) Pty. Ltd.; ConocoPhillips (03-12) Pty. Ltd., ConocoPhillips (03-13) Pty. Ltd.; ConocoPhillips (03-19) Pty. Ltd.; ConocoPhillips (03-16) Pty. Ltd.; ConocoPhillips (03-20) Pty. Ltd.; ConocoPhillips Australia Pty. Ltd.; ConocoPhillips Australia Gas Holdings Pty. Ltd.; ConocoPhillips JPDA Pty. Ltd.; ConocoPhillips Pipeline Australia Pty. Ltd.; ConocoPhillips STL Pty. Ltd.; ConocoPhillips WA-248 Pty. Ltd.; Darwin LNG Pty. Ltd.; Tokyo Timor Sea Pty. Ltd.; and Phillips Petroleum Company ZOC Pty. Ltd. shall be referred to as "ConocoPhillips" or the "ConocoPhillips defendants."

37.    The ConocoPhillips defendants identified in paragraphs 14 through 35 are subsidiaries of defendants ConocoPhillips. ConocoPhillips and its subsidiaries are engaged directly and indirectly in the business of extracting, transporting, refining and selling oil and natural gas. ConocoPhillips and its subsidiaries directed, authorized, participated in or ratified the acts complained of herein by each ConocoPhillips defendant and were the agent and alter ego of each ConocoPhillips defendant in connection with said acts. There exists, and at all times herein there existed, identical or overlapping directorates, a unity of interest and ownership among and between defendant ConocoPhillips and its subsidiaries such that any distinction among entities has ceased, and each ConocoPhillips subsidiary is the alter ego of both ConocoPhillips and its other subsidiaries. Moreover, the ConocoPhillips defendants identified in

paragraphs 14 through 35 all list "ConocoPhillips" as the "ultimate holding company" in their Australian Securities & Investments Commission filings. In these circumstances, adherence to the separate corporate existence of ConocoPhillips and each of its subsidiaries would promote injustice and fraud.

### C. The ConocoPhillips Group

38. As used in this Complaint, the ConocoPhillips Group primarily includes defendants ConocoPhillips; ConocoPhillips Company; Tokyo Timor Sea Resources, Inc.; Phillips Petroleum Company ZOC; Phillips Petroleum Company Indonesia; Phillips Petroleum (03-20), Inc.; Phillips Petroleum Production Indonesia, Inc.; Phillips Indonesia, Inc.; Phillips International Investment, Inc.; ConocoPhillips (03-21) Pty. Ltd.; ConocoPhillips (03-12) Pty. Ltd., ConocoPhillips (03-13) Pty. Ltd.; ConocoPhillips (03-19) Pty. Ltd.; ConocoPhillips (03-16) Pty. Ltd.; ConocoPhillips (03-20) Pty. Ltd.; ConocoPhillips Australia Pty. Ltd.; ConocoPhillips Australia Gas Holdings Pty. Ltd.; ConocoPhillips JPDA Pty. Ltd.; ConocoPhillips Pipeline Australia Pty. Ltd.; ConocoPhillips STL Pty. Ltd.; ConocoPhillips WA-248 Pty. Ltd.; Darwin LNG Pty. Ltd.; Tokyo Timor Sea Pty. Ltd.; and Phillips Petroleum Company ZOC Pty. Ltd.

39. The ConocoPhillips Group also includes a large number of officers, directors, employees and agents of ConocoPhillips or the other ConocoPhillips defendants, some of whom knew of the illegal conduct of the ConocoPhillips Group, including the conduct of and participation in the illegal enterprise; and some of whom carried out the ConocoPhillips Group's illegal activities under the supervision of others in the ConocoPhillips Group, including the conduct of and participation in the conduct of and participation in the illegal enterprise. These individuals include, but are not limited to, James Mulva, Stephen Brand, Karen Brand, James Godlove and Arthur Bennett.

### D.    The Designated Authority Group

40.    Defendant Timor Sea Designated Authority ("Designated Authority") is a commercial unincorporated entity formed by East Timor and Australia.  The Designated Authority has been and is currently engaged in the commercial development of oil and natural gas in the Joint Petroleum Development Area between East Timor and Australia.  The Designated Authority entered into commercial production sharing contracts with, among others, certain ConocoPhillips defendants.  Those production sharing contracts provide that the contracting ConocoPhillips defendants would receive title to petroleum in exchange for complying with contractual obligations owed to the Designated Authority and making payments to the Designated Authority.

41.    The Designated Authority Group also includes a large number of officers, directors, employees and agents of the Designated Authority, some of whom knew of the illegal conduct of the Designated Authority Group, including the conduct of and participation in the illegal enterprise; and some of whom carried out the Designated Authority Group's illegal activities under the supervision of others in the Designated Authority Group, including the conduct of and participation in the conduct of and participation in the illegal enterprise.  These include, but are not limited to, Mari Alkatiri, titular head of the Designated Authority; Jose Teixeira, one of the two East Timorese joint commissioners of the Designated Authority; Ahmed Alkatiri and Rogerio Lobato.

### E.    Doe Defendants

42.    Plaintiffs are unaware of the true names and capacities, whether individual, corporate, associate or otherwise, of defendant Does 1 through 50, and therefore sue

these defendants by their fictitious names.  Plaintiffs will seek leave to amend this complaint when the identities of the Doe defendants are known.

43.     Plaintiffs are informed and believe, and on that basis allege, that at all relevant times mentioned in this Complaint, defendants, and each of them, were acting in concert and active participation with each other in committing the wrongful acts alleged herein, and were the agents or alter egos of each other and were acting within the scope and authority of that agency and with the knowledge, consent and approval of one another.

## F.     Non-Defendant Co-Conspirators

44.     Oceanic has not named the Timor Gap Joint Authority for the Zone of Cooperation ("Joint Authority"); PT Pertamina (Persero) ("Pertamina"); or Badan Pelaksana Kegiatan Usaha Hulu Minyak Dan Gas Bumi ("BPMIGAS") as defendants.  Pertamina and the Joint Authority, however, are members of the RICO conspiracy alleged herein.

### 1.     The Pertamina Group

45.     PT Pertamina (Persero) ("Pertamina") is a company organized under the laws of the Republic of Indonesia with a principal place of business in Jakarta, Indonesia.  At all relevant times, Pertamina shipped petroleum resources to the United States, maintained bank accounts in the United States, owned property in the United States, and maintained offices in the United States, including, but not limited to, offices in New York, New York; Houston, Texas and Los Angeles, California.  As used in this Complaint, Pertamina shall be referred to as the Pertamina Group.

46.     The Pertamina Group also includes others, some of whom knew of the illegal conduct of the Pertamina Group, including the conduct of and participation in the illegal enterprise; and some of whom carried out the Pertamina Group's illegal activities under the

supervision of and direction of others in the Pertamina Group, including the conduct of and

participation in the illegal enterprise.  These include, but are not limited to, General Suharto,

Bambang Trihatmodjo, Hutomo "Tommy" Mandala Putra, P.T. McDermott International,

Mohammed "Bob" Hasan, Suyitno Padmosukismo and Tabrani Ismail.

### 2.    The Joint Authority Group

47.    Before East Timor gained its independence and before the formation of the

Designated Authority, Australia and Indonesia formed the Timor Gap Joint Authority ("Joint

Authority") as a commercial entity to engage in the marketing and production of oil and natural

gas in the Timor Gap.  The Joint Authority entered into commercial production sharing contracts

with, among others, certain of the ConocoPhillips defendants.  Those production sharing

contracts provide that the contracting ConocoPhillips defendants would receive title to petroleum

in exchange for services provided and payments made to the Joint Authority.

48.    The Joint Authority Group also includes a large number of officers,

directors, employees and agents of the Joint Authority, some of whom knew of the illegal

conduct of the Joint Authority Group, including the conduct of and participation in the illegal

enterprise; and some of whom carried out the Joint Authority Group's illegal activities under the

supervision of others in the Joint Authority Group, including the conduct of and participation in

the illegal enterprise.

## IV.    BACKGROUND

### A.    The Timor Gap

49.    The Timor Gap is an area of the Timor Sea between East Timor and

Australia in which no agreed seabed boundary exists.  On May 17, 1971, Australia and Indonesia

signed the Australian-Indonesian Continental Shelf Agreement that delineated the maritime

border between Australia and Indonesia on both sides of East Timor. Because Portugal was the internationally recognized sovereign of East Timor at the time, that agreement did not establish a maritime border between East Timor and Australia. Therefore, the boundary line in the Timor Sea between Australia and Indonesia was not continuous. This break in the boundary line between East Timor and Australia came to be known as the "Timor Gap." A map depicting the Timor Gap is attached as Exhibit A.

50.     The Timor Gap holds significant natural gas and oil reserves, including the Bayu-Undan natural gas field; the Elang, Kakatua and Kakatua North oil fields; and approximately twenty percent (20%) of the Greater Sunrise natural gas field. Current estimates are that the area holds proven reserves of over five trillion cubic feet of natural gas and 500 million barrels of oil, natural gas liquids and condensate. At current prices, the value of the known reserves exceeds US$50 billion.

### B.     Oceanic Exploration Company

51.     Oceanic is an established oil and gas exploration company with a history of successful exploration. Beginning in the late sixties, Oceanic began acquiring concessions in unexplored areas of the world that had been overlooked by other companies. For example, in 1969, Oceanic entered into a concession agreement with the Greek government to explore for hydrocarbons offshore Greece in the North Aegean Sea. The Oceanic-led consortium, consisting of Wintershall A.G., Whiteshield Oil Company and Hellenic Oil Company, discovered the Prinos Oil Field and Kavala Gas Field, which provided Greece with its first significant hydrocarbon production. Subsequently, Oceanic was granted a concession offshore Sabah, Malaysia and teamed with British Petroleum Company and Chinese Petroleum Company to discover oil in that concession area. Oceanic also formed a consortium that obtained a license for Block 16/13a in

the British North Sea. Oceanic teamed with Britoil and Deminex and discovered natural gas and condensate on this Block. Oceanic has also engaged in exploration in Thailand, Cameroon, and Nicaragua, Peru, Panama and Ghana. Oceanic in conjunction with partners, Shell International Exploration and Eni S.P.A., participates with Chinese Petroleum Corporation in a concession offshore Taiwan in the East China Sea. Approximately 10,000 km of seismic exploration has been done in this area, but exploration drilling has not yet occurred. Oceanic has also provided geologic consulting services for various government entities, such as a geologic study of the Chaco Basin, provided to the government of Bolivia, and a geologic study for the Nicaraguan government in conjunction with the Norwegian Petroleum Directorate.

## III. COMMON ALLEGATIONS

### A. Oceanic's Activities in the Timor Sea

52. For centuries, Portugal was the internationally recognized sovereign over East Timor and remained so until the inhabitants voted their independence in 1999. In 1968, Oceanic applied to the Portuguese government for the concession in an area off the southern coast of East Timor to explore for petroleum and petroleum equivalents. Between 1969 and 1974, Oceanic undertook extensive research of East Timor seabed geology, including gathering seismic information and preparing detailed prospect maps in preparation for exploratory drilling in the Timor Sea.

53. On August 2, 1972, the Portuguese Ministry of Overseas granted a provisional concession to Oceanic so that work could proceed. As a formality, the Portuguese government required Oceanic to create Petrotimor, a Portuguese subsidiary to administer the concession. The by-laws for Petrotimor were completed on April 8, 1972 and submitted to the

Portuguese Ministry of Overseas for final approval. At all relevant times, all parties recognized that Oceanic was the real party in interest to the Portuguese concession.

54. On January 31, 1974, Portugal issued Decree No. 25-74, Article 1, which authorized the Portuguese Ministry of Overseas to grant the concession to Oceanic. The concession was signed on December 11, 1974. It awarded Oceanic the exclusive rights to explore for and extract any oil, natural gas or other hydrocarbon products in a 14.8 million acre area off the southern shore of East Timor in the Timor Gap.

55. On July 1, 1975, Jaime Fernandes Dos Santos established a Petrotimor office in Dili, the capital of Portuguese Timor, located at 10 Mousinho de Albuquerque Street, Dili, East Timor. Dos Santos opened a bank account for Petrotimor with Banco Nationale Ultramarino in or about August 1975.

56. Until the Petrotimor office could be made secure, Oceanic stored in the office of Timor Oil its geographical and seismic data of the Timor Sea and other confidential and proprietary information gained from its exploration activities. Given the confidential and proprietary nature of this exploration data, access to that data was restricted.

**B.    Indonesian Invasion of East Timor**

57. On December 7, 1975, the Indonesian military forces launched a full scale invasion of East Timor and moved into Dili, the capital. During the ensuing Indonesian occupation of East Timor, more than 200,000 East Timorese were killed, more than one-third of the population of East Timor. During the first week of the invasion, the offices of Timor Oil were targeted and ransacked by the Indonesian Army. Members of the Indonesian military removed, under threat of violence and death, the highly proprietary and confidential data that Oceanic collected during its exploration in the Timor Sea, including maps that identified the

location of the later discovered Bayu-Undan gas field. None of Oceanic's confidential and proprietary information was ever recovered by Oceanic.

58.     On July 17, 1976, General Suharto, the then President of Indonesia, signed a bill declaring East Timor to be the 27th Province of Indonesia. The United Nations refused to recognize this incorporation and took the position consistently for twenty-five years that Portugal remained the administrating power.

### C.     ConocoPhillips' Corruption in Indonesia

59.     ConocoPhillips has a long history of corrupt activities in Indonesia. ConocoPhillips' Director of Contracts and Acquisitions for Indonesia, Arthur Bennett, from the mid-1960's to mid-1970's, actively engaged in paying bribes to Indonesian officials, including officials of the state-run oil company, to secure ConocoPhillips' foothold in Indonesia.

60.     The establishment of Pertamina as a state-run oil company in Indonesia regularized the corrupt payments made by ConocoPhillips. Pertamina required that ConocoPhillips utilize certain specified Indonesian contractors owned by Suharto, his family members and other Suharto cronies. One of the required subcontractors was P.T. McDermott Indonesia, which was a joint venture between McDermott International and Mohammed "Bob" Hasan. McDermott provided the resources and expertise, while Hasan handled interface with the Indonesian government and Pertamina. If oil companies were to receive approval for projects, they needed to use P.T. McDermott in those projects. Hasan typically would receive a 20% agent fee for his efforts. That fee was then paid to the Suharto family. ConocoPhillips regularly used P.T. McDermott in Indonesia. The company knew that the "agent fee" was a device used to bribe Suharto.

61.     In the mid-1980's, officials of Pertamina established a shell corporation known as Rainbow, operating out of Los Angeles, California.  ConocoPhillips, seeking to secure production sharing contracts, entered into "joint ventures" with Rainbow during every tender process for production sharing contracts.  Upon a successful award, ConocoPhillips then "bought out" Rainbow's interest in the "joint venture."  ConocoPhillips' payment to Rainbow for its interest in the "joint venture" was nothing more than a bribe paid to Pertamina officials for the award of new production sharing contracts.  The "bribe" was channeled through the Pertamina officials, through Pertamina, to Suharto and his cronies.

62.     Rainbow registered with the California Secretary of State, but it never established a physical office.  It represented to the California Secretary of State that its business address was on Sunset Boulevard in Los Angeles, California.  In truth, that business address was nothing more than a post office box in a commercial mail box store.  Rainbow existed solely as a device to channel bribes or kickbacks to Pertamina officials, Pertamina and Suharto.  This scheme operated throughout the period of 1985 through 1995.

63.     ConocoPhillips also participated in Indonesian corruption through the use of a complex tax scheme that allowed ConocoPhillips fraudulently to understate its U.S. taxes.  The device to perpetrate this scheme was the production sharing contracts between Indonesia and ConocoPhillips.  Under these agreements, ConocoPhillips received a portion of the oil it actually extracted.  Pertamina received another portion, with a further portion then going to Pertamina for sale for the benefit of Indonesia.  By agreement, each party treated the barrels of oil as being sold at a pre-established price well above actual market price.

64.     By treating its portion of the oil as being sold for an above market price, ConocoPhillips overstated its revenues.  Indonesia imposed and ConocoPhillips paid taxes on

those overstated revenues. Indonesia recognized that ConocoPhillips was overpaying taxes. To bring that overpayment into balance, Pertamina granted ConocoPhillips a right to extract and sell additional oil in an amount equivalent to the amount of taxes that ConocoPhillips overpaid to Indonesia—a refund in kind.

65. ConocoPhillips reported on its consolidated United States corporate income tax returns the initial foreign tax amount assessed by Indonesia. ConocoPhillips did not reflect the refund oil on its tax returns, even though that refund was recognized by all parties to be a refund of taxes paid to adjust for the ghost "sale" of oil at the pre-set, artificial, and above market price.

66. The Internal Revenue Code allows corporations to credit against United States taxes certain taxes paid abroad—the foreign tax credit. Because foreign taxes operate as a credit against payment of U.S. federal taxes, ConocoPhillips' failure to account for the refund of oil meant that each year it overstated the amount of its foreign tax credit. By overstating its foreign tax credit for each year, ConocoPhillips' grossly understated its federal tax obligation to the United States.

67. ConocoPhillips knew that it was receiving oil that was not subject to the Indonesian taxes for each tax year. ConocoPhillips knew that it was receiving this oil for the sole purpose of offsetting the taxes overpaid to Indonesia due to the sale of oil at artificial, pre-set, above-market prices. ConocoPhillips knowingly did not reduce the amount that it claimed to have paid in Indonesia taxes.

68. Through this scheme and artifice to defraud, ConocoPhillips defrauded the United States of taxes properly due and owing for all tax years since at least 1975, perhaps earlier, through tax year 1999. Through this scheme and artifice to defraud, ConocoPhillips

avoided and evaded United States taxes that would have been properly due and owing for all these tax years.

69.     ConocoPhillips uses a calendar year as its tax year.  On or about the September 15th following the close of each tax year, ConocoPhillips mailed or caused to be mailed to the Internal Revenue Service Center in Austin, Texas, a United States corporate income tax return (Form 1120).  Both Schedule J of Form 1120 and the associated Form 1118 contained false and fraudulent overstatements of ConocoPhillips' claimed foreign tax credit. Each Form 1120 and associated schedules that ConocoPhillips mailed to the Internal Revenue Service Center materially and falsely overstated the amount of foreign tax credit that ConocoPhillips claimed in a cumulative amount of millions of dollars.

70.     ConocoPhillips' failure to accurately report the foreign tax credit and the resulting overstatement of that credit on its United States corporate income tax returns and associated schedules with the concomitant underpayment of taxes further enriched both Indonesia and ConocoPhillips for the benefit of sustaining its operations in Indonesia.  This underpayment of U.S. taxes, fraudulently secreted from the U.S. government in the reporting of Indonesia-related operations by ConocoPhillips, defrauded the United States of millions of dollars in taxes that otherwise would have been payable and provided financial resources for ConocoPhillips to continue to pay off corrupt Indonesian officials.

**D.     As a Result of ConocoPhillips' Corruption in Indonesia, ConocoPhillips Gained Favored Status with the Joint Authority**

71.     As a result of ConocoPhillips' long history of corrupt activities in Indonesia, set forth in the preceding section, ConocoPhillips ultimately secured a favored

position when Pertamina officials who worked for the Joint Authority began to participate in the award of production sharing contracts to ConocoPhillips in the Timor Sea.

72.     On December 11, 1989, Indonesia and Australia agreed to commercially exploit the oil and natural gas in the Timor Gap by agreeing to a Zone of Cooperation in the area between East Timor and Northern Australia.  Area A of Zone of Cooperation substantially corresponded to the concession area that Portugal had granted to Oceanic, as shown in the attached Exhibit B.

73.     Indonesia and Australia created a commercial entity, the Joint Authority, to produce, market and sell the oil and natural gas in the Zone of Cooperation.  The Joint Authority established its head office in Jakarta, with an operating office in Darwin, Australia. The Indonesian representatives to the Joint Authority were Pertamina officials.

74.     The Joint Authority was responsible for the "activities relating to exploration for and exploitation of the petroleum resources in Area A [of the Zone of Cooperation]" and had the stated goal to "achieve the optimum commercial utilization of the petroleum resources of Area A . . . ."  Consistent with that goal, the Joint Authority had the right to "market any or all petroleum production."   The Joint Authority was responsible for marketing, selling and disposing of its portion of the oil and natural gas produced in the Joint Petroleum Development Area.

75.     The Joint Authority would enter production sharing contracts between itself and a private petroleum companies.   The production sharing contracts, distinguished from natural resources licences which simply provide a fee to the government, involve the actual involvement of the awarding entities in the exploitation and marketing of resources.  The Joint Authority, like the other parties to these production sharing contracts, shared the risk and

potential benefit of these joint ventures. The production sharing contracts "provide for the contractor to take a share of petroleum production as payment from the Joint Authority for the petroleum operations." The Joint Authority was responsible for supervision of the oil exploration activities, termination of the production sharing contracts, collection and distribution of any proceeds from petroleum production, and preparation of annual income and expenditure financial estimates.

76. The Joint Authority had independent legal status with the ability "to contract, to acquire and [sic] dispose of moveable and immovable property and to institute and be party to legal proceedings."

77. In 1991, the Joint Authority released for tender 14 contract areas in Zone A of the Zone of Cooperation. Those companies holding concessions in the Zone of Cooperation that Australian states had previously granted were given preferential treatment. They had the right to meet any bid offered for Blocks 91-03, 91-04, 91-10 and 91-12. No preferential treatment was given to other former concession holders, including Oceanic.

78. Bidding actually was opened on June 24, 1991 with the close of applications for permits on October 7, 1991. Tenders were evaluated by the financial commitment to be undertaken by the bidding company in exploring for potential hydrocarbon resources in the geographical block subject to the bid. The most significant participant in the bid for Block 91-13 was ConocoPhillips. ConocoPhillips bid an extraordinarily high amount in comparison with other offerors to secure Block 91-13, despite the fact that ConocoPhillips had done no exploration in this area.

79. ConocoPhillips' success in identifying what ultimately proved to be a very large reserve of hydrocarbons in the Timor Gap--a confidence reflected in its high tender price to

secure those rights--resulted from Pertamina having provided to ConocoPhillips the survey and geological data previously prepared by Plaintiffs and stolen by the Indonesian military from Timor Oil's office in Dili in 1975. This data identified accurately the locations ultimately exploited as the well sites for the largest hydrocarbon fields in the Zone of Cooperation. ConocoPhillips, as a result of having this stolen data, was able to successfully identify the well locations in the Block for which it had been awarded concessions. ConocoPhillips, unlike Oceanic, had no prior experience or interest in any area of the Timor Sea prior to 1991.

80. Oceanic did not submit a bid for Block 91-13 or any other Block released at that time. On February 22, 1991, Portugal, the country that had granted Oceanic the concession in the Timor Gap, had initiated an action in the International Court of Justice that challenged the Indonesian invasion and Australia's and Indonesia's establishment of the Joint Authority as a commercial entity to develop oil and natural gas in the Timor Gap. Oceanic did not bid at that time because that act would have been inconsistent with and conflicted with the then pending effort of Portugal to resolve the dispute in Oceanic's favor before the International Court of Justice. On June 20, 1995, the International Court of Justice held, by a 14 to 2 vote, that it could not reach the merits of Portugal's claim because Indonesia, like Australia later, would not submit to the jurisdiction of that court. In addition, the Joint Authority tendering the Blocks for bid was an entity of questionable legitimacy, created solely as a result of Indonesia's invasion of East Timor. Holding legitimate rights from Portugal, Oceanic had no reason call into question its own rights by bidding for rights that it already. Oceanic had no reason to bid for rights that the Joint Authority had no authority to tender and possibly confer legitimacy on a questionable--and since discredited--entity.

81.     In addition, Oceanic did not bid at that time because, unlike the Australian oil companies that held Australian-awarded concessions in the Zone of Cooperation, the Joint Authority denied Oceanic's requested for preferential status as a prior interest holder in the area, despite Oceanic's long history and involvement in the area.

82.     The Bayu-Undan natural gas field falls within Blocks 91-12 and 91-13. ConocoPhillips estimated that the gross hydrocarbon recovery potential from the Bayu-Undan gas field in Blocks 91-12 and 91-13 to be 400 million barrels of petroleum liquids and 3.4 trillion cubic feet of natural gas.  In connection with the commercial development of the Bayu-Undan gas field, ConocoPhillips continued its affiliation with P.T. McDermott, a company with a history of corrupt affiliation with Indonesia's General Suharto.  ConocoPhillips contracted with P.T. McDermott for a significant portion of the platform that ConocoPhillips would use to produce the natural gas and gas condensate from the Bayu-Undan gas field.

**E.     East Timor Gains Its Independence and Vitiates All Prior Interests in the Timor Sea**

83.     The East Timorese people voted overwhelmingly in favor of independence in a vote conducted on August 30, 1999.  Pursuant to the transfer of administrative authority to the United Nations under an agreement with Portugal, the United Nations Security Council, on October 25, 1999, established a United Nations Transitional Administration in East Timor ("UNTAET") with a mandate to maintain law and order and to facilitate humanitarian assistance. At that time, Portugal transferred its internationally recognized role as administrator for East Timor to UNTAET.

84.     The leadership of East Timor was adamant that all interests previously granted in the Timor Sea were invalid, including all prior production sharing contracts that the

Joint Authority had awarded.  Mari Alkatiri, the leader of the largest East Timorese political party, and ultimately Prime Minister for East Timor, stated that his party "would not legitimatize a treaty between a thief and the receiver of stolen goods," referring to the Timor Gap Treaty between Indonesia and Australia that permitted their joint commercial exploration of the oil and natural gas in the Timor Sea.  Alkatiri later stated that "we still consider the Timor Gap Treaty an illegal treaty.  This is a point of principle.  We are not going to be a successor to an illegal treaty."  As such, ConocoPhillips interests in the Timor Gap would have been vitiated.

85.     On November 16, 1999, Jose Ramos Horta, spokesman for the United Nations provisional administration, and later the Deputy Prime Minister of East Timor, spoke out against ConocoPhillips specifically.  He was furious that ConocoPhillips had made payments to Indonesia of approximately US$3 million for oil extracted from the Timor Gap after the independence elections.  Ramos Horta stated:

> I think it's outrageous.  At a minimum, they [ConocoPhillips] had an obligation to seize all revenue from oil production after the ballot.  They did not have any authority to make such payments.  Notwithstanding their claim of a treaty, they contracted with Indonesia in disregard of the illegality of the treaty.

86.     In response to East Timor's new independence, James Godlove, ConocoPhillips' Darwin Area Manager said "under the current terms of the treaty and our contracts, if by the end of 2001 we do not have a declaration of commercial discovery and an approved development plan . . . we run the risk of losing all of the investments we have made and our rights to develop this field.  This would be a disaster of major proportions."

87.     As an interim measure, UNTAET and Australia signed an Exchange of Notes on February 10, 2000, which temporarily continued the terms of the Timor Gap Treaty and allowed East Timor to begin receiving revenue until newly independent East Timor definitively could decide how to proceed with respect to the oil and natural gas in the Timor Gap.

88.     East Timor later adopted a Constitution that vitiated all prior interests, including those of ConocoPhillips, in East Timorese natural resources.

> The resources of the soil, the subsoil, the territorial waters, the continental shelf and the exclusive economic zone, which are essential to the economy, shall be owned by the State and must be used in a just and equitable manner in accordance with national interests. (Constitution of the Democratic Republic of East Timor, art. 139, para. 1).
>
> The Democratic Republic of East Timor shall not recognize any acts or contracts concerning the natural resources referred to in number 1 of Article 139 entered into or undertaken prior to the entry into force of the Constitution which are not confirmed by the competent organs after the Constitution enters into force. (Constitution of the Democratic Republic of East Timor, art. 158, para. 3).

The East Timor Constitution thus vitiated all prior exploration, production or property interests in the Timor Gap, including the ConocoPhillips defendants' interest in all production sharing contracts.

**F.    ConocoPhillips Bribes East Timor's Prime Minister Mari Alkatiri**

89.    To avoid this "disaster of major proportions" – the loss of ConocoPhillips' investment in the Timor Gap – ConocoPhillips conducted a campaign of making cash payments and payments in kind to and for the benefit of Mari Alkatiri and other East Timor officials, in an amount over US$2.5 million.  The significance of these payments can best be understood by comparing them to Mr. Alkatiri's current US$450 monthly salary as the Prime Minister.

90.    These cash payments were in U.S. dollars transferred as a result of travel between Australia, the United States and East Timor by Godlove, Brand and even James Mulva, the Chief Executive Officer of ConocoPhillips.  ConocoPhillips made these payments to influence Mari Alkatiri and to induce him to use his influence to ensure that East Timor would reinstate the production sharing contracts that ConocoPhillips previously held and to ensure that Oceanic would not be awarded production sharing contracts in the Timor Gap.

91.    Since August 30, 1999, Mari Alkatiri, regardless of the title he may have held with either UNTAET or the East Timor government, had direct responsibility for all natural resources in East Timor, including oil and natural gas in the Timor Gap.  He was able to influence the determination of whether any company would be allowed to bid for the proven oil and natural gas reserves in the Timor Gap.  He was able to influence the determination of whether the Designated Authority would award production sharing contracts, or allow competition for production sharing contracts, by companies other than those that previously held rights granted while Indonesia occupied East Timor, most significantly the ConocoPhillips defendants.  ConocoPhillips recognized Alkatiri's significant influence over the East Timor natural resources, including the oil and natural gas in the Timor Gap, and dealt with him almost exclusively on this issue from August 30, 1999.

92.     From August 30, 1999, until he was named Prime Minister of East Timor on April 14, 2002 , Mari Alkatiri was the Chief Economic Affairs Minister for UNTAET.  As Prime Minister, Alkatiri was concurrently the Minister for Development of the Environment.  In addition, Alkatiri serves as the titular head of the Timor Sea Designated Authority.  Jose Teixeira, a known accomplice of Alkatiri, is one of the two East Timor joint commissioners of the Designated Authority.

93.     ConocoPhillips' 2000 Annual Report stated that the company had "donated 13 trucks for agricultural use," purportedly "to help the new nation of East Timor."  The 2000 Annual Report pictured Stephen Brand, "Australasia division president" presenting an additional vehicle--to be used as "a mobile medical clinic"--to three nuns.  In facts, the "trucks" were Toyota SUVs intended to become personal vehicles for the senior political leadership in East Timor.  These SUVs have been so used; they can be seen nightly parked in the driveways of government officials, including the Alkatiri residence.  Senior ConocoPhillips management not only intended that these SUVs be a bribe to curry favorable treatment for the company, but also have actually witnessed in trips to East Timor that the vehicles in no way are actually "for agricultural use."  Subsequently, ConocoPhillips has "contributed" a number of other vehicles for the personal benefit of officials in East Timor.

94.     Ahmed Alkatiri is Mari Alkatiri's brother.  During this time and thereafter, Mari Alkatiri sometimes used Ahmed to collect bribes made by foreign companies, including ConocoPhillips, to secure favorable treatment.  Beginning in January 2001, Ahmed Alkatiri received $74,000 in U.S. funds that were then paid into bank accounts in Australia.  Those accounts are with the Australia and New Zealand Bank ("ANZ Bank") facility, one of which is Account Number 0164955606-24866.  Another account used for this purpose at the same bank,

but in the name of Mari Alkatiri, is Account Number 0159015376-18038.  Some of the cash was

deposited at the ANZ branch at 247 Trower Road, Monterey House, Casuarina.  This money was

paid by ConocoPhillips in its effort to solidify approval by Mari Alkatiri, on behalf of East

Timor, of the prior production sharing contracts that had been secured from the Joint Authority in

the Timor Gap.

    95. As a direct result of the illegal payments ConocoPhillips made to and for

the benefit of Mari Alkatiri, he no longer condemned ConocoPhillips' production sharing

contracts that ConocoPhillips was awarded during the Indonesian occupation of East Timor.  To

the contrary, on July 5, 2001, Mari Alkatiri, then the East Timorese Cabinet Member for

Economic Affairs for the UNTAET, signed a Memorandum of Understanding with Australia.  In

that document, Alkatiri agreed that upon East Timor's independence, an arrangement similar to

the one that existed between Australia and Indonesia would govern joint exploitation of the Joint

Petroleum Development Area (previously Area A of the Zone of Cooperation under the Timor

Gap Treaty).  The Joint Petroleum Development Area, like Area A of the Zone of Cooperation,

overlapped the area of Oceanic's concession from Portugal, as shown in Exhibit B.

    96. In the summer of 2001, Mari Alkatiri sought to impose on ConocoPhillips

a tax rate in excess of the tax rate that Indonesia had imposed upon ConocoPhillips.

ConocoPhillips took the position that if East Timor continued to insist on its higher tax rates,

then the development project in the Timor Gap would be discontinued and there would be, as a

result, no revenues to benefit East Timor in the near term.  The company further stated that there

would be no further investment by ConocoPhillips until the terms and conditions of the prior

arrangement with Indonesia were restored.  Thereafter, Mulva flew to Dili to meet with Mari

Alkatiri.  He traveled with Stephen Brand and James Godlove on a ConocoPhillips aircraft, Registration No. N663P, arriving in Dili on August 24, 2001.

97.     Mulva's trip to Dili to attempt to secure the same tax arrangements as previously had been in place with Indonesia took place just before the elections in East Timor. Mulva met with Alkatiri, who at the time was designated as the Chief Timorese negotiator by both UNTAET and the provisional East Timorese government.  Alkatiri told Mulva in those meetings to wait until after the elections to further discuss the issue.

98.     After the elections, repeated discussions between ConocoPhillips and Alkatiri took place.  For example, on October 12, 2001 ConocoPhillips officials flew to Dili from Perth on a ConocoPhillips aircraft, Registration No. N663P, later returning to Darwin.  Finally, on December 21, 2001 Brand, President of Phillips Petroleum (91-12) Pty. Ltd., now known as ConocoPhillips (03-12) Pty. Ltd., speaking on behalf of ConocoPhillips and its subsidiaries and co-ventures in the Bayu-Undan field, stated that the East Timor Counsel of Ministers, which was controlled by Mari Alkatiri, had decided to endorse the Understanding on Tax and Fiscal Package that solidified the tax rates that ConocoPhillips previously had in place with Indonesia.

99.     At the end of October, Mari Alkatiri and Ahmed Alkatiri, on his brother's behalf, received approximately $44,000 in U.S. funds which ultimately were paid into bank accounts in Australia at the ANZ Bank in Casuarina.  These payments were made by ConocoPhillips to influence the decision by East Timor to reduce its tax rates.

100.     On April 14, 2002, Mari Alkatiri was designated the Prime Minister. Mulva, originating his travel in the United States on a ConocoPhillips aircraft, Registration No. N663P, visited Dili, departing on April 17, 2002, in the company of Billy Parker, Stephen Brand and Blair Murphy, with a destination of Sydney, Australia.  East Timor planned to have its

"independence day" the next month. ConocoPhillips paid to Alkatiri US$500,000 purportedly for the celebrations. The payment has never been accounted for to the East Timor public and was not spent on the celebrations.

101. Mulva, ConocoPhillips CEO, traveled to Dili and attended the celebrations. Originating his travel in the United States on a ConocoPhillips aircraft, Registration No. N667P, Mulva arrived in Dili on May 19, 2002, in the company of Blair Murphy, Stephen Brand and Billy Parker. Prior to the arrival in Dili, the aircraft stopped in Darwin, Australia. Mulva arranged to have over $2 million in U.S. funds paid to Mari Alkatiri during Mulva's trip as a bribe for Alkatiri's participation in ensuring that ConocoPhillips maintained its interests in the Timor Sea on the same terms as it had previously secured from Australia and Indonesia. This US$2 million cash payment was then ferried in various amounts to Australia and placed in a bank account in the name of Ahmed Alkatiri, for the benefit of Mari Alkatiri. Between May and December, 2002, Alkatiri and members of his family and cohorts made over 80 trips from Dili to Darwin for this purpose. The resulting cash was deposited at the Wespac Bank at 7 Bradshaw Terrace, Casuarina. In transactions with the Westpac Bank, Ahmed--in an effort to cover-up his actions--used at least four different names: Ahmad Alkatiri, Ahmad Bin Hamud Alkatiri, Ahmed Alkatiri and Ahmade Hamute Alkatiri.

102. On June 15, 2002, Rogerio Lobato–an Alkatiri bagman–was stopped at the Darwin airport by Australian customs authorities with approximately $1 million in United States currency in a suitcase. Because of his assertion of diplomatic immunity, he was allowed to proceed into Australia, but a report of suspicious financial activity was generated by the Australian officials. This money ended up in Alkatiri's bank accounts in Australia.

103.     In addition, in the period between May and July, 2002, additional monies were given to Ahmed and Mari Alkatiri by ConocoPhillips in an amount approximating A$138,000.  These funds, as well, were ultimately transported to Australia for placement in the separate ANZ bank accounts.

104.     December 31, 2002 was seen as the deadline for Australia to approve the Timor Sea Treaty between Australia and East Timor covering the Timor Gap area, now denominated as the Joint Petroleum Development Area.   Although the Timor Sea Treaty had earlier been signed by East Timor and Australia on May 21, 2002, that treaty required parliamentary approval by both countries.  The International Unitization Agreement was necessary as a separate agreement between the two countries because the Greater Sunrise gas field straddled the eastern border of the Joint Petroleum Development Area and is thus partially outside the boundaries covered by the Timor Sea Treaty.  The Timor Sea Treaty, signed by the heads of state in May 2002, contemplated that the International Unitization Agreement would be finalized by December 31, 2002.

105.     In December 2002, ConocoPhillips applied further pressure to get the Timor Sea Treaty ratified.  It took the position that it could not proceed with the Darwin liquid natural gas plant until such time as the ratification process was complete.  ConocoPhillips insisted that a liquid natural gas plant could not be constructed in East Timor because an undersea pipeline to such a plant from the Bayu-Undan gas field was not "technically feasible." ConocoPhillips' knew that its statement was false.  In 1996, ConocoPhillips engaged a pipeline engineering consultant, JP Kenney Company, to study the feasibility of a pipeline to East Timor. A report prepared by JP Kenney Company and provided to ConocoPhillips concluded that an undersea pipeline from the Bayu-Undan gas field to East Timor was technically feasible.  In

addition, the report concluded that because the distance to East Timor was half of the distance to Australia, an undersea pipeline to East Timor was likely to be less expensive.

106. The East Timor Parliament ratified the Timor Sea Treaty on December 17, 2002, but without agreement on the International Unitization Agreement that covered the Sunrise oil fields. ConocoPhillips's Murphy stated at the time that East Timor would receive US$3 billion from the Bayu-Undan oil field over the next 17 years.

107. At about this same time, Alkatiri, through his brother Ahmed, received approximately $54,000 in U.S. funds from ConocoPhillips to secure his approval and participation in the treaty ratification. These funds were ultimately deposited in ANZ Bank accounts in the name of Mari and Ahmed Alkatiri.

108. Thereafter, ConocoPhillips imposed a deadline of March 11, 2003 by which it must have ratification of the Timor Sea Treaty in order to go forward with the construction of a liquid natural gas facility in Darwin. The Timor Sea Treaty formally came into effect on April 1, 2003, with the exchange of notes between Australia and East Timor.

109. One day later, the Designated Authority was formed to commercially exploit the oil and natural gas in the Timor Gap. The Designated Authority entered into production sharing contracts that same day. Six of those seven production sharing contracts were with ConocoPhillips defendants or to consortia in which ConocoPhillips defendants held significant interests. The Designated Authority, like the other parties to these production sharing contracts, shared the risk and potential benefit of these joint ventures. The Designated Authority was responsible for marketing, selling and disposing of its portion of the oil and natural gas produced in the Joint Petroleum Development Area. The Designated Authority, like the commercial actor that it is, reserved the right to engage in, and did engage in downstream

activities, *i.e.*, the disposition of the oil or natural gas after extraction from the seabed, including marketing, sale, purchase and transportation of the oil and natural gas. A significant portion of the Designated Authority's oil and natural gas was imported into the United States.

110.     Shortly after the Timor Sea Treaty ratification on April 1, 2003, Mulva, in a trip originating out of the United States, traveled to Dili to meet with Alkatiri in the second week of April, 2003. He flew with William Berry and Blair Murphy on a ConocoPhillips aircraft, Registration No. N667P, departing Dili on April 14, 2003 for Darwin, Australia. At or around the same time, Alkatiri introduced before the East Timorese Parliament legislation that would reduce the income tax rates that would be applied to the Bayu-Undan gas field, in other words the legislation would reduce the income tax rates of primarily ConocoPhillips. Notwithstanding Alkatiri's earlier insistence that much higher tax rates should apply to ConocoPhillips, the legislation that Alkatiri proposed reduced the rate below the rate that Indonesia had imposed on ConocoPhillips. The East Timor Parliament approved the tax legislation on June 5, 2003 and confirmed the reduced income tax rate would apply for at least 20 years. This reduction in the income tax rate applied to ConocoPhillips does not benefit the East Timorese people. To the contrary, it reduced the amount of taxes that East Timor's largest taxpayer would have to pay. It deprived the people of East Timor of money that could have been used to improve the health or education of its people or to develop a basic modern infrastructure. Alkatiri provided no economic justification why the poorest country in Asia would reduce the amount of taxes that its largest taxpayer would have to pay. Alkatiri reduced the income tax rate that ConocoPhillips would pay as a result of the improper payments that made to him by ConocoPhillips.

111.    ConocoPhillips then announced on June 15, 2003, that the Designated Authority had approved its gas development plan for Bayu-Undan.  ConocoPhillips stated that it would then proceed with the US$1.5 billion development that included a pipeline from the Bayu-Undan gas field to Darwin, Australia, and the construction of a liquified natural gas plant in Darwin.  Production of gas condensate began in 2004.

**G.      Oceanic's Efforts to Obtain New Interests in the Timor Sea or New Recognition of its Prior Interests**

112.    Having been thwarted in its efforts to capitalize on the concession that Portugal had granted it, Oceanic consistently sought to compete for and to bid for the rights to explore for and produce oil and natural gas in the Timor Gap.

113.    With the formation of the Joint Authority in 1989, Oceanic continued to press for rights to explore for and produce oil and natural gas in the Timor Gap.  Oceanic inquired of and attempted to meet with not only representatives of the Joint Authority, but with representatives of Pertamina and Australia. Oceanic's efforts were unsuccessful.

114.    Shortly after the UNTAET became the transitional governing authority in newly independent East Timor in 1999, Oceanic attempted to meet with the responsible parties, including the members of the governing authority and individuals in East Timor's provisional parliament.  In addition to seeking recognition of the concession granted by Portugal, this time Oceanic also attempted, in the alternative, to pursue significant new business opportunities and to seek from UNTAET, as the provisional governing authority, rights to explore for and produce oil and natural gas in the Timor Sea in areas not covered by the Portuguese concession, but which would fall within East Timor international boundaries under international law and would triple East Timor's seabed resource base.

115. On June 6, 2001, an Oceanic representative contacted Sergio Vieria de Mello, Special Representative of the Secretary General for East Timor and Head of the Mission (UNTAET) to set up a meeting with Oceanic representatives. de Mello, upon the instruction of Alkatiri, refused to meet with the Oceanic representatives.

116. On June 21, 2001, Oceanic representatives were able to meet briefly with Mari Alkatiri, who was then the UNTAET Chief Economic Affairs Minister, and two advisors. As a result of that meeting, one of Alkatiri's advisors arranged a meeting for the following day with certain members of the UNTAET Cabinet. At the meeting with certain members of the UNTAET Cabinet, two Oceanic representatives were permitted only ten minutes to discuss Oceanic's efforts to obtain rights to explore for and produce oil and natural gas in the Timor Gap and the viability of a natural gas pipeline from the Bayu-Undan gas field to East Timor. The only member of the UNTAET Cabinet who responded to Oceanic's discussion was Mari Alkatiri, who was furious that Oceanic did not limit its presentation to the viability of a natural gas pipeline, but discussed potential exploration and production rights in the Timor Gap, as part of the company's alternative approaches.

117. All subsequent efforts by Oceanic representatives to meet with Alkatiri over the following months were met with rejection.

118. In early October 2001, Oceanic and Petrotimor delivered to UNTAET a new formal request for a concession in the Timor Gap. The request was for oil and natural gas exploration and production rights within the expanded lateral boundaries of East Timor in the Timor Gap. The request proposed, and provided economic justification for, a liquid natural gas facility in East Timor. Oceanic and Petrotimor representatives hand delivered the documents to all members of the UNTAET government, including Mari Alkatiri, then the Chief Minister and

Minister of Economy and Development. The Oceanic and Petrotimor representatives attempted to meet with Alkatiri, who was the official responsible for natural resources, to discuss the request. Alkatiri accepted the document in the reception area to his office, but quickly entered and shut the door to his office and refused to speak with or listen to the representatives.

119. Shortly after Oceanic had delivered its formal request, Alkatiri asked Sergio Vieira de Mello, Head of the UNTAET Mission, to issue an edict prohibiting any UNTAET employee from speaking with Oceanic's representatives. de Mello acceded to Alkatiri's request. On October 10, 2001, de Mello issued a memorandum acknowledging Alkatiri's request, stating that Alkatiri was the only UNTAET official with authority to deal with Oceanic and requiring that "[b]y this memorandum, I wish to instruct all UNTAET personnel to have no contacts with these representatives [of Oceanic] or their associates."

120. In early March 2002, representatives of Oceanic and Petrotimor visited East Timor. These representatives met with officials of the East Timorese government. Oceanic had invested significantly in research and analysis of the legal viability of a claim that could be brought on behalf of East Timor in the International Court of Justice to establish a permanent seabed boundary in the Timor Gap between East Timor and Australia. Respected scholars on international boundaries rendered opinions on the issue on Oceanic's behalf. During that time in East Timor, Oceanic provided these opinions to the East Timorese officials, including Mari Alkatiri, and offered to fund litigation in the International Court of Justice on behalf of East Timor so that East Timor could pursue the entirety of its legitimate rights under international law to the natural resources in the Timor Sea. These expanded boundaries, to which East Timor is entitled, would have tripled the amount of oil and natural gas within the sovereignty of East Timor. In exchange for funding litigation in the International Court of Justice to establish these

expanded rights, Petrotimor and Oceanic asked the East Timorese government to grant it a revenue interest in the currently producing fields that would come within East Timorese sovereignty. Oceanic received no response to this request. Within days after Oceanic and Petrotimor made this offer, Australia, without public fanfare, withdrew from the jurisdiction of the International Court of Justice as to all disputes pertaining to delimitation of maritime zones.

121.    On March 23-24, 2002, representatives of Oceanic and Petrotimor sponsored a conference in Dili, East Timor that addressed East Timor's maritime boundaries and pipeline activities. Oceanic had invited to the conference East Timor's cabinet members and all members of East Timor's parliament (many of whom attended), the leaders of all political parties, the general public, and the press. The conference consisted of three presentations: a presentation on East Timor's justifiable maritime boundaries according to international law; a presentation on the economic impact of East Timor claiming these justifiable boundaries; and a presentation advocating the construction of a gas pipeline from the Bayu Undan and Greater Sunrise gas fields to East Timor instead of Darwin, Australia, thereby enabling East Timor to benefit from a domestic liquid natural gas plant and, as a result, to provide billions of dollars of investment in East Timor infrastructure and jobs for unemployed East Timorese citizens. Oceanic later hand delivered materials from the conference to Alkatiri, his cabinet members, and those members of parliament who could not attend. Oceanic sent these materials to both the official and personal electronic mail addresses of Alkatiri and his cabinet members, and those members of parliament with electronic mail addresses.

122.    In August 2002, Oceanic representatives again visited Dili, East Timor and attempted to meet with Prime Minister Alkatiri. Alkatiri refused to meet with the Oceanic representatives.

123.     With United Nations assistance, Oceanic representatives were able to make a short presentation regarding how Oceanic could assist East Timor to gain recognition of its legitimate boundaries in the Timor Sea to Mari Alkatiri and Niny Borges at the United Nations Building in New York, New York on September 27, 2002.  Alkatiri appeared to listen, but never acknowledged Oceanic's request for recognition of or broadening of rights to explore for and produce the oil and natural gas in the Timor Sea.  The meeting produced no results.

124.     An Oceanic representative attended an oil industry conference in Darwin, Australia in June 2003.  Jose Teixeria, one of two East Timorese joint commissioners of the Designated Authority, informed the Oceanic representative that the Designated Authority would not recognize Oceanic's prior concession and that the Designated Authority would not consider any Oceanic bids for production sharing contracts in the Joint Petroleum Development Area because doing so would be an "action that might annoy the Sunrise Field Group." ConocoPhillips owns a significant portion of the referenced Sunrise Field Group.

125.     Oceanic had no opportunity to bid for any production sharing contracts from the Designated Authority.  On April 2, 2003, the Designated Authority, under Alkatiri's influence, awarded seven production sharing contracts in the Joint Petroleum Development Area. The production sharing contracts were awarded to those companies to which the Joint Authority had previously granted production sharing contracts.  The Designated Authority awarded these production sharing contracts without any formal acreage release or public bidding process.

126.     Six of the seven production sharing contracts awarded by the Designated Authority were awarded to the ConocoPhillips defendants or to groups in which the ConocoPhillips defendants held a significant interest.  Those entities include:  ConocoPhillips (91-12) Pty Ltd.; ConocoPhillips (91-13) Pty Ltd.; ConocoPhillips JPDA Pty Ltd.;

ConocoPhillips Petroleum Timor Sea Pty Ltd.; ConocoPhillips (96-16) Pty Ltd.; ConocoPhillips (95-19) Pty Ltd.; ConocoPhillips (96-20) Pty Ltd.; and ConocoPhillips (00-21) Pty Ltd.

127.    Alkatiri allowed these production sharing contracts to be awarded without competition or considering the best interests of the East Timorese people, which would have been served by an undersea pipeline from the Bayu-Undan gas field to East Timor and a liquid natural gas facility in East Timor, not Australia, as Oceanic consistently proposed. Alkatiri did not consider either a pipeline from the Bayu-Undan gas field to East Timor or a domestic East Timorese liquid natural gas facility as a condition of awarding the production sharing contracts to the ConocoPhillips defendants. Rather, he was "persuaded" to adopt and did adopt the false ConocoPhillips position that a pipeline to East Timor from the Bayu-Undan gas field was not technically feasible.

## IV.    DEFENDANTS' CONTACTS WITH THE UNITED STATES

128.    Phillips Petroleum ("Phillips"), a predecessor to ConocoPhillips itself, the Joint Authority, and the Designated Authority have, since October 2001, imported to the United States millions of barrels of oil that they derived from the Elang-Kakatua oil field in the Timor Sea:

| DATE | BARRELS IMPORTED | PLACE OF IMPORT |
|---|---|---|
| October, 2001 | 650,000 | Martinez, California |
| November, 2001 | 618,000 | San Francisco, California |
| December, 2001 | 678,000 | San Francisco, California |
| January, 2002 | 650,000 | Seattle, Washington |
| April, 2002 | 648,000 | San Francisco, California |
| May, 2002 | 657,000 | Seattle, Washington |
| June, 2002 | 569,000 | Martinez, California |

| DATE | BARRELS IMPORTED | PLACE OF IMPORT |
|---|---|---|
| June, 2002 | 49,000 | Seattle, Washington |
| July, 2002 | 682,000 | Martinez, California |
| August, 2002 | 63,000 | Martinez, California |
| September, 2002 | 1,300,000 | Martinez, California |
| October, 2002 | 652,000 | Martinez, California |
| November, 2002 | 641,000 | Martinez, California |
| December, 2002 | 636,000 | Martinez, California |
| January, 2003 | 622,000 | Martinez, California |
| February, 2003 | 650,000 | Martinez, California |
| March, 2003 | 631,000 | Martinez, California |
| April, 2003 | 367,000 | Eureka, California |
| May, 2003 | 616,000 | Martinez, California |
| June, 2003 | 657,000 | Martinez, California |
| July, 2003 | 725,000 | Martinez, California |
| August, 2003 | 410,000 | Eureka, California |
| August, 2003 | 251,000 | Martinez, California |
| January, 2004 | 623,000 | Martinez, California |
| May, 2004 | 591,000 | Martinez, California |
| August, 2004 | 655,000 | Martinez, California |
| October, 2004 | 589,000 | Martinez, California |
| November, 2004 | 622,000 | Martinez, California |
| December, 2004 | 1,380,000 | Martinez, California |

129.    The oil belonging to the Joint Authority extracted from the Elang-Kakatua

oil fields in the Zone of Cooperation in the Timor Gap was, with full knowledge and approval of

the Joint Authority, imported into the United States where it was sold for the commercial benefit of the Joint Authority.

130.    The oil belonging to the Designated Authority extracted from the Elang-Kakatua oil fields in the Zone of Cooperation in the Timor Gap was, with full knowledge and approval of the Designated Authority, imported into the United States where it was sold for the commercial benefit of the Designated Authority.

131.    The Joint Authority established a banking relationship with Chase Manhattan Bank in New York, New York.   Chase Manhattan is insured by the Federal Deposit Insurance Corporation.  The Joint Authority maintained and controlled both depository and flow-through accounts with Chase Manhattan Bank in New York.  It is through these accounts that the Joint Authority conducted its financial transactions, namely the regular and continuous receipt of revenues for the commercial exploitation of oil, including revenues from the sale of its own portion of oil and natural gas.  The Joint Authority directed those entities that owe money to the Joint Authority for activities in the Zone of Cooperation of the Timor Gap, including ConocoPhillips, to deposit or to transfer by wire such funds to its Chase Manhattan Bank accounts.

132.    Employees of and agents of the Joint Authority spoke with representatives of the Chase Manhattan Bank in the United States by telephone and conveyed information to representatives of the Chase Manhattan Bank by facsimile or wire transmissions.  Employees and agents of the Joint Authority also had telephone and facsimile communications with employees or agents of members of the ConocoPhillips Group in the United States.  These communications were used to effectuate the acts of bribery, corruption and conspiracy alleged herein.

133. Once the production of oil from the Elang-Kakatua fields began, the Joint Authority instructed ConocoPhillips, to deposit the proceeds from the sale of the Joint Authority's portion of the oil produced from the Elang-Kakatua fields in that Chase Manhattan Bank account. ConocoPhillips regularly so deposited the sale proceeds. Those transactions, which have been documented in the Joint Authority's annual reports, constitute transactions that involve the use of a financial institution engaged in activities that affect interstate or foreign commerce in any way or degree.

134. The Joint Authority in February 1999 described the sharing mechanism between the operators and the countries for revenues received from extracted oil in the Elang-Kakatua field:

> The first receipt of revenue from the sale of petroleum from the Elang-Kakatua-Kakatua North field was received on 5 October 1998. These revenues are received into a special fund bank account held with the Chase Manhattan Bank in New York, where interest is earned under an enhanced automatic investment program. The petroleum revenues and interest are shared equally between the Contracting States and transferred to the accounts nominated by the Contracting States on the 15th of each month.

135. The Designated Authority is a customer of Chase Manhattan Bank in New York, New York. The Designated Authority maintains and controls both depository and flow-through accounts with Chase Manhattan Bank in New York. The Designated Authority directs firms that owe money to it for activities in the Joint Petroleum Development Area of the Timor Gap, including ConocoPhillips, to deposit or transfer by wire such funds to its Chase Manhattan

Bank accounts. These communications were used to effectuate the acts of bribery, corruption and conspiracy alleged herein.

136.     Employees and agents of the Designated Authority spoke with representatives of the Chase Manhattan Bank in the United States by telephone and conveyed information to the Chase Manhattan Bank by facsimile or wire transmission. Employees and agents of the Joint Authority also had telephone and facsimile communications with employees or agents of members of the ConocoPhillips Group who are located in the United States.

137.     ConocoPhillips deposits the proceeds of its sale of oil from the Elang-Kakatua fields in an as yet unidentified domestic financial institution that is insured by the Federal Deposit Insurance Corporation. ConocoPhillips transfers or causes to be transferred by wire from accounts in the financial institution holding its deposits to the Joint Authority's and/or Designated Authority's accounts at Chase Manhattan Bank in New York, New York.

138.     ConocoPhillips' deposits in the Joint Authority's account in Chase Manhattan Bank and subsequently in the Designated Authority's account in Chase Manhattan Bank were made with the intent to promote specified unlawful activity. If ConocoPhillips did not make those payments to the Joint Authority and subsequently to the Designated Authority for the first tranche oil, then the Joint Authority and subsequently the Designated Authority would terminate the respective production sharing contracts and preclude ConocoPhillips from taking and selling any more of the oil (and later natural gas) from the Timor Sea.

139.     On a monthly basis, the Joint Authority and subsequently the Designated Authority distributed the funds deposited in their bank accounts at Chase Manhattan Bank in New York to the bank accounts nominated by each of the Contracting States.

140. The Joint Authority's and Designated Authority's deposits in the bank accounts designated by the Contracting States were made with intent to promote specified unlawful activity. By making payments to the Contracting States, the Joint Authority and Designated Authority ensured that the Contracting States would continue to reap financial benefits from ConocoPhillips' exportation of oil (and later natural gas), that the Contracting States would continue to recognize ConocoPhillips' production sharing contracts, and that ConocoPhillips would continue exporting oil (and later natural gas) from the Timor Sea.

141. Both the oil (and later extracted natural gas) and the revenue generated from the sale of those products from the Timor Sea constitute proceeds of specified unlawful activity. Specified unlawful activity includes, but is not limited to, the predicate acts and other claims including: murder, robbery, extortion, destruction of property by means of explosive or fire, a crime of violence, fraud, or any scheme to defraud, bribery of a public official, interstate and foreign travel to aid racketeering, an offense with respect to which the United States would be obligated by a multilateral treaty, either to extradite the alleged offender or to submit the case for prosecution, if the offender were found within the territory of the United States.

142. The financial transactions engaged in by ConocoPhillips and the Designated Authority that result from the sale of the oil were and are made with the intent to promote specified unlawful activity because only by getting money for the oil do ConocoPhillips and the Designated Authority realize the benefit from the oil and natural gas and the specified unlawful activity.

143. ConocoPhillips and the Designated Authority knew, at the time that they participated in or attempted to participate in the foregoing financial transactions that the funds at

issue represented the proceeds of some form of an activity that constituted a felony under state, federal, or foreign law.

144.    In addition to the foregoing transactions being made and continuing to be made with the intent to promote specified unlawful activity, the foregoing transactions were made with the intent to evade taxes or commit tax fraud; with the intent to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity; and/or with the intent to avoid a transaction reporting requirement under state or federal law.

## V.    DEFENDANTS' CONCEALMENT OF INHERENTLY SECRET WRONGFUL ACTS AND PLAINTIFFS' DISCOVERY OF SUCH ACTS

145.    The acts of bribery, corruption and wrongdoing as specified in this Complaint, and which resulted in the exclusion of Oceanic from the opportunity to compete and bid for the rights to explore for and produce oil and natural gas in the Timor Gap, were inherently secret acts not known to the world, and which defendants and each of them made concerted efforts to conceal from the public, shareholders and Plaintiffs each and every act of tortious or criminal conduct alleged herein.

146.    As a result of defendants' concealment of said acts of bribery, corruption and wrongdoing, plaintiffs lacked sufficient knowledge of facts, and did not have reason to have such knowledge of facts, such as would allow plaintiffs to determine that defendants had engaged in wrongful acts that had injured plaintiffs and constituted a sufficient legal basis for plaintiffs to assert civil causes of action, as now set forth herein, against defendants and each of them.

147.    In 2002, East Timor adopted a constitution that vitiated all pre-existing interests in the Timor Sea. The subsequent act of recognition of ConocoPhillips' production

sharing contracts in the Timor Sea, to the exclusion of Oceanic, was contrary to the prior public statements Mari Alkatiri and other East Timor officials, who had previously made clear that they would not recognize the production sharing contracts awarded while Indonesia unlawfully occupied East Timor. In short, Alkatiri, for his part, had described those production sharing contracts as the proceeds of "theft."

148. As a result, in 2003, plaintiffs commenced an investigation to determine whether this abrupt reversal of position by East Timorese officials was the result of any wrongful conduct by defendants or others who had significant financial interests in the Timor Gap. Oceanic's investigation revealed information regarding the acts of bribery and other criminal and tortious conduct engaged in by defendants after East Timor's independence. Those acts are set forth at length at paragraphs 89-111.

149. As a result of Oceanic's discovery of the information regarding defendant ConocoPhillips' acts of bribery, and the corruption of the officials of East Timor who accepted and acted thereon in denying Oceanic any opportunity to compete for or bid for the rights to explore for or produce oil or natural gas from the Timor Sea, plaintiffs conducted further investigation into the conduct of ConocoPhillips.

150. Of course, Oceanic could not have known of ConocoPhillips' corrupt acts before they took place in 2001, 2002 and 2003.

FIRST CLAIM

RACKETEER INFLUENCED AND CORRUPT

ORGANIZATIONS ACT

(18 U.S.C. §§ 1962(c) and 1964(c))

(Against All Defendants)

151.     Plaintiffs reallege and incorporate by reference each and every allegation

in Paragraphs 1 through 150.

152.     During all relevant times and continuing through the filing of this

Complaint, conspirators were persons and were associated-in-fact with an enterprise engaging in,

and the activities of which affect, interstate and foreign commerce.  This enterprise is made up of

the ConocoPhillips Group, the Joint Authority Group, the Designated Authority Group, and

Pertamina Group (collectively the "Conspirators")

153.     The Conspirators and each of them, for the purpose of executing and

attempting to execute the scheme to improperly prevent Plaintiffs from competing fairly with

ConocoPhillips and preventing Plaintiffs from obtaining rights to explore for and produce oil and

natural gas in the Timor Gap, by means of tortious, fraudulent and criminal conduct, did and do

unlawfully, willfully and knowingly conduct and participate, directly and indirectly, in the

conduct of said enterprise's affairs through a pattern of racketeering activity. Their actions

include multiple, related acts in violation of:  (1) Interstate and Foreign Travel to Aid

Racketeering, 18 U.S.C. § 1952; (2) Money Laundering, 18 U.S.C. § 1956; and (3) Engaging in

Monetary Transactions in Proceeds from Specified Unlawful Activities, 18 U.S.C. § 1957.

154.     The enterprise as described herein is at all relevant times a continuing

enterprise because, it was designed to and did unlawfully prohibit and prevent Plaintiffs from

fairly competing with ConocoPhillips and prevent Plaintiffs from obtaining rights to explore for oil and natural gas in the Timor Gap. The conduct of the enterprise continues through the date of this Complaint and is ongoing by virtue of Conspirators' continued exploitation of and importing into the United States hydocarbons from under the Timor Sea, all to the detriment of Plaintiffs.

155. The pattern of racketeering activity, as defined by 18 U.S.C. §§ 1961(1) and (5), presents both a history of criminal conduct and a distinct threat of continuing criminal activity. Such activity consists of multiple acts of racketeering by each Conspirator herein, is interrelated, not isolated and is perpetrated for the same or similar purposes by the same persons. Such activity extends over a substantial period of time, up to and beyond the date of this Complaint. Such activities occurred after the effective date of 18 U.S.C. §§ 1961 et seq., and the last such act occurred within 10 years after the commission of a prior act of racketeering activity. These racketeering activities included repeated acts of:

(a)     Interstate and Foreign Travel in Aid of Racketeering Enterprises:
On or about the dates indicated in the paragraphs incorporated below, the defendant Conspirators and their employees and/or agents acting on their behalf, aided and abetted by each other, and the remaining Conspirators, traveled in interstate or foreign commerce or used the mail or any facility in interstate or foreign commerce, with intent to do so thereafter distributed or attempted to distribute the proceeds of any unlawful activity, committed or attempted to commit any crime of violence to further any unlawful activity; or promoted, managed, established, carried on, or facilitated the promotion, management, establishment, or carrying on, of any unlawful activity or attempted to do so. Said unlawful activity included, but was not limited to, extortion and/or bribery in violation of the laws of the United States, including but not limited to violations of the Foreign

Corrupt Practices Act, 15 U.S.C. §§78dd-1 to -3, and violations of 18 U.S.C. § 1952 and

18 U.S.C. § 2, as described in Paragraphs 1, 4-6, 59-71, 89-90, 93-103 and 106-111 of

this Complaint.

(b)  Money Laundering--Transaction:  On or about the dates indicated

in the paragraphs incorporated below, the defendant Conspirators, aided and abetted by

each other, and the remaining Conspirators, with knowledge that the property involved in

a financial transaction represented the proceeds of some form of unlawful activity,

conducted or attempted to conduct a financial transaction that, in fact, involved or would

have involved the proceeds of specified unlawful activity.  The defendant Conspirators

did so with the intent to promote or to attempt to promote the carrying on of specified

unlawful activity; with intent to engage or to attempt to engage in conduct constituting

tax fraud or tax evasion; or knowing that the transaction was designed in whole or in part

to conceal or disguise the nature, the location, the source, the ownership, or the control of

the proceeds of specified unlawful activity; or to avoid a transaction reporting

requirement under state or federal law.  Such actions are in violation of 18 U.S.C. § 1956

and 18 U.S.C. § 2, as described in Paragraphs 1, 4-6, 59-71, 89-90, 93-103, 106-111,

and 128-144 of this Complaint.

(c)  Money Laundering - Transportation:  On or about the dates

indicated in the paragraphs incorporated below, the defendant Conspirators, aided and

abetted by each other, and the remaining Conspirators, transported, transmitted,

transferred or attempted to transport, transmit, or transfer a monetary instrument or funds

from a place in the United States to or through a place outside the United States or to a

place in the United States from or through a place outside the United States with the

intent to promote or to attempt to promote the carrying on of specified unlawful activity; or knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer or attempted transportation, transmission or transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or to avoid a transaction reporting requirement under state or federal law. Such actions are in violation of 18 U.S.C. § 1956 and 18 U.S.C. § 2, as described in Paragraphs 1, 4-6, 59-71, 89-90, 93-103, 106-111 and 128-144 of this Complaint.

(d)     Monetary Transactions in Proceeds from Specified Unlawful Activities: On or about the dates indicated in the paragraphs incorporated below, the defendant Conspirators, aided and abetted by each other, and the remaining Conspirators, knowingly engaged or attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000, which property was or would have been derived from specified unlawful activity. The defendant Conspirators committed or attempted to commit that offense both in the United States (or in any special maritime and territorial jurisdiction of the United States) and with respect to those defendants that are United States persons outside the United States (or any special jurisdiction). Such actions are in violation of 18 U.S.C. § 1957 and 18 U.S.C. § 2, as described in Paragraphs 1, 4-6, 59-71, 89-90, 93-103, 106-111 and 128-144 of this Complaint.

156.     The persons alleged herein to have violated 18 U.S.C. § 1962(c) are separate from, though employed by or associated with, the ConocoPhillips Group, the Joint Authority, the Designated Authority Group, and the Pertamina Group.

157.     Each Conspirator had a role in the racketeering activity that was distinct from the undertaking of those acting on its behalf.  Each Conspirator also attempted to benefit, and did benefit, from the activity of their employees and agents alleged herein, and thus were not passive victims of racketeering activity, but active perpetrators.

158.     Plaintiffs, and each of them, have been injured in their business or property as a direct and proximate result of the defendant Conspirators' violations of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts constituting the pattern of racketeering activity.

159.     Oceanic and Petrotimor have been injured, at a minimum, in their valuable business and property by the actions of the defendant Conspirators in unlawfully preventing and interfering with their ability to compete fairly for the ability to extract hydocarbons from the Timor Sea and preventing and interfering with their ability to secure production sharing contracts to explore for and produce oil and natural gas in the Timor Sea.

160.     As a result of the violations of 18 U.S.C. § 1962(c) by members of the ConocoPhillips Group and the Designated Authority Group, plaintiffs have suffered substantial damages in an amount to be proved at trial.

161.     Pursuant to 18 U.S.C. § 1964(c), plaintiffs are entitled to recover treble their general and special compensatory damages, plus interest, costs and attorneys, fees, incurred by reason of defendants' violations of 18 U.S.C. § 1962(c).

SECOND CLAIM

CONSPIRACY TO VIOLATE RACKETEER INFLUENCED

AND CORRUPT ORGANIZATIONS ACT

(18 U.S.C. §§ 1962(d) and 1964(c))

(Against All Defendants)

162.    Plaintiffs reallege and incorporate by reference each and every allegation in Paragraphs 1 through 161 as if fully set forth herein.

163.    During all relevant times and continuing through the time of filing this Complaint, Conspirators willfully, knowingly and unlawfully, did conspire, combine, confederate and agree together, and with various other persons whose names are both known and unknown, to violate 18 U.S.C. § 1962(c).

164.    These Conspirators were and are associated-in-fact with an enterprise engaged in, and the activities of which affect, interstate and foreign commerce. Specifically, the ConocoPhillips Group, the Joint Authority Group, the Designated Authority Group, and the Pertamina Group, constituting a group of entities associated-in-fact, did unlawfully, willfully and knowingly participate in and conduct, directly and indirectly, said enterprise's affairs through a pattern of racketeering activity.

165.    The pattern of racketeering activity, as defined by 13 U.S.C. §§ 1961(1) and (5) included:

(a)    Acts of Interstate and Foreign Travel to Aid Racketeering, 18 U.S.C. § 1952 as described in Paragraphs 1, 4-6, 59-71, 89-90, 93-103 and 106-111 of the Complaint;

(b)     Acts of Money Laundering, 18 U.S.C. § 1956, as described in Paragraphs 1, 4-6, 59-71, 89-90, 93-103, 106-111 and 128-144 of the Complaint;

(c)     Acts of Engaging in Monetary Transactions in Proceeds from Specified Unlawful Activities, 18 U.S.C. § 1957, as described in Paragraphs 1, 4-6, 59-71, 89-90, 93-103, 106-111 and 128-144 of the Complaint.

166.     Conspirators, and each of them, conspired and schemed to improperly prevent and interfere with Plaintiffs' opportunity to compete for the ability to extract and sell oil and natural gas from under the Timor Sea by means of tortious, fraudulent and criminal conduct, as more fully set forth in paragraphs 1, 4-6, 59-71, 89-90, 93-103, 106-111 and 128-144.

167.     In furtherance of this unlawful conspiracy, and to effect its objectives, Conspirators committed numerous overt acts, including but not limited to those set forth in paragraphs 1, 4-6, 59-71, 89-90, 93-103, 106-111, and 128-144.

168.     Oceanic and Petrotimor have been injured in their business or property by reasons of defendants' violations of 18 U.S.C. § 1962(d), including injury by reason of the predicate acts constituting the pattern of racketeering injury.

169.     As a result of the conspiracies between and among all Conspirators to violate 18 U.S.C. § 1962(c), plaintiffs have suffered substantial damages, in an amount to be proved at trial.

170.     Pursuant to 18 U.S.C. § 1964(c), plaintiffs are entitled to recover treble their general and special compensatory damages, plus interest, costs and attorneys' fees, by reason of Conspirators' violation of 18 U.S.C. § 1962(d).

THIRD CLAIM

VIOLATION OF THE ROBINSON-PATMAN ACT

15 U.S.C. §§ 13(c), 15

(Against the ConocoPhillips Defendants)

171.    Plaintiffs repeat, reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 170 above, as though set forth at length herein.

172.    The ConocoPhillips defendants are engaged in the business of exploring for and extracting oil and natural gas.  Oceanic and Petrotimor are also engaged in the business of exploring for and extracting oil and natural gas.

173.    The ConocoPhillips defendants are engaged in commerce.  In the course of commerce the ConocoPhillips defendants provided items of value as a commission, brokerage, or other compensation to East Timor, the Designated Authority and/or Mari Alkatiri or their respective agents, representatives or other intermediaries in connection with the sale or purchase of goods, wares or merchandise.  At the time of such transaction, the person receiving the value was or was subject to the direct or indirect control of East Timor, the Designated Authority and/or Mari Alkatiri.

174.    The ConocoPhillips defendants did not provide these items of value to East Timor, the Designated Authority and/or Mari Alkatiri or their respective agents, representatives or other intermediaries for services rendered in connection with the sale or purchase of goods, wares, or merchandise.  Rather, ConocoPhillips provided these items of value to gain a competitive advantage over Plaintiffs.  As a result of the ConocoPhillips defendants' improper conduct, Plaintiffs had no meaningful opportunity to obtain production sharing

contracts with the named entities or even to meaningfully communicate with them in pursuit of such contracts. By reason of the ConocoPhillips defendants' improper conduct, Plaintiffs were deprived of any opportunity to fairly compete and bid for the opportunity to explore for and produce oil and natural gas from below the Timor Sea.

175.    As a result of the ConocoPhillips defendants' improper conduct, Plaintiffs are entitled to recover treble the damages they suffered in an amount to be proven at trial.

FOURTH CLAIM

VIOLATION OF THE LANHAM ACT

(15 U.S.C. § 1126)

(Against All Defendants)

176.    Plaintiffs repeat, reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 175 above, as though set forth at length herein.

177.    Australia, Indonesia, Portugal and the United States are each signatories to the Paris Convention for the Protection of Industrial Property (the "Paris Convention" ).

178.    Plaintiff Petrotimor is a national of Portugal. Plaintiff Oceanic is a national of the United States.

179.    The Paris Convention affords protection to nationals of signatory states against acts of unfair competition, including acts of competition contrary to honest practices in industrial and commercial matters.

180.    Defendants engaged in acts of competition contrary to honest practices in industrial and commercial matters, including engaging in fraudulent conduct and committing

multiple acts of conspiracy within the United States. Each of these acts violates the Paris Convention's prohibitions against unfair competition.

181.    Under 15 U.S.C. § 1126(h), plaintiff Petrotimor is entitled to bring suit against defendants, and invoke the remedies of the Lanham Act, for defendants' violations of the Paris Convention.

182.    Under 15 U.S.C. § 1126(i), plaintiff Oceanic is entitled to bring suit against defendants, and invoke the remedies of the Lanham Act, for defendants' violations of the Paris Convention.

183.    As a result of defendants' acts of unfair competition in violation of the Paris Convention, defendants have been unjustly enriched and plaintiffs have sustained losses and plaintiffs have been compelled to file suit.

184.    Defendants' conduct was malicious, willful, fraudulent and deliberate.

185.    Pursuant to 15 U.S.C. § 1126(h) and 15 U.S.C. § 1117, plaintiffs are entitled to recover all damages sustained as a result of defendants' unfair competition, including (1) defendants' profits, (2) plaintiffs' losses, (3) the costs of suit, and (4) reasonable attorneys' fees.

## FIFTH CLAIM

## <u>INTENTIONAL INTERFERENCE WITH</u>

## <u>PROSPECTIVE ECONOMIC ADVANTAGE</u>

(Against the ConocoPhillips Defendants)

186.    Plaintiffs repeat, reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 185 above, as though set forth at length herein.

187.     Plaintiffs had, during the time period covered in this Complaint a valid business expectancy between Plaintiffs, on the one hand, and the Designated Authority and/or East Timor, on the other hand, relating to the award of production sharing contracts relating to the oil and natural gas under the Timor Sea.

188.     The ConocoPhillips defendants, and each of them, knew of the existence of a valid business expectancy between Plaintiffs, on the one hand, and the Designated Authority and/or East Timor, on the other hand relating to the award of production sharing contracts relating to the oil and natural gas under the Timor Sea.

189.     The ConocoPhillips defendants, and each of them, intentionally interfered with Plaintiffs' valid business expectancies relating to the award of production sharing contracts relating to the oil and natural gas under the Timor Sea.

190.     As a direct and proximate result of the ConocoPhillips defendants' intentional interference with those expectancies, which resulted, among other things, in Plaintiffs' denial of the opportunity to bid for oil exploration rights that Plaintiffs would have been otherwise awarded, Plaintiffs suffered damages in an amount to be proven at trial.

### SIXTH CLAIM

### <u>UNJUST ENRICHMENT</u>

(Against all Defendants)

191.     Plaintiffs repeat, reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 190, above, as though set forth at length herein.

192.     The conduct of Defendants has secured to each Defendant profits and value, which unjustly enriches Defendants to the detriment and expense of Plaintiffs.  Plaintiffs

hereby request the disgorgement of all profits and value unjustly earned or retained by Defendants.

## SEVENTH CLAIM

## UNFAIR COMPETITION

### (Against All Defendants)

193.    Plaintiffs repeat, reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 193, above, as though set forth at length herein.

194.    Defendants' illegal and unfair conduct interfered and continues to interfere with Plaintiffs' ability to compete, and interfered with and continues to interfere with Plaintiffs' ability to extract oil and natural gas from the Timor Gap.

195.    Defendants' acts complained of herein have damaged Plaintiffs.  Plaintiffs are entitled to an award of (i) their damages; (ii) an accounting of Defendants' profits; and (iii) the award of Defendants' unjust profits and Plaintiffs' lost profits.

196.    The aforementioned acts of Defendants were committed with oppression and malice.  Plaintiffs are therefore entitled to punitive damages.

## PRAYER

WHEREFORE, Plaintiffs pray for judgment against all Defendants and Does 1-50 jointly and severally, as follows:

1.    For all damages permitted by the common law, contract or statute in an amount to be determined at trial, but not less than $10.5 billion over the productive life of the resources;

2.    For treble damages pursuant to 18 U.S.C. § 1964(c);

3.        For treble damages pursuant to 15 U.S.C. § 15;

4.        For all punitive and exemplary damages to which Plaintiffs may be entitled to under applicable law or statute;

5.        For disgorgement of all improperly obtained revenue;

6.        For a constructive trust with respect to all improper revenue or other property improperly possessed or controlled by any defendant or any agent of any defendant;

7.        For further damages according to proof;

8.        For pre-judgment and post-judgment interest;

9.        For any and all costs of suit herein incurred, including, but not limited to, attorneys' fees; and

10.       For such other and further relief that the Court may deem just and proper.

Respectfully submitted this 1st day of March, 2005.

By_____/s/_____

Dale H. Oliver (D.C. Bar #166975)
Kathleen Sullivan (admitted *pro hac vice*)
Jon D. Corey (admitted *pro hac vice*)
James J. Webster (D.C. Bar #481627)
QUINN EMANUEL URQUHART OLIVER
& HEDGES LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017
Phone: (213) 624-7707
Fax: (213) 624-0643

Attorneys for Plaintiffs
Petrotimor Companhia de Petroleos,
S.A.R.L. and Oceanic Exploration Company

By_____/s/_____

Robert E. Scully, Jr. (D.C. Bar #340828)
REES, BROOME & DIAZ, P.C.
8133 Leesburg Pike, Ninth Floor
Vienna, Virginia  22182
Phone: (703) 790-1911
Fax: (703) 848-2530

OF COUNSEL

Robert J. Becher
Sarah J. Cole
Ellen Y. Yang
Sarah E. Oliver
Michael L. Fazio
     QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
     865 South Figueroa Street, 10th Floor
     Los Angeles, California  90071
     Phone: (213) 443-3000
     Fax: (213) 443-3100

Paddy Jones
     Barrister
     Level 15
     Wardell Chambers
     39 Martin Place
     Sydney NSW 2000
     Phone: 61-2-9221-3216
     Fax:  61-2-9235-3931

Mark O'Brien
GILBERT & TOBIN, Solicitors
2 Park Street
Sydney, Australia 2000
Phone: 61-2-9263-4000
Fax: 61-2-9235-3931



Exhibit A



Exhibit B-1



Exhibit B-2