# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
OCEANIC EXPLORATION CO., *et al.*, )
)
Plaintiffs, )
)
v. ) Civil Action No. 04-332 (EGS)
)
CONOCOPHILLIPS, INC., *et al.*, )
)
Defendants. )
_____)

## MEMORANDUM OPINION

Pending before the Court are defendant Timor Sea Designated Authority's ("TSDA") Motion to Dismiss the Second Amended Complaint and defendants ConocoPhillips' Motion to Dismiss the Second Amended Complaint.  Upon careful consideration of the motions, the responses and replies thereto, and for the following reasons, the Court **GRANTS** TSDA's Motion to Dismiss and **GRANTS in part** and **DENIES in part** ConocoPhillips' Motion to Dismiss.

## I.   FACTUAL BACKGROUND[1]

_____

[1] Because the facts of this case are quite involved, the Court will focus only on those facts that are relevant to the pending motions. The facts are taken from plaintiffs' second amended complaint (Doc. No. 81), defendants' motions to dismiss plaintiffs' amended complaint (Doc. Nos. 21 and 23), and the documents incorporated by reference therein.  The defendants in their motions to dismiss the second amended complaint (Doc Nos. 83 and 84) do not repeat the facts laid out in their original motions to dismiss plaintiffs' amended complaint. Rather, they acknowledge the Court's familiarity of the facts and proceed with their arguments.

Plaintiffs Oceanic Exploration Company and Petrotimor Companhia de Petroleos, S.A.R.L. (collectively "Oceanic") commenced this action to recover damages for the loss of opportunity to compete or bid for rights to explore for and produce oil and natural gas from the seabed between East Timor and Australia. The seabed between East Timor and Australia is known as the Timor Gap.

In 1974, Portugal, then sovereign of East Timor, awarded plaintiffs a concession to explore for and produce oil and natural gas in the Timor Gap.[2] In 1975, Indonesia invaded East Timor, and established East Timor as the 27th province of Indonesia. On December 11, 1989, Indonesia and Australia agreed to exploit the oil and natural gas in the Timor Gap by establishing a "Zone of Cooperation" and signed the Timor Gap Treaty, effective February 9, 1991. The Timor Gap Treaty negated the validity of all previous unilateral concessions in the Timor Gap, including the Portuguese colonial concession of 1974 and concessions granted by Australia prior to signing of the Treaty.

The Timor Gap Treaty also created the Joint Authority, which

---

[2] The seabed boundary between Australia and East Timor has long been disputed. In the early 1970s, Australia and Indonesia negotiated a series of agreements delineating the maritime border between the two nations. Portugal, then the colonial sovereign of Timor, and Australia, however, were unable to reach an agreement, resulting in a gap in the maritime boundary where it passed eastern Timor. Both Portugal and Australia asserted conflicting claims over the resulting "Timor Gap" region.

2

had the exclusive authority to grant concessions for the development of natural resources in the Timor Gap, with royalties to be divided equally between Australia and Indonesia. The Joint Authority awarded concessions pursuant to a competitive bidding process between June to October 1991. Defendants ConocoPhillips[3] became one of the recipients of concessions at the conclusion of the bidding process. ConocoPhillips eventually uncovered substantial oil and natural gas reserves in the Timor Gap in an area overlapping the area covered by plaintiffs' colonial concession from Portugal.[4]

Plaintiffs abstained from the 1991 bidding process because they believed that they already had legitimate rights to explore for oil and natural gas in the Timor Gap from Portugal. Rather than calling into question the concession conferred by Portugal in 1974, the plaintiff chose not to participate in the 1991 bidding process.[5]

_____

[3] Defendants ConocoPhillips, ConocoPhillips Company, and the 22 different domestic and foreign subsidiaries of ConocoPhillips are referred to as "ConocoPhillips" herein.

[4] According to the plaintiffs, ConocoPhillips' success resulted in part from their survey and geological data, which was stolen by the Indonesian miliary and allegedly provided to ConocoPhillips.

[5] Another reason why the plaintiffs may have abstained from bidding is that on February 22, 1991, Portugal initiated an action challenging the Indonesian invasion, and Australia's and Indonesia's establishment of the Joint Authority to develop oil and natural gas in the Timor Gap in the International Court of Justice. Plaintiffs were interested in seeing the outcome of

3

On August 30, 1999, the East Timorese people voted for
independence, and on May 20, 2002, East Timor formally celebrated
its independence.  The new East Timorese Constitution asserted
sovereignty over its natural resources, and specifically
nullified any previous concessions not ratified by the new
independent government. Pursuant to these provisions of the new
constitution, the governments of East Timor and Australia signed
the Timor Sea Treaty to govern natural resource exploitation in
the Timor Gap.

Like the Timor Gap Treaty signed by Indonesia and Australia
in 1991, the Timor Sea Treaty between East Timor and Australia
established the Timor Sea Designated Authority ("TSDA") to
oversee the granting of exploration and development concessions
in an area designated as the "Joint Petroleum Development Area"
("JPDA") in the Timor Gap.  The Timor Sea Treaty also provided
immediate concessions to certain corporations holding existing
contracts, including ConocoPhillips.  The value of the oil and
natural gas reserves in the disputed concession areas allegedly
exceed $50 billion.

Plaintiffs filed this suit seeking damages for the "theft"
of their oil and natural gas rights in the Timor Gap.  Plaintiffs
allege that ConocoPhillips funneled illegal payments to

---

that litigation.  On June 20, 1995, the International Court of
Justice held, by a 14 to 2 vote, that it could not reach the
merits of Portugal's claim.

Indonesian government officials leading up to the 1991 bidding process in order to secure influence in the region and eliminate competitors. Plaintiffs further allege that when East Timor gained independence and established its government, ConocoPhillips bribed East Timorese government officials to ensure that they recognized ConocoPhillips' concession rights, but not plaintiffs' rights, in the Timor Gap.

In their complaint, plaintiffs accuse ConocoPhillips of violating and conspiring to violate the Racketeer and Corrupt Organization Act ("RICO")(Count I and II); violating the Robinson-Patman Act (Count III) and the Lanham Act (Count IV); intentionally interfering with prospective economic advantage (Count V); unjust enrichment (Count VI); and unfair competition (Count VII). All of these counts, but for Count III, are also alleged against defendant TSDA. Plaintiffs seek damages of at least $10.5 billion.

## II. STANDARD OF REVIEW

The defendants' respective motions to dismiss are brought pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, 12(b)(2) for lack of personal jurisdiction, and 12(b)(6) for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(1), (2), (6).

The Court will not grant a motion to dismiss for failure to state a claim under Rule 12(b)(6) "unless it appears beyond doubt

5

that the plaintiff can prove no set of facts in support of his
claim which would entitle him to relief." *Conley v. Gibson*, 355
U.S. 41, 45-46 (1957); *Kowal v. MCI Communications Corp.*, 16 F.3d
1271, 1276 (D.C. Cir. 1994). Accordingly, at this stage of the
proceedings, the Court accepts as true all of the complaint's
factual allegations. *See Doe v. United States Dep't of Justice*,
753 F.2d 1092, 1102 (D.C. Cir. 1985). Plaintiffs are entitled to
"the benefit of all inferences that can be derived from the facts
alleged." *Kowal*, 16 F.3d at 1276.

A motion under Rule 12(b)(1) presents a threshold challenge
to the Court's jurisdiction. *Haase v. Sessions*, 835 F.2d 902, 906
(D.C. Cir. 1987). *See also* 4 Wright & Miller, Fed. Prac. & Proc.
§ 1350 (2002 Supplement)("subject matter jurisdiction deals with
the power of the court to hear the plaintiff's claims in the
first place"). A court may resolve a Rule 12(b)(1) motion based
solely on the complaint, or if necessary, may look beyond the
allegations of the complaint to affidavits and other extrinsic
information to determine the existence of jurisdiction. *Haase*,
835 F.2d at 908. *See also Herbert v. Nat'l Acad. of Sci.,* 974
F.2d 192, 197 (D.C. Cir. 1992). The standard of review is
virtually identical to that used for 12(b)(6) motions, however,
the plaintiff bears the burden of proving jurisdiction. *See
Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999).

When personal jurisdiction is challenged pursuant to Rule

12(b)(2), the plaintiff has the burden of establishing a *prima facie* case that personal jurisdiction exists. *See Second Amend. Foundation v. U.S. Conference of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001). A *prima facie* case in this context means that the plaintiff must present evidence sufficient to defeat a motion for judgment as a matter of law. *See Carter v. Duncan-Huggins, Ltd.,* 727 F.2d 1225, 1227 (D.C. Cir. 1984)(such motions should be denied unless "the evidence, together with all inferences that can reasonably be drawn therefrom, is so one-sided that reasonable men could not disagree on the verdict").

To determine if a basis for personal jurisdiction exists, the Court should resolve factual discrepancies in the complaint and affidavits in favor of the plaintiff. *Crane v. New York Zoological Society*, 894 F.2d. 454, 456 (D.C. Cir 1990). When reviewing a challenge pursuant to Rule 12(b)(1) or 12(b)(2), the Court may consider documents outside the pleadings to assure itself that it has jurisdiction. *AGS International Services v. Newmont USA Limited*, 346 F. Supp. 2d 64, 73-74 (D.D.C. 2004).

## III.  DEFENDANT TSDA'S MOTION TO DISMISS

TSDA is the unincorporated entity responsible for the day-to-day regulation and management of petroleum activities in the JPDA, including the granting of concessions.[6]  TSDA was created

---

[6] Plaintiffs characterize the TSDA as a commercial entity but they do not provide any evidence to support their assertion.

7

in April 2003, pursuant to Article 6 of the Timor Sea Treaty.[7]

### A. The Court has subject matter jurisdiction under 28 U.S.C. § 1605(a)(2).

As a threshold matter, the Court must determine whether it has subject matter jurisdiction over the TSDA.  The TSDA posits that it is immune from the claims against it under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602-11, because it is an agency of foreign governments.  Further, it contends that because it deals in natural resources, its activities are not commercial in nature.  Rather, its grant of concession rights in the form of production sharing contracts, is more akin to a grant of a license because the TSDA does not actually have the physical capabilities to exploit and market the petroleum itself.

The FSIA, passed by Congress in 1976, clarified the legal standards governing claims of immunity in civil actions against a foreign state or its political subdivision, agencies or instrumentalities. *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 488 (1983).  A foreign state is generally immune from the jurisdiction of federal courts, subject to a set of

---

*See* Pls.' Opp. to TSDA's Mot. to Dismiss, p.25 (TSDA is  "a commercial entity created by foreign sovereigns for the sole purpose of entering into production sharing contracts with private companies and engaging in the production and marketing of oil and natural gas.").

[7] *See* Timor Sea Treaty, May 20, 2002, Austl.-East Timor, 2003 Austl. T.S. No. 13, Art.6.

8

exceptions as specified in 28 U.S.C. §§ 1605 and 1607. *Id.* When one of these exceptions applies, "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." *Id.* at 489 (quoting 28 U.S.C. § 1606). In other words, if foreign governments and their agents engage in commercial activities like a private party, they then cannot claim sovereign immunity against claims arising out of those activities.

Plaintiffs contend that the Court has jurisdiction pursuant to an exception found in 28 U.S.C. § 1605(a)(2), which provides:

> A foreign state shall **not** be immune from the jurisdiction of the United States or of the States in any case . . . (2) in which the action is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States. (Emphasis added).

According to the plaintiffs, even if the TSDA is an agency of a foreign government, the TSDA cannot claim immunity under the FSIA because it acted "in connection with a commercial activity," and its conduct has a "direct effect" in the United States when it entered into production sharing contracts with private companies and engaged in production and marketing of oil and natural gas. *See Id.*

"Commercial activity" is defined in the FSIA as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). "The commercial

character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id.* The conduct need not be entirely commercial to fall under the exception, however. *See Adler v. Fed. Republic of Nigeria*, 107 F.3d 720, 725 (9th Cir. 1997) ("[t]he FSIA does not require that every act by the foreign state be commercial for the third clause of the commercial activity exception to apply.") As long as an act causes a direct effect in the United States, it need only be "in connection with a commercial activity." 28 U.S.C. § 1605(a)(2). Further, "the effect of the act need not be substantial or even foreseeable, so long as it is more than purely trivial and it follows as an immediate consequence of the defendant's activity." *Hugo Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1172 (D.C. Cir. 1994).

Turning to whether the TSDA is immune from plaintiffs' claims pursuant to the FSIA, the Court concludes that it is not. First, under 28 U.S.C. § 1605(a)(2), the claims against TSDA are based upon the acts of TSDA "in connection with a commercial activity." The TSDA has been vested with the authority to award production sharing contracts to private companies.[8] These contracts lay out the terms of a joint commercial venture between

---

[8] *See* Risa Declaration ¶ 2, 5, attached to defendant TSDA's motion to dismiss second amended complaint (Doc. No. 83).

10

the TSDA and the private companies to produce and market petroleum and natural gas from the Timor Gap.

For example, in 2002, the TSDA and Conocophillips entered into production sharing contracts.[9]  Pursuant to these contracts, ConocoPhillips extracts both its portion and the TSDA's portion of oil and natural gas from the Timor Gap.  ConocoPhillips submits annual work programs and budgets for TSDA's approval; recovers its operating costs; and divides the profits with the TSDA, but with the TSDA capturing an increasing percentage of the profits.  Further, under the contracts, the TSDA reserves the right to market petroleum covered by the production sharing contract itself, although it has yet to exercise its right.[10]

Moreover, the fact that the contracts involve natural resources do not affect the commercial nature of the contracts. *See* H.R. Rep. No. 94-1487 at 16 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6615-16 (in enacting FSIA, Congress specifically identified a "mineral extraction company" as a commercial activity").  What is of import is that the TSDA has the authority to market the petroleum, if and when it chooses to do so.  In short, the Court is persuaded that when the TSDA

---

[9] *See* Ex. 5 and 6 to Risa Declaration.

[10]  As of the Risa Declaration dated March 24, 2005, "[a]ll petroleum that has been shipped from the Joint Petroleum Development area to the United States and other countries has been shipped there as a result of marketing and sales decisions made by the contractors."  Risa Decl. ¶ 13.

entered into production sharing contracts with ConocoPhillips to engage in production and marketing of oil and natural gas, it acted "in connection with a commercial activity," satisfying the first prong of the § 1605(a)(2) exception.

Turning to the second prong of the exception, "direct effect in the United States," plaintiffs assert that shipping and selling petroleum from Timor Gap in the United States for TSDA's commercial profit and depositing the proceeds of these sales to the TSDA's bank accounts in the United States constitute "direct effect in the United States." The Court finds that either one of these actions satisfies the "direct effect" requirement because the effect "follows as an immediate consequence of the [TSDA's] activity." *Princz,* 26 F.3d at 1172. Accordingly, this Court has subject matter jurisdiction, pursuant to 28 U.S.C. § 1605(a)(2).[11]

**B. The act of state doctrine bars the Court from adjudicating plaintiffs' claims against defendant TSDA.**

The TSDA argues that the act of state doctrine bars the

---

[11] The TSDA does not respond to the plaintiffs' argument that the Court has personal jurisdiction over the TSDA. Regardless, the Court here notes that it does have personal jurisdiction over the TSDA under 28 U.S.C. § 1330(b). Section 1330(b) provides that once service has been properly made under 28 U.S.C. § 1608, personal jurisdiction exists over a foreign state for every claim over which the Court has subject matter jurisdiction. *See Prince v. Socialist People's Libyan Arab Jamhiriya,* 294 F.3d 82, 89 (D.C. Cir. 2002). The TSDA stipulated that it was properly served in a June 1, 2004 stipulation filed with the Court, which was approved by the Court in a June 2, 2004 Minute Order.

Court from adjudicating any of the plaintiffs' claims and thus, the action should be dismissed in its entirety.  The Court agrees.

The act of state doctrine "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory."  *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964); *see also Underhill v. Hernandez*, 168 U.S. 250, 252 (1887) ("[e]very sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory.").  The doctrine has evolved as a "consequence of domestic separation of powers," and reflects the "strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder the conduct of foreign affairs."  *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp.*, 493 U.S. 400, 404 (1990).

The act of state doctrine is not jurisdictional (like the political question doctrine), but rather is "*a principle of decision* binding on state and federal courts alike."  *W.S. Kirkpatrick*, 493 U.S. at 406 (emphasis in original).  This simply requires reviewing courts to "deem valid" the acts of foreign sovereigns taken within their own jurisdictions. *Id*. at 409.  In

every case in which the Supreme Court has held the act of state doctrine applicable, "the relief sought or the defense interposed would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *Id*. at 405.  The party moving for the doctrine's application has the burden of proving that dismissal is an appropriate response to the circumstances presented in the case. *See Alfred Dunhill of London, Inc. v. Cuba*, 425 U.S. 682, 694 (1976).

Plaintiffs' theory of recovery against the TSDA is based upon its alleged "loss of opportunity in the post-independence period of East Timor to compete or bid for rights to explore for and produce oil and natural gas from the seabed between East Timor and Australia."[12]  In order for plaintiffs to get the relief they seek, they must first have a legally cognizable right to "compete or bid for rights" in the areas about which they are complaining.

Annex F of the Timor Sea Treaty entered into by East Timor and Australia states,

> Contracts shall be offered to those corporations holding, immediately before entry into force of the Treaty, contracts numbered 91-12, 91-13, 95-17, and 96-20 in the same terms as those contracts, modified to take into account the administrative structure under

---

[12] Sec. Am. Compl. ¶ 1.

14

this Treaty, or as otherwise agreed by East Timor and Australia.[13]

Annex F of the Timor Sea Treaty is an official act of both East Timor and Australia.  Through Annex F, East Timor and Australia made a sovereign decision to confirm, rather than disavow, the concessions that were awarded through the competitive bidding process in 1991.  By signing and ratifying this bilateral international treaty, East Timor and Australia confirmed their joint decision to allow companies, who had made substantial investments since 1991 in the Timor Gap, to continue exploring and developing the oil and natural gas reserves.  In 2002, when the Treaty came into effect, no provisions were made for bidding or further opportunities to compete for concession rights in the Timor Gap.  Therefore, plaintiffs nor any one else had a right to "compete or bid for rights" in the Timor Gap at that time.

Plaintiffs argue, however, that Annex F was drafted and approved as a result of ConocoPhillips' bribery of East Timorese officials, and that the act of state doctrine does not bar claims for damages resulting from such unlawful conduct.  Plaintiffs claim that they are not challenging the right of East Timor and

---

[13] Timor Sea Treaty, May 20, 2002, Austl.-East Timor, 2003 Austl. T.S. No. 13, Annex F.

Australia to enter into a treaty, rather they are challenging the corrupt activities of ConocoPhillips and the TSDA.

Plaintiffs rely on *W.S. Kirkpatrick Co. v. Environmental Tectonics Corp., International,* 493 U.S. 400 (1990). In *W.S. Kirkpatrick*, the losing bidder for a Nigerian military procurement contract brought RICO and Robinson-Patman Act claims based on its competitor's alleged bribery of Nigerian officials. Although the *W.S. Kirkpatrick* Court found that judicial resolution of plaintiff's case required imputing an "unlawful motivation" to foreign officials, the Court did not apply the act of state doctrine because plaintiff's cause of action did not technically "turn on" the validity of a sovereign act. *See W.S. Kirkpatrick*, 493 U.S. at 406 ("[r]egardless of what the court's factual findings may suggest as to the legality of the Nigerian contract, its legality is simply not a question to be decided in the present suit."). Further, the Court noted that the plaintiff was not "trying to undo or disregard" an act of the government, "but only to obtain damages from private parties who had procured it." *Id*. at 407.

Although *W.S. Kirkpatrick* deals with allegations of how a competitor bribed a foreign government official in order to procure a contract like the case before this Court, *W.S. Kirkpatrick* is distinguishable from the facts of this case in three important ways. One, *W.S. Kirkpatrick* involved a private

lawsuit between two competing bidders.  Unlike the defendant in
W.S. *Kirkpatrick*, the TSDA is not a competitor who bribed a
foreign government office to obtain a commercial contract.  The
TSDA can hardly be plaintiffs' competitor because it is not a
"commercial entity."  Rather, the TSDA is a regulatory body
created by the sovereign governments of Australia and East Timor,
pursuant to the Timor Sea Treaty.

Article 6 of the Timor Sea Treaty creates a three-tiered
joint administrative structure to regulate the activities in the
Timor Gap: the Designated Authority, the Joint Commission and the
Ministerial Council.[14]  Article 6(b)(iv) further provides that
the TSDA "shall be responsible to the Joint Commission and shall
carry out the day-to-day regulation and management of petroleum
activities."[15]  A more detailed function of the TSDA is set out
in Annex C of the Treaty.[16]  The TSDA's duties include: "day-to-
day management and regulation of petroleum activities";
"preparation of annual reports" to the Joint Commission;
"requesting assistance with pollution prevention measures" from
appropriate Australian and East Timorese authorities;
establishing safety and restricted zones consistent with

---

[14] *See* Timor Sea Treaty, May 20, 2002, Austl.-East Timor,
2003 Austl. T.S. No. 13, Art. 6.

[15] *Id.*

[16] *Id.* at Annex C.

17

international law; "controlling movements into, within and out of" Timor Gap; and "issuing regulations and giving directions under the Treaty on all matters related to the supervision and control of petroleum activities."[17] *See also* Risa Decl. ¶ 16. ("[t]he TSDA acts as a regulating authority on behalf of the sovereign states that concluded the Timor Sea Treaty, Australia and Timor-Leste. It is not a commercial entity."). In short, unlike the defendant in *Kirkpatrick*, the TSDA is not a purely commercial enterprise that competes with the plaintiffs, rather it functions much like a regulatory agency.

Another reason why this case is distinguishable from *W.S. Kirkpatrick* is that this case does turn on the validity of an official act. Unlike the plaintiff in *W.S. Kirkpatrick*, the plaintiffs in this case are asking the Court to invalidate an official act of two foreign sovereigns. S*ee Kirkpatrick*, 493 U.S. at 406. In order for the Court to recognize that plaintiffs had a "right to compete or bid" in the post-independence period of East Timor, the Court must find the official acts of the TSDA in awarding contracts to those companies that had won concession rights back in 1991 as invalid, which in turn, means finding Annex F, which authorized such renewals, as invalid. The TSDA, as a regulatory governmental agency, was merely following the

---

[17] *Id.*

18

directives of two sovereign nations as articulated in the Timor Sea Treaty.  In sum, the Court is barred by the act of state doctrine to pass judgment on the official sovereign acts of Australia and East Timor that resulted in the drafting, signing and ratification the Timor Sea Treaty, including Annex F.[18]

The final important difference between this case and *W.S. Kirkpatrick* is that this case concerns the granting of rights to exploit natural resources, whereas *Kirkpatrick* was based on the

---

[18] Plaintiffs insist that adjudication of their claims would only require an inquiry into East Timor's motivations to confirm ConocoPhillips' contracts.  Plaintiffs are not asking the Court to validate or invalidate any acts taken by East Timor. *See* Pls.' Opp. to TSDA's Mot. to Dismiss, p. 24.  That argument misses the mark, however.  Whereas in *W.S. Kirkpatrick* neither the claim or any of the asserted defenses required a determination that Nigeria's contract with the defendant company was or was not effective; here plaintiffs' claims are premised on the TSDA undoing or disregarding an official directive mandated by Australia and East Timor. Further, the Timor Sea Treaty, including Annex F, was ratified by two legislatures, whereas the procurement contract in *W.S. Kirkpatrick* did not require such actions. It is one thing to question the motives of an official in approving a contract, and quite another to question the motives of an entire foreign legislature in ratifying a treaty.

Moreover, the TSDA was not created unilaterally by East Timor, rather it is a regulatory agency jointly created by Australia and East Timor, and the plaintiffs have not raised any allegations that Australian officials have been bribed.

Finally, plaintiffs allege that they are not asking the Court to declare Annex F to be invalid because they are not seeking declaratory or injunctive relief, but rather monetary damages.  The nature of relief sought does not determine whether an act of state is implicated or not.  Regardless of the type of relief sought, plaintiffs are asking the Court to deem invalid an act of two foreign sovereigns taken within their own respective jurisdictions.

award of a procurement contract.  The decisions relating to the
development of natural resources are quintessentially sovereign
prerogatives. *See World Wide Minerals, Ltd. v. Republic of
Kazakhstan,* 296 F.3d 1154, 1165 (D.C. Cir. 2002) ("We have no
doubt that issuance of a license permitting the removal of
uranium from Kazakhstan is a sovereign act . . . . [t]he right to
regulate imports and exports is a sovereign prerogative.").

Thus, *W.S. Kirkpatrick* is inapplicable to this case and the Court
must abide by the act of state doctrine.  This Court is precluded
from instructing the governments of both East Timor and Australia
that they should disrupt a decade of economic investment and
development in their own valuable natural resources, and instead
afford companies, like plaintiffs Oceanic, an opportunity to
compete or bid for concession rights.  Accordingly, the act of
state doctrine bars this Court from adjudicating any of
plaintiffs' claims against the TSDA.

## C.  Applicability of the "corruption exception" to the act of state doctrine.

Plaintiffs argue that even if the act of state doctrine is
applicable, the corruption exceptions apply, therefore, the
conduct of the TSDA is still subject to this Court's scrutiny.
The TSDA responds that plaintiffs are relying on *dicta* for their

argument that an exception be made when the act of the foreign state was procured by bribery, coercion or fraud.

Plaintiffs rely on a Southern District of New York case *Dominicus Americana Bhoio v. Gulf & W. Indus., Inc.,* 473 F. Supp. 680, 690 (S.D.N.Y. 1979) for the proposition that the act of state doctrine is not applicable when the government act is perpetuated by fraud and coercion.[19]  *Dominicus Americana Bhoio* cites to a Second Circuit opinion in *Hunt v. Mobil Oil Corp.*, 550 F.2d 68 (2d Cir. 1977) as authority for its purported "corruption exception," however, *Hunt* does not address the existence or the applicability of such an exception under the act of state doctrine.  Therefore, because *Hunt* does not support plaintiffs' broad assertion of such an exception, plaintiffs' reliance on *Dominicus Americana Bhoio* is misplaced.

---

[19] In *Dominicus Americana Bhoio*, the plaintiffs alleged that their efforts to try to build tourist facilities in a resort area of La Romana in Dominican Republic were hindered by the illegal acts of the defendants who owned and operated existing tourist facilities in La Romana.  One allegation involved the defendants fraudulently encouraging the Dominican government to expropriate private lands, including the lands owned by plaintiffs, to create a national park. The Dominican government issued a decree endorsing the creation of the national park, however, the decree was rescinded when the government discovered that it involved confiscation of plaintiffs' property.  The *Dominicus* Court stated that the expropriation by the Dominican government of plaintiffs' property to create a national park would appear to fall under the act of state doctrine.  However, "the allegations here that government actions were procured by fraud and coercion thus suffice to preclude application of the act of state doctrine even to the expropriation issue at this stage of the litigation." *Dominicus Americana Bhoio*, 473 F. Supp. at 691.

In *Hunt,* the plaintiff was a independent producer of oil who had obtained an oil concession from Libya. *Hunt*, 550 F. 2d at 70. The defendants were seven major oil producers producing oil both in Libya and the Persian Gulf fields. *Id.* The plaintiff alleged that the conspiratory actions of the defendants manipulated and persuaded Libya to eliminate plaintiff as a producer of Libyan crude oil. *Id.* at 72. The *Hunt* defendants asserted the act of state doctrine defense that it was Libya, a sovereign nation, which ultimately decided to cut back plaintiff's production and eventually nationalize its interests. *Id*. at 72-74. In response, the plaintiff pointed out how it was not complaining about what Libya did, but what the defendants did in order to catalyze Libya's decision to nationalize its oil production. *Id*. at 76. The plaintiff maintained that it was not claiming "that Libya acted illegally, simply that as a matter of fact its 'lawful' act was induced by the unlawful conduct of the named defendants." *Id.*

The *Hunt* Court concluded that although it is not called upon to sit in judgment upon the acts of Libya, it is nonetheless asked to make "an inquiry into the subtle and delicate issue of the foreign policy of a foreign sovereign." *Id*. at 77. The *Hunt* Court recognized that it cannot logically separate Libya's motivation from the validity of its seizure. *Id.* When Libya acted to nationalize its oil production, that act was a lawful sovereign act. *Id*. at 76-77. As such, the *Hunt* Court was

22

foreclosed from adjudicating what motivated the Libyan government to take such an act. *Id.* Further, the *Hunt* Court noted that this case was not the "proper vehicle for consideration of international commercial bribery in so far as it affects the act of state doctrine" because no allegations had been made that Libyan officials were bribed. *Id.* at 90.

Turning to whether the corruption exception to the act of state doctrine is mere *dicta* and if not, whether it is applicable to this case, the Court concludes that it need not decide that issue at this time. The situation presented in this case is analogous to *Hunt*, and much like the Court in *Hunt*, this Court cannot logically separate East Timor's motivation to award contracts to those companies that had won concession rights back in 1991 from the validity of its sovereign conduct to draft and approve Annex F of the Timor Sea Treaty which authorized such renewals. Accordingly, plaintiff's reliance on *Dominicus Americana Bhoio* is unpersuasive because that case is inapposite and the act of state doctrine remained applicable to plaintiffs' claims against the TSDA.

**D. Applicability of the "commercial exception" to the act of state doctrine.**

Plaintiffs' argument that the act of state doctrine is not applicable to shield commercial conduct must fall as well. Plaintiffs incorrectly assert that the act of state doctrine

23

would not bar suits once the FSIA's commercial activity exception has been satisfied.

Even when a court has jurisdiction over a foreign sovereign under the commercial activity exception to the FSIA, the act of state doctrine may apply. *Virtual Defense and Development International, Inc. v. Republic of Moldova*, 133 F. Supp. 2d 1, 7 (D.D.C. 1999). *See also International Ass'n of Machinists and Aerospace Workers v. Organization of Petroleum Exporting Countries*, 649 F.2d 1354, 1360 (9th Cir. 1981) ("[t]he act of the state doctrine is not diluted by the commercial activity . . . . While purely commercial activity may not rise to the level of an act of state, certain seemingly commercial activity will trigger act of state considerations.").

The Supreme Court requires a balancing approach when commercial conduct is involved and the act of state doctrine is alleged. *Banco Nacionale de Cuba v. Sabbatino*, 376 U.S. 398, 428 (1964). "It is necessary to balance a judiciary's interest in hearing a case involving a commercial activity with its desire to avoid matters of foreign affairs controlled by the executive or legislative branches." *Virtual Defense*, 133 F. Supp. 2d at 8. When balancing, a court is to be mindful that the decision to deny judicial relief to a party should not be made lightly. *Id*.

Viewing the facts of this case in light of this standard,

24

and having carefully balanced this Court's interest in hearing a
case involving a commercial activity with its desire to avoid
matters of foreign affairs best left to the other two branches of
the government, the Court concludes that the commercial activity
exception of FISA does not limit the act of the state doctrine as
applicable in this case.  Although, as explored fully above, the
TSDA does engage in some commercial activity, the nature of that
commercial activity is not the crux of plaintiffs' complaint
against the TSDA.  Plaintiffs chief complaint revolves around
East Timor's and the TSDA's decision regarding with whom they
will partner to exploit its natural resources.  East Timor's
decision, embodied in the Timor Sea Treaty, was an act of state.
It chose to partner with defendants ConocoPhillips rather than
plaintiffs.  On balance, the Court is foreclosed from questioning
the validity of East Timor's decision to sign and ratify the
Timor Sea Treaty, including Annex F, and to confirm, as opposed
to disavow, the production sharing contracts that were awarded
back in 1991.  Accordingly, the act of state doctrine bars the
Court from adjudicating any of plaintiffs' claims against
defendant TSDA and thus, all of plaintiffs' claims are dismissed.

## IV.  DEFENDANTS CONOCOPHILLIPS' MOTION TO DISMISS

### A.  Plaintiffs have asserted a legally cognizable injury-in-fact.

At the outset, defendants ConocoPhillips argue that

plaintiffs do not have standing because they have failed to assert a concrete, particularized injury-in-fact. According to ConocoPhillips, since plaintiffs did not bid for a concession when a competitive bidding occurred in 1991, they cannot claim that they have been injured by "the loss of the opportunity . . . to compete or bid" for the right to explore for oil and gas in the Timor Sea in 2002. ConocoPhillips contend that plaintiffs' claims rest on nothing more than their disappointment that East Timor and Australia did not disavow the concessions awarded in 1991 and establish a procedure to reallocate the concessions.

The case and controversy requirement of Article III requires plaintiffs to have suffered (1) an injury-in-fact (2) that is fairly traceable to the defendants' challenged conduct and (3) that is likely be redressed by a favorable decision on the merits. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-61 (1992).

Plaintiffs assert that bidding is not a prerequisite to injury when bidding was impossible or futile. In *Astech-Marmon, Inc. v. Lenoci*, 349 F. Supp. 2d 265, 267 (D. Conn. 2004), a contractor who regularly performed the city's asbestos work was informed that the removal of asbestos work was unavailable and would not be subject to the standard city bidding procedures. The city officials, including the mayor, were paid bribes and kickbacks to award the contracts during this period to the

26

defendant companies. *Id*. at 268.  The *Astech-Marmon* Court found that the defendants' unlawful actions effectively eliminated the bidding process and denied plaintiff substantial asbestos work, which caused plaintiff financial harm. *Id*. at 269.  Although the plaintiff had not submitted a bid at the relevant time periods, the Court nonetheless found that the plaintiff had standing to pursue its RICO claims. *Id.*

*Astech-Marmon* is instructive to this case.  Taking all of the factual allegations in the complaint as true, plaintiffs have demonstrated that ConocoPhillips' alleged wrongdoing caused plaintiffs' alleged injury.  By 1991, ConocoPhillips had already won the favor of Indonesian officials, having bribed them for some time, thus rendering plaintiffs' participation in the bidding process futile.  In essence, the die was already cast. Moreover, plaintiffs have shown that ConocoPhillips allegedly continued to use its influence in 2002 to convince the new East Timorese government to maintain the results of the tainted 1991 bidding process.  Therefore, but for ConocoPhillips' alleged wrongful conduct, plaintiffs may have had an opportunity to try to convince the East Timorese officials that they were better suited to be partnered with to explore the Timor Gap in 2002 for petroleum and natural gas.  Their attempted meetings with East Timorese officials, however, were rebuked as a result of ConocoPhillips' alleged pattern of racketeering activity over

many compounding years.[20]  Accordingly, the Court concludes that the plaintiffs have sufficiently alleged a legally cognizable injury at this juncture.  Namely they were harmed when they were deprived of a valuable business opportunity to develop oil and natural gas from the Timor Sea and of a fair opportunity to compete to secure that business opportunity due to the unlawful activities of ConocoPhillips.

**B.  The Court lacks personal jurisdiction over both the domestic subsidiary defendants and the foreign subsidiary defendants of ConocoPhillips.**

In their Second Amended Complaint[21], plaintiffs have named the two parent corporations, ConocoPhillips, organized under the laws of Delaware with a principal place of business in Houston, Texas, and ConocoPhillips Corporation, organized under the laws of Delaware and registered to do business in the District of Columbia, and 22 subsidiaries of ConocoPhillips, seven domestic and 15 Australian, as defendants in this case.[22]  Defendants argue that the Second Amended Complaint should be dismissed with respect to the domestic and foreign subsidiaries of ConocoPhillips for lack of personal jurisdiction.  ConocoPhillips argue that its subsidiaries lack the required requisite contact

---

[20] *See* Sec. Amend. Compl. ¶¶ 112-127.

[21] *Id. at* ¶¶ 12-35.

[22] Footnote 8 of ConocoPhillips' Mot. to Dismiss notes that one of its domestic subsidiaries, the Phillips Petroleum Company ZOC, named as a defendant in this case, no longer exists.

28

with District of Columbia, therefore, exercise of jurisdiction in this forum would offend traditional notions of fair play and substantial justice.

### 1. Lack of personal jurisdiction over the domestic subsidiary defendants.

With regard to its domestic subsidiaries, ConocoPhillips contends that plaintiffs have failed to properly serve them under RICO's service provision, therefore personal jurisdiction is lacking.  Alternatively, the "ends of justice" do not require the domestic subsidiaries to be haled into this particular forum.

A federal court obtains personal jurisdiction over a defendant if it is able to serve process on him. *Butcher's Union Local No. 498, United Food and Commercial Workers v. SDC Investment, Inc.*, 788 F.2d 535, 538 (9th Cir. 1986).  In order to effect valid service of process, the federal court must meet two requirements: (1) some statute must authorize the service of process; and (2) the exercise of personal jurisdiction must not contravene any constitutionally protected right of the defendant. *Id*.  If service is not authorized under a relevant federal statute, the federal court must rely on the jurisdictional statute of the state in which the federal court is located to obtain jurisdiction. Fed. R. Civ. P. 4.  The plaintiff bears the burden of showing that the court has jurisdiction. *Butcher's Union*, 788 F.2d at 538.

29

The RICO statute invoked by plaintiff provides for
nationwide personal jurisdiction over all domestic defendants to
ensure that all co-conspirators can be brought before one judge
in a single forum, regardless of the defendants' contact with the
forum state. *See* 18 U.S.C. § 1965.  "[A]s long as one defendant
is subject to service in a district, additional parties residing
in other districts may be brought before the forum court" where
the "ends of justice require." 18 U.S.C. § 1965(b).  *See*
*Butcher's Union*, 788 F.2d at 539 ("[f]or nationwide service to be
imposed under § 1965(b), the court must have personal
jurisdiction over at least one of the participants in the alleged
multi-district conspiracy and the plaintiffs must show that there
is no other district in which a court will have personal
jurisdiction over all of the alleged co-conspirators"); *Jin v.*
*Ministry of State Security*, 335 F. Supp. 2d 72, 84 n.8 (D.D.C.
2004) (noting how the D.C. Circuit has relied in part on the
Ninth Circuit case, *Butcher's Union Local*, for a RICO
jurisdictional issue).  Moreover, in order for a plaintiff to
avail itself of the benefits of nationwide service, it must
effect service pursuant to RICO. *See AGS International Services,*
*S.A. v. Newmont USA Limited*, 346 F. Supp. 2d 64, 86-88 (D.D.C.
2004).

Plaintiffs admit that they have failed to avail themselves
of the benefits of nationwide service under RICO because

plaintiffs did not serve the domestic subsidiaries under RICO's
service provision. However, plaintiffs' argue, they were not
required to effect service due to a stipulation entered into by
the plaintiffs and defendants ConocoPhillips. According to the
plaintiffs, ConocoPhillips agreed not to challenge the
sufficiency of process or of service of process in a stipulation
entered into by the parties on June 1, 2004.[23] While
acknowledging the stipulation, ConocoPhillips responds that the
same stipulation also expressly states that ConocoPhillips may
assert any defenses or objections, including but not limited to
lack of personal jurisdiction or improper venue.[24]

The Court concludes that ConocoPhillips' challenge of
personal jurisdiction based on plaintiffs' failure to comply with
a nationwide service provision of RICO is not barred by the
parties' June 1, 2004 stipulation. ConocoPhillips is not
challenging the sufficiency of process or service of process,

---

[23] Stipulation and Proposed Order Regarding Extension of Time
to Respond to Amended Complaint (Doc. No. 19)(hereinafter
"stipulation"), June 1, 2004 at p. 2 ("The undersigned defendants
will not challenge the sufficiency of process or the service of
process with respect to the March 1, 2004 Complaint or May 26,
2004 Amended Complaint.") The stipulation was approved by the
Court in a June 2, 2004 Minute Order.

[24] See Id. at 2 ("This stipulation and agreement of the
parties is without prejudice to, and the ConocoPhillips
Defendants and the Designated Authority do not waive, any defense
that ConocoPhillips Defendants or the Designated Authority may
assert in any motion or responsive pleading, including but not
limited to any defenses or objections regarding lack of personal
jurisdiction or improper venue . . . ").

rather they are challenging personal jurisdiction based on plaintiffs' failure to comply with a nationwide service provision. Plaintiffs were not required to effect service pursuant to RICO in this case, but their failure to do so means that they cannot avail themselves of the benefits of nationwide service. Therefore, because plaintiffs failed to effect service to the domestic subsidiaries pursuant to the RICO's service provision, the Court lacks personal jurisdiction over ConocoPhillips' domestic subsidiaries. Accordingly, ConocoPhillips' domestic subsidiaries shall be dismissed without prejudice from this suit.

### 2. Lack of personal jurisdiction over the foreign subsidiary defendants.

Plaintiffs allege that the Court has personal jurisdiction over the foreign subsidiary defendants under the alter ego theory. Alternatively, plaintiffs posit that the Court has personal jurisdiction over the foreign subsidiaries under Federal Rule of Civil Procedure 4(k)(2).

The courts will impute personal jurisdiction under an alter ego theory in cases where the parent company "so dominated the [subsidiary] corporation as to negate its separate personality." *Material Supply International Inc. v. Sunmatch Industrial Co., Ltd.*, 62 F. Supp. 2d 13, 20 (D.D.C. 1999). The following factors are helpful to determine whether there exists such a unity of interest and ownership that the separate personalities of the

subsidiary and parent company have merged:

> [W]hether parent and subsidiary have common business departments; whether the parent finances the subsidiary; whether the parent incorporated the subsidiary; whether the subsidiary is inadequately capitalized; whether parent and subsidiary file consolidated financial statements and tax returns; whether they have a joint accounting and payroll system; whether the subsidiary is operated as a mere division of the parent; whether the subsidiary depends on the parent for substantially all of its business; whether the subsidiary's obligations are assumed to be those of the parent; whether the subsidiary's property is used by the parent as its own; and whether the subsidiary is operated exclusively in the interest of the parent. *Id*.

Additionally, it is not relevant that the parent ultimately benefitted from the activities of the subsidiary or that the subsidiary's supervisors reported to the parent. *Id.*

Plaintiffs, in a very conclusory manner, assert that ConocoPhillips' foreign subsidiaries "are financed by the parent, are operated in the interest of the parent, and are mere divisions of the parent"[25], therefore exercise of personal jurisdiction is proper. Such unsubstantiated, conclusory statements fail to provide the Court with sufficient information

---

[25] Pls.' Opp. to ConocoPhillips' Mot. to Dismiss, p. 41. Plaintiffs also provide the following evidence to support their alter ego theory: ConocoPhillips' CEO and top executives travel to Australia, which indicates that the parent company's executives are involved with ConocoPhillips' projects in the Timor Sea region; ConocoPhillips' 2002 annual report states that ConocoPhillips has a large project under way in the Timor Sea; ConocoPhillips' foreign subsidiaries list "ConocoPhillips" as the "ultimate holding company"; and many of the Australian subsidiaries have the same, or substantially similar, directors and officers, some of whom reside in the U.S. *Id*. at p. 42.

as to the nature of the relationship between parent
ConocoPhillips and its foreign subsidiaries.  The paucity of
individualized evidence[26] as to what is the actual, existing
relationship between the parent ConocoPhillips with each of the
15 foreign subsidiaries leads the Court to conclude that it
cannot make an informed assessment as to whether the Court has
personal jurisdiction over them under the alter ego theory.
Further, in its Order of February 9, 2005, the Court directed
plaintiffs to allege specific jurisdictional facts supporting
this Court's jurisdiction over each of the foreign subsidiary
defendants.[27]  Plaintiffs have failed to do so and therefore, the
Court cannot concede that it has personal jurisdiction over
ConocoPhillips' foreign subsidiaries.

Turning to plaintiffs' alternative contention that the Court
has personal jurisdiction over the foreign subsidiaries under
Federal Rule of Civil Procedure 4(k)(2), that argument must also

---

[26] Plaintiffs fail to apply any of the factors articulated in
*Sunmatch*: whether ConocoPhillips and each of its foreign
subsidiary has a common business department; whether
ConocoPhillips finances each foreign subsidiary; whether each
foreign subsidiary is inadequately capitalized; whether
ConocoPhillips and each foreign subsidiary file a joint financial
statement and tax returns or have a joint accounting and payroll
system; whether each foreign subsidiary operates as a mere
division of ConocoPhillips; whether each foreign subsidiary
depends on ConocoPhillips for substantially all of its business;
and whether each foreign subsidiary operates exclusively in
ConocoPhillips' interests.

[27] *See Oceanic Exploration Co. v. ConocoPhillips, Inc.,* Case
No. 04-332, Order, Feb. 9, 2005.

fall.  Rule 4(k)(2) allows a federal court to assert jurisdiction in cases "arising under federal law" when the defendant is not subject to personal jurisdiction in any state court, but has contacts with the United States as a whole. *Base Metal Trading, Limited v. OJSC "Novokuznetsky Aluminum Factory"*, 283 F.3d 208, 215 (4th Cir. 2002).  A plaintiff who seeks to invoke Rule 4(k)(2) as a basis for jurisdiction must show the following: (1) plaintiff's claim arises under federal law; (2) the defendant is beyond the jurisdictional reach of any state court of general jurisdiction; (3) the federal court's exercise of personal jurisdiction over the defendant must not offend the Constitution or other federal law. *Briton v. Palestinian Interim Self-Government Authority*, 310 F. Supp. 2d 172, 177 (D.D.C. 2004). Rule 4(k)(2) therefore "allows a district court to acquire jurisdiction over a foreign defendant which has insufficient contacts with any single state but has contacts with the United States as a whole." *In re Vitamins Antitrust Litigation*, 94 F. Supp. 2d 26, 31 (D.D.C. 2000).

In applying this test in this case, the question is whether the foreign subsidiary defendants have sufficient minimum contacts with the United States so as not to offend traditional notions of fair play and substantial justice as required under the Due Process Clause of the Fifth Amendment. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474 (1985) (the constitutional

touchstone of due process analysis is "whether the defendant purposefully established minimum contacts in the forum" and "[t]he foreseeabllility that is critical to due process analysis...is that the defendant's conduct and connection with the forum...are such that he would reasonably anticipate being haled into court there."). The Court finds that the plaintiffs have failed to proffer adequate evidence to demonstrate that the foreign subsidiary defendants have had sufficient contacts with the United States as a whole to justify general personal jurisdiction.

Plaintiffs, in broad strokes, again assert in a conclusory manner that all of the 15 foreign subsidiaries have "sufficient nationwide contacts" for the Court to assert jurisdiction, including "sale of oil production from the Elang/Kakatua field in the Timor Sea" to the United States, and as signatories to production sharing contracts, they make deposits into the TSDA's bank accounts in New York.[28] These statements by the plaintiffs are simple, unsubstantiated assertions lacking in any concrete evidence. Without more, the Court has no basis for exercising jurisdiction over foreign subsidiaries with little or no connection to the United States. *See Base Metal Trading*, 283 F.3d at 216 (finding no basis for jurisdiction under Rule 4(k)(2) upon plaintiff's allegations that defendant "is a major aluminum

---

[28] Pls.' Opp. to ConocoPhillips' Mot. to Dismiss, p. 44-45.

producer in Russia and has extensive business contacts inside Russia as well as around the world including in the United States."); *BP Chemicals LTD v. Formosa Chemical & Fibre Corp.*, 229 F.3d 254, 261 (the following facts did not constitute minimum contacts: defendant placing orders in Taiwan with U.S. based suppliers, sending correspondence from Taiwan to the U.S. regarding those orders, and defendant's agreement to arbitrate with supplier in New York.)  In sum, the contacts alleged by the plaintiffs do not constitute sufficient nationwide contacts for this Court to exert personal jurisdiction over the foreign subsidiary defendants. Accordingly, ConocoPhillips' foreign subsidiaries shall be dismissed from this suit.

### C. The act of state doctrine does not bar this Court from hearing plaintiff's claims against defendant ConocoPhillips.

The Court has extensively discussed the act of state doctrine in the above section discussing defendant TSDA's motion to dismiss.  Whereas the Court found that the act of state doctrine barred it from adjudicating any of the plaintiffs' claims against defendant TSDA, the same is not true for plaintiffs' claims against defendants ConocoPhillips. ConocoPhillips cannot invoke the act of state defense as a bar to plaintiffs' claims.

*W.S. Kirkpatrick*, 493 U.S. at 400, is the controlling case here. In *W.S. Kirkpatrick*, plaintiffs alleged that defendant W.S.

37

Kirkpatrick bribed Nigerian officials in order to obtain contracts from the Nigerian government and to keep the plaintiff from winning such contracts. *W.S. Kirkpatrick*, 493 U.S. at 401-01. The *W.S. Kirkpatrick* Court rejected the argument that the act of state doctrine barred plaintiff's claims for damages resulting from defendant's bribery of a Nigerian government official. *Id*. at 405. The Court observed that neither the claims or defenses asserted required a determination by the Court that the contracts entered into by the Nigerian government and the defendant had to be invalidated or declared ineffective. *Id*. at 406. The plaintiff was not trying to undo a foreign government's sovereign action, rather the plaintiff only sought to obtain damages from the defendant who had procured it by unlawful means. *Id*. at 407.

The facts of *W.S. Kirkpatrick* could not be more similar to plaintiffs' cause of action against defendants ConocoPhillips in this case. None of the claims or defenses asserted by either the plaintiffs or ConocoPhillips require this Court to determine that ConocoPhillips' production sharing contracts with the TSDA is ineffective. The legality or the illegality of the contracts is not a question to be determined in this suit by plaintiffs against ConocoPhillips. Rather the focus lies in CONOCOPHILLIPS' unlawful conduct and how that conduct resulted in harm to the plaintiffs. Therefore, the act of state doctrine is not a bar

38

to plaintiffs' claims against defendants ConocoPhillips.

### D. **Plaintiffs have pleaded facts sufficient to establish RICO claims.**

ConocoPhillips argues that plaintiffs (1) have not pleaded facts sufficient to establish that RICO applies to the extraterritorial conduct alleged in this case; (2) have not shown that an "enterprise" existed; (3) have not pleaded with specificity the "participation requirement"; (4) have not established a "pattern of racketeering activity"; (5) have not satisfied RICO's injury[29] requirement; and (6) have not established a RICO conspiracy.[30]

Having accepted all of the complaint's[31] factual allegations and drawing all inferences to the benefit of the plaintiffs, the Court is persuaded that plaintiffs have sufficiently pleaded facts to make out a RICO claim against ConocoPhillips.

---

[29] The Court incorporates here its discussion of standing in the section above. In view of that analysis, the Court is persuaded at this juncture that plaintiffs were injured when ConocoPhillips deprived them of the valuable business opportunity to compete for production sharing contracts.

[30] A cause of action under 18 U.S.C. § 1962 consists of seven elements. *See* 18 U.S.C. § 1962(c); *Fiore v. Kelly Run Sanitation*, 609 F. Supp. 909, 916-17 (W.D. Pa. 1985). There must be (1) a defendant who (2) through the commission of two or more acts (3) constituting a pattern of (4) racketeering activity (5) directly or indirectly invests in or maintains an interest in, or participates in (6) an enterprise, (7) the activities of which affect interstate commerce. *Id*.

[31] When the Court talks about the complaint, it is referring to plaintiffs' second amended complaint.

### 1. *Rico applies to the extraterritorial conduct alleged in this case.*

"The anti-fraud laws of the United States may be given extraterritorial reach whenever a predominantly foreign transaction has substantial effects within the United States." *Consol. Gold Fields PLC v. Minorco, S.A.,* 871 F.2d 252, 261-62 (2d Cir. 1989).[32]  This test is met when the domestic effect is "a direct and foreseeable result of the conduct outside of the United States." *Id.* at 262.  By contrast, "courts have been reluctant to apply our laws to transactions that have only remote and indirect effects in the United States." *Id.*

RICO applies to the extraterritorial acts alleged in this case.  At this stage, plaintiffs' complaint sufficiently demonstrates that the alleged misconduct, including money laundering, took place in the United States.  Further, under the "effects test," as articulated by *Minorco*, ConocoPhillips' alleged unlawful conduct had a substantial effect in the United States. *See Minorco,* 871 F.2d at 262.  Namely, ConocoPhillips imported petroleum to the United States, deposited the proceeds from the sale of this petroleum to a bank in the United States,

---

[32] *See also Doe I v. Unocal Corp.*, 395 F.3d 932, 961-62  (9th Cir. 2002) (agreeing with the Second Circuit that RICO applies extraterritorially when the claim meets either the "effect" or the "conduct" test.)

and its conduct directly caused plaintiffs financial harm in the
United States.  Therefore, RICO applies to the extraterritorial
conduct alleged.

### 2.    Plaintiffs have sufficiently pleaded the existence of an enterprise.

An enterprise "is established by common purpose among the
participants, organization, and continuity." *United States v.
Perholtz*, 842 F.2d 343, 362 (D.C. Cir. 1988).  At the motion to
dismiss stage, plaintiffs need only plead the existence of an
enterprise.  *Ago v. Begg*, 1988 WL 75224 (D.D.C. Feb. 24, 1988).

At this stage, the Court concludes that plaintiffs have
sufficiently demonstrated that defendants ConocoPhillips were
part of an enterprise.  An enterprise was established when the
defendants sought a common goal and purpose, which was to  attain
financial and economic benefits that flowed from entering into
production sharing contracts with the TSDA.  The goal of
obtaining the proceeds of these contracts motivated
ConocoPhillips and other members of the enterprise throughout all
relevant time periods to commit their alleged unlawful conduct.
*See Perholtz*, 842 F.2d at 358.

### 3.    Plaintiffs have sufficiently pleaded that ConocoPhillips participated in the enterprise.

A person participates in a RICO enterprise so long as he
"takes part in the conduct of the enterprise." *U.S. v. Oreto*, 37

F.3d 739, 750 (1st Cir. 1994). It is not necessary that the defendants have formal positions in the enterprise. *Reeves v. Ernst & Young*, 507 U.S. 170, 179 (1993). The Court finds that sufficient facts have been alleged at this juncture by the plaintiffs for it to conclude that ConocoPhillips participated in the affairs of the enterprise by allegedly undertaking schemes to bribe first, Indonesian, and then East Timorese officials.

### 4. *Plaintiffs have sufficiently alleged to support a pattern of racketeering activity.*

In order to prove a pattern of racketeering activity, a plaintiff must show at least two racketeering predicates that are related, and that they amount to or pose a threat of continued criminal activity. *H.J. Inc. v. Northwestern Bell Telephone*, 492 U.S. 229, 238-9 (1989). *See also Western Associates Limited Partnership v. Market Square Assocs.,* 235 F.3d 629, 633-35 (D.C. Cir. 2001) (plaintiff must alleged either a series of related predicates extending over a substantial period of time; or a specific threat of repetition extending indefinitely into the future).

In *H.J. Inc.,* for a period of 6 years, the defendants at various, intermittent times bribed government officials in different manners with the goal of benefitting their business. *H.J. Inc.,* 492 U.S. at 251. The Court found that their conduct

42

established a pattern of RICO activities. *Id*.

The facts alleged in this case are much like the facts of *H.J. Inc.* Plaintiffs assert that over a period of at least a decade, ConocoPhillips continuously bribed Indonesian and then East Timorese government officials, which caused them to award ConocoPhillips production sharing contracts for areas of the Timor Gap, first in 1991, and then again in 2002. The Court finds that plaintiffs have demonstrated that the racketeering predicates are related and constitute a continuous criminal activity. See *H.J. Inc.,* 492 U.S. at 251 (concluding that the acts of bribery were related by a common purpose, which was to influence officials to win contracts, and the frequency of the bribes indicated continuity). Therefore, a pattern of racketeering activity has been sufficiently established by the plaintiffs at this stage of the litigation.

### 5. *Plaintiffs have alleged a RICO conspiracy.*

"A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Salinas v. U.S.*, 522 U.S. 52, 63 (1997). In fact, if the partners in the criminal plan agree to pursue the same criminal objective and divide up the work, each is responsible for the acts of each other. *Id.* at 63-64. "A conspirator must intend to further an endeavor which, if completed, would satisfy

43

all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Id.* at 65.

Plaintiffs have sufficiently shown that ConocoPhillips and their coconspirators[33] had the same criminal objective and were ultimately successful in carrying forth that objective.  Namely, ConocoPhillips conspired to bribe officials, and in the process, engaged in money laundering and other unlawful monetary transactions, all in furtherance of their goal of obtaining and maintaining the lucrative production sharing contracts.[34] Therefore, plaintiffs have adequately alleged a RICO conspiracy under 18 U.S.C. § 1262(d).

### E.   Plaintiffs have sufficiently alleged a Robinson-Patman Act claim.

Defendants ConocoPhillips argue that the Robinson-Patman Act

---

[33] The Court notes that a defendant may be held liable for having participated in a conspiracy even though its co-conspirators are not defendants to the action. *See U.S. Indus. v. Touche Ross & Co.,* 854 F.2d 1223, 1252 (10th Cir. 1988) ("[i]t is axiomatic that since co-conspirators are jointly and severally liable for all damages cause by a conspiracy, a private plaintiff need not sue all the conspirators, but may choose to proceed against any one or more of them.").

[34] In its Sec. Am. Compl., plaintiffs detail ConocoPhillips alleged long history of corrupt activities in Indonesia and then in East Timor, including how ConocoPhillips channeled its bribes to governmental officials.  *See* Sec. Am. Compl. ¶¶ 59-62, 89-95, 99-103, 107, 128, 137-38.

does not apply extraterritorially to the conduct at issue in this case and, therefore, that the Court lacks subject matter jurisdiction. *See* 15 U.S.C. §§ 13, 13a, 13b, 21a. ConocoPhillips maintain that the challenged conduct and the resulting injury occurred overseas and American antitrust laws do not reached alleged anticompetitive conduct anywhere in the world, in the absence of any direct adverse effect on competition in the United States. Alternatively, ConocoPhillips assert the Act is not applicable because the transactions at issue do not involve "the sale or purchase of goods, wares or merchandise." *See* 15 U.S.C. § 13(c).

In order to allege an action under § 2(c) of the Robinson-Patman Act, *codified in* 15 U.S.C. § 13(a), plaintiffs must show that the unlawful conduct occurred "in commerce" or "in the course of such commerce." Commerce is defined in 15 U.S.C. § 12 as "trade or commerce among the several States and with foreign nations." The Supreme Court in *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 195 (1974) held that "in commerce" under the Robinson-Patman Act "denote[s] only person or activities within the flow of interstate commerce – the practical economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer." *Gulf Oil Corp.*, 419 U.S. at 195. The Court further stated that

45

it is not enough to show that the allegedly anti-competitive acquisitions and activities affected commerce. *Id*. Therefore, in order for the Robinson-Patman Act to apply extraterritorially to the conduct at issue, plaintiffs must show that ConocoPhillips' unlawful conduct occurred "in commerce."[35]

The Supreme Court has cautioned that in anti-trust cases, where the proof is largely in the hands of the alleged conspirators, "dismissal prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Bldg. Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746 (1976). In view of that rigorous standard, the Court is persuaded at this motion to dismiss stage that plaintiffs have sufficiently alleged a claim under the Robinson-Patman Act. According to the plaintiffs, ConocoPhillips' wrongful activity did occur within the flow of commerce with a foreign nation.[36]

---

[35] Although the jurisdictional language is slightly different in subsections (a), (c), (d), and (e) of § 2 of the Robinson-Patman Act, the jurisdictional provision are coextensive in scope. *See Rotec Industries, Inc. v. Mitsubishi Corp.*, 348 F.3d 1116 (10th Cir. 2003)(holding that the jurisdictional analysis under § 2(c) of the Robinson-Patman Act is governed by the standard announced by the Supreme Court in *Gulf Oil* and, therefore, the reach of § 2(c) extends only to persons and activities which are themselves within the flow of commerce among the states or with foreign nations, but does not extend to all activities which affect such commerce).

[36] ConocoPhillips relies on *F. Hoffman-LaRoche Ltd. v. Empagran S.A.,* 542 U.S. 155 (2004) for its argument that the

ConocoPhillips provided commission, brokerage or other compensation to East Timorese officials, not for any services rendered in connection with the sale or purchase of goods, wares or merchandise, but to gain a competitive advantage over the plaintiffs. Such improper conduct on the part of ConocoPhillips enabled them to procure production sharing contracts for production of oil and natural gas in the Timor Gap.

Turning to ConocoPhillips alternative argument, the Court concludes that this case does involve "services rendered in connection with the sale or purchase of goods, wares, or merchandise." What is involved in this case are production sharing contracts which permit ConocoPhillips to develop, produce, market, and sell oil and natural gas for profit.[37] Therefore, plaintiffs' claim under the Robinson-Patman Act does involve "sale or purchase of goods, wares, or merchandise." In sum, the plaintiffs have properly alleged a Robinson-Patman Act

---

Court lacks subject matter jurisdiction. The case is inapposite for it deals with a completely different statute and the facts involve foreign plaintiffs asserting an antitrust claim based on purely foreign conduct that caused foreign harm.

[37] Some cases where the transactions did not constitute a sale of "goods, wares or merchandise" under the Robinson-Patman Act were those involving permits, see *Fiore v. Kelly Run Sanitation, Inc.,* 609 F. Supp. 909, 916 (W.D. Pa. 1985), and licenses, see *Country Theatre Col, v. Paramount Film Distribution Corp.,* 146 F. Supp. 933 (E.D. Pa. 1956). Neither of those cases are applicable here.

claim at this time.

**F.   Plaintiffs' Lanham Act claim fails as a matter of law.**

Plaintiffs allege that the Lanham Act, which implements the Paris Convention, provides them with relief for a separate claim of unfair competition.  In support of their argument, plaintiffs rely on *General Motors Corp v. Ignacio Arriortua*, 948 F. Supp. 684 (E.D. Mich. 1996).  The holding of that case, however, is contrary to the holdings of at least five different Circuits.[38] ConocoPhillips argue that plaintiffs' claims alleging a violation of the Lanham Act fail as a matter of law because the Lanham Act does not cover the wrongdoing alleged by the plaintiffs.

The Lanham Act, generally, prohibits two types of unfair competition: trademark infringement, *see* 15 U.S.C. § 1114, and false designation of origin or passing off, *see* 15 U.S.C. § 1125. Further, § 44 of the Lanham Act, *codified in* 15 U.S.C. § 1126(b)[39], also implements Article 10 *bis* of the Paris

---

[38] *See Grupo Gigante SA de CV v. Dallo & Co.,* 391 F.3d 1088 (9th Cir. 2004); *Barcelona.com Inc. v. Ayuntamiento de Barcelona*, 330 F.3d 617 (4th Cir. 2003); *International Café, S.A.L. v. Hard Rock Café Int'l, Inc.* 252 F.3d 1274 (11th Cir. 2001); *Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633 (2d Cir. 1956); *L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.,* 214 F.2d 649 (3d Cir. 1954).

[39] Section 44 (h) of the Lanham Act, *codified in* 15 U.S.C. § 1126(b), provides, "Any person whose county of origin is a party to any convention or treaty relating to trademarks, trade or commercial names, or the repression of unfair competition, to

Convention.  Article 10 *bis* requires member countries "to assure
to nationals of other member countries effective protection
against unfair competition." Paris Convention, Art. 10 *bis*, 21
U.S.T. at 1648.

The Court disagrees with plaintiffs' contention that Article
10 *bis* of the Paris Convention requires signatory nations to
prohibit unfair competition more generally and broadly, beyond
trademark infringement and false designation of origin or passing
off.  The majority of the courts that have dealt with this
question have concluded that "Article 10 *bis* itself does not
create additional substantive rights." *Grupo Gigante SA de CV v.
Dallo & Co.,* 391 F.3d 1088, 1099-1100 (9th Cir. 2004).  "Rather,
the Paris Convention ensures that foreign nationals should be
given the same treatment in each of the member countries as that
country makes available to its own citizens as to trademark and
related rights." *Id*. *See also International Café v. Hard Rock
Café,* 252 F.3d 1274 (11th Cir. 2001) ("[w]e agree that section 44
of the Lanham Act incorporated, to some degree, the Paris

─────────────────────

which the United States is also a party, or extends reciprocal
rights to national of the United States by law, shall be entitled
to the benefits of this section under the conditions expressed
herein to the extent necessary to give effect to any provision of
such convention, treaty or reciprocal law, in addition to the
right to which any owner of a mark is otherwise entitled by this
chapter."

Convention. But we disagree that the Paris Convention created substantive rights beyond those independently provided in the Lanham Act. As other court of appeals have noted, the rights articulated in the Paris Convention do not exceed the rights conferred by the Lanham Act"); *Barcelona.com v. Excelentisimo Ayuntamiento de Barcelona,* 330 F.3d 617 (4th Cir. 2003) ("[t]he rights articulated in the Paris Convention do not exceed the rights conferred by the Lanham Act"); *L'Aiglon Apparel v. Lana Lobell, Inc.,* 214 F.2d 649 (3d Cir. 1954) (after examining the legislative history of the Lanham Act, court concluded that the "Lanham Act was not intended to bring all unfair competition in commerce within federal jurisdiction").

Because the Lanham Act protects only against forms of unfair competition related to trademark infringement, false designation of original and other related theories, plaintiffs' Lanham Act claim falls outside the scope of the Act. Accordingly, plaintiffs' claim under the Lanham Act against defendants ConocoPhillips is dismissed.

### G. Plaintiffs' Common Law Claims

Plaintiffs have raised three common law claims: (1) intentional interference with prospective economic advantage; (2) unjust enrichment; and (3) unfair competition. The Court finds that plaintiffs have failed to state a claim for unjust

enrichment, therefore, that claim is dismissed. Plaintiffs have stated a claim for intentional interference with prospective economic advantage and unfair competition.

> ### 1. *Plaintiffs have stated a claim for intentional interference with prospective economic advantage.*

Defendants CONOCOPHILLIPS posit that plaintiffs have failed to establish their intentional interference with prospective economic advantage ("IIPEA") claim because they have failed to show the existence of a reasonable likelihood or probability that, but for the alleged interference, a contract would have resulted.

Under the law of the District of Columbia, intentional interference with prospective economic advantage has four elements: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage. *Riggs v. Home Builders Inst.*, 203 F. Supp. 2d 1, 23 (D.D.C. 2002).

A protected relationship exists only if there is a reasonable likelihood or probability that a business relationship would have resulted - something beyond a mere hope. *Tose v. First Pennsylvania Bank, N.A.*, 648 F.2d 879, 898 (3d Cir. 1981). *See*

51

*also Ellsworth Associates v. U.S.*, 917 F. Supp. 841, 849 (D.D.C. 1996)(holding that plaintiffs failed to state a claim for tortious interference with business relations because they cannot and do not allege that they would have received the contract); *Klein v. Grynberg*, 44 F.3d 1497, 1506 (10th Cir. 1995) (tortious interference requires reasonable likelihood that contract would have resulted and not just mere hope); *Fishman v. Estate of Wirth*, 807 F.2d 520, 545 (7th Cir. 1986) (no tortious interference when plaintiff had no unconditional right under the contract, but only a mere expectancy prior to third party approval).

Plaintiffs allege that, but for ConocoPhillips' interference, they would have been prime candidates for receiving production sharing contracts from the TSDA. The Court agrees that there was a reasonable likelihood, as opposed to a mere hope or speculative expectation, that plaintiffs would have received concession rights from the TSDA post East Timor's independence in 2002. Plaintiffs have sufficiently shown that they had invested a significant amount of research and resources in analyzing and developing ways to explore for and produce petroleum and natural gas in the Timor Gap since the 1970s. Therefore, plaintiffs have demonstrated a reasonable likelihood or probability that, but for the alleged interference by

ConocoPhillips, a contract would have resulted. Accordingly, plaintiffs have stated a claim for IIPEA.

> **2.  Plaintiffs have failed to state a claim for unjust enrichment as a matter of law.**

Unjust enrichment refers to a quasi-contract theory. *Fred Ezra Co., v. Peas,* 682 A.2d 173, 175 (D.C. 1986).[40]  To state a claim for unjust enrichment, plaintiffs must establish that: (1) they conferred a legally cognizable benefit upon defendants; (2) defendants possessed an appreciation or knowledge of the benefit; and (3) defendants accepted or retained the benefit under inequitable circumstances. *In re Lorazepam & Clorazepate Antitrust Litigation*, 295 F. Supp. 2d 30, 51 (D.D.C. 20003).[41] "To qualify for an award of restitution under this theory, plaintiffs must show that they conferred a benefit (usually money) on defendants under circumstances in which it would be unjust or inequitable for defendants to retain the  benefit." *Id.*

 "A necessary element of a claim of unjust enrichment is that the plaintiff conferred a benefit on the defendant."  *Id.*

Plaintiffs have failed to state a claim for unjust

---

[40] A quasi-contract is an obligation that is implied-in-law. *Fred Ezra Co.,* 682 A.2d at 175.

[41] *See Ellsworth Associates v. U.S.*, 917 F. Supp. 841, 849 (D.D.C. 1996)(noting the similarities between the elements of unjust enrichment for the District of Columbia, Maryland and Virginia).

enrichment because they have failed to allege that they have
conferred a benefit on the defendants.  Rather, any benefit to
the defendants were conferred by a third party, the TSDA, at the
directive of East Timor and Australia.  Further, a disappointed
bidder for a government contract cannot maintain an unjust
enrichment cause of action against a successful bidder for the
value of that contract. *Ellsworth Associates*, 917 F. Supp. at
848-49. *See also Tao of Systems Integration, Inc. v. Analytical
Services & Materials*, 299 F. Supp. 2d 565, 576 (E.D. Va. 2004).
This is so because in order to bring an action to recover monies
received by ConocoPhillips from the governments of East Timor and
Australia, plaintiffs must demonstrate that they had a
preexisting right to that fund. *See Id.*  This the plaintiffs
cannot do because they had no preexisting right to a production
sharing contract to the Timor Gap.  Accordingly, the claim of
unjust enrichment against defendants ConocoPhillips is dismissed.

### 3. *Plaintiffs have stated a claim for unfair competition.*

Unfair competition is not defined in terms of specific
elements but by the description of various acts that would
constitute the tort if they resulted in damages. *Furash & Col.,*

*Inc. v. McClave*, 130 F. Supp. 2d 48, 57 (D.D.C. 2001).[42]
Commercial bribery constitutes unfair competition. *See B&W Management, Inc. v. Tasea Investment Co.*, 451 A.2d 879, 881 n.3[43] (D.C. 1982)(noting that commercial bribery may constitute unfair competition at common law); *Business Equipment Center v. DeJure-Amsco, Corp.*, 465 F. Supp. 775 (D.D.C. 1978) (finding that whereas refusal to deal is not an act of unfair competition, defamation of plaintiff or disparagement of its goods or business methods constitute unfair competition).

The gravamen of the plaintiffs' complaint is that ConocoPhillips' acts of bribery of government officials deprived them of the opportunity to compete for production sharing contracts for oil and natural gas rights in the Timor Gap. Therefore, the Court finds that the plaintiffs have stated a claim for unfair competition.

---

[42] In *Furash,* the Court held that interference with access to business constitutes an act of unfair competition. *Furash*, 130 F. Supp. 2d at 57.

[43] The footnote cites to W. Prosser, Handbook of the Law of Torts, 956-57 (4th ed. 1971), which provides that the following may constitute unfair competition at common law: defamation, disparagement of a competitors goods or business methods, intimidation of customers or employees, interference with access to the business, threats of groundless suits, commercial bribery, inducing employees to sabotage, and false advertising or deceptive packaging likely to mislead customers into believing in goods are those of a competitor.

## V.    CONCLUSION

For the aforementioned reasons, the Court concludes that defendant TSDA's motion to dismiss is granted because the act of state doctrine precludes this Court from adjudicating any of plaintiffs' claims against the TSDA.

Further, defendant ConocoPhillips motion to dismiss is granted in part and denied in part.  The Court finds the following: (1) the act of state doctrine does not bar this Court from adjudicating plaintiffs' claims against defendants ConocoPhillips; (2) the Court does not have personal jurisdiction over ConocoPhillips' domestic subsidiary defendants or its foreign subsidiary defendants; (3) plaintiffs have stated a claim under RICO and the Robinson-Patman Act, but have failed to state a claim under the Lanham Act; (4) plaintiffs have stated a claim for intentional interference with prospective economic advantage and unfair competition, but have failed to state a claim for unjust enrichment.

An appropriate Order accompanies this Memorandum Opinion.

**Signed:    Emmet G. Sullivan**
            **United States District Court**
            **September 21, 2006**