# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

OCEANIC EXPLORATION COMPANY
AND PETROTIMOR COMPANHIA DE
PETROLEOS, S.A.R.L.,

Plaintiffs,

CONOCOPHILLIPS, et al.,

Defendants

CASE NUMBER: 1:04-cv-00332-EGS

## CONFERENCE REPORT AND DISCOVERY PLAN

Pursuant to Fed. R. Civ. P. 26(f) and Local Civil Rule 16(c), Oceanic Exploration Company and Petrotimor Companhia de Petroleos, S.A.R.L. ("Oceanic"), Plaintiffs, and the ConocoPhillips Defendants ("ConocoPhillips"), respectfully submit the following Joint Conference Report and Discovery Plan.

## SUMMARY OF THE FACTS OF THE CASE

### A. Plaintiffs' Statement of The Case

Plaintiffs bring this action for damages for the loss of the opportunity to compete or bid for rights to explore for and produce oil and natural gas from the seabed between East Timor and Australia. These damages were suffered as a result of defendant's bribery of government officials, which ultimately precluded Oceanic from being awarded a concession to explore for and extract oil and natural gas from the Timor Gap.

From 1974, Oceanic owned concession rights to explore for and produce oil and natural gas in the Timor Gap. Indonesia's invasion of East Timor the following year thwarted Oceanic's efforts to benefit from those rights. While the Indonesian army occupied East Timor, Indonesia and Australia created the commercial Joint Authority to develop, produce and market the oil and natural gas in the Timor Gap. The Joint Authority entered into production-sharing

contracts with the ConocoPhillips defendants that gave them the rights to explore for and produce oil and natural gas in the Timor Gap. ConocoPhillips secured these interests from the Joint Authority as a result of 30 years of corruption and bribery in Indonesia.

Upon East Timor's independence, East Timorese political leaders, including Mari Alkatiri, were adamant that East Timor would not recognize any interests that had been awarded in the Timor Gap while Indonesia occupied East Timor, including ConocoPhillips' production-sharing contracts.

With East Timor's independence, Oceanic had positioned itself to compete for and bid for the exploration and production rights that would be awarded in the Timor Gap. Oceanic actively petitioned the interim United Nations' mission and the East Timor government for exploration and production rights in the Timor Gap and provided support and advice that would promote East Timor's national interests, including expanded maritime boundaries and the development of an LNG facility in East Timor.

A ConocoPhillips executive characterized as a "disaster of major proportions" the company's potential loss of the production-sharing contracts and related investment in the Timor Gap as a result of East Timor's independence and actions that it may take to promote its national interests. To avoid this "disaster of major proportions," beginning in 2000, ConocoPhillips bribed, among others, Mari Alkatiri, the official responsible for East Timor natural resources and later the Prime Minister of East Timor. As a direct result of those bribes, Oceanic was given no opportunity to bid for exploration and production rights in the Timor Gap. As a direct result of those bribes, ConocoPhillips' production-sharing contracts in the Timor Gap were reinstated on terms even more favorable to ConocoPhillips than those that applied under Indonesia's occupation of East Timor.

Had Oceanic not been deprived of the opportunity to meaningfully compete for rights to explore for and produce oil and natural gas in the Timor Gap Oceanic would have been the successful bidder for those rights.

On March 28, 2005, defendants filed a Motion to Dismiss the Second Amended Complaint. By its September 21, 2006 ruling, the Court dismissed defendants Timor Sea Designated Authority with prejudice and dismissed the domestic and foreign subsidiaries of ConocoPhillips.

### B. Defendants' Statement of The Case

Plaintiffs' claims have absolutely no merit. Instead, what this case represents is simply the latest in a series of cynical efforts to leverage plaintiffs' questionable deal with the waning colonial power in East Timor -- plaintiffs' dubious colonial concession from Portugal -- to seize the profits from others' investment and labor. The latest effort comes in the form of Oceanic's claim that, contrary to Australian and East Timorese sovereign decisions, it was entitled to a "right to compete" for oil and gas opportunities, which competition it would have won but for supposed bribery by ConocoPhillips affiliates.

*Oceanic's claim is false.* ConocoPhillips affiliates did not secure their place in the Timor Sea development efforts by bribery, but rather by promising to dedicate significant resources to exploration, and then following through on that commitment. By 2002, ConocoPhillips affiliates had already spent ten years and were well into a $1.9 billion capital spending project related to oil and gas production for Australia and East Timor. *See, e.g.*, ConocoPhillips' 2002 Form 10K. On the other hand, in 2002 (at the same time it claims it would have won a competition for the oil and gas exploration rights) Oceanic classified itself as an "employment agency services" firm with no active oil and gas operations or true exploration expenditures. *See* Oceanic's 10Q (period ending 9/30/02). Indeed, all but $15,000 of Oceanic's supposed "exploration expenditures" were legal and

professional fees related to its Australian litigation and lobbying efforts; as Oceanic made clear in its 2002 10K, "[t]he Company is not currently conducting exploration activities other than [$1.4 million in] litigation activities and application to expand the East Timor concession."

The notion that a bribe to East Timorese officials persuaded the governments of East Timor and Australia to jointly sign up to Annex F of the Timor Sea Treaty and its provisions for sticking with ConocoPhillips affiliates, rather than turning over exploration and production rights to the "employment agency services" firm Oceanic, strains credulity. In 2002, ConocoPhillips was, without question, one of the world's largest integrated family of energy companies and had the necessary wherewithal and expertise to develop an off-shore project like those in the Timor Sea. Further, ConocoPhillips had an extensive and proven track record of successful development in the world's off-shore fields, including the Gulf of Mexico, the UK and Norwegian sectors of the North Sea, off-shore China and off-shore Indonesia. The governments of East Timor and Australia were well aware that ConocoPhillips companies had the know-how and experience to continue doing what they had already begun, *i.e.*, converting what otherwise would be a stranded gas field into marketable, transportable and valuable liquefied natural gas. By comparison, as noted above, in 2002 Oceanic had no recent exploration or operation expertise to speak of. Indeed, Oceanic's recent track record consisted of one well drilled in Kansas in 2000: a dry hole that involved investments of only $33,000. *See* Oceanic's 2000 Annual Report.

Moreover, the suggestion that Oceanic simply wants a fair opportunity to compete, which it contends it would win, is patently false. Oceanic's repeated efforts have not been aimed at securing competition, but at precluding such competition and effectively imposing the terms of its Portuguese colonial concession on Australia and East Timor. In fact, Oceanic did not participate in the very competition over exploration rights that the Timor Sea Designated Authority **has permitted**.

*See, e.g.*, Aug. 15, 2006 TSDA Media Release (http://www.timorseada.org/060816_Media_Release_Award_of_Bids__Final_.pdf) (announcing four new contracts; identifying bidders, which did not include Oceanic or Petrotimor). In truth, Oceanic does not even want the benefit of operating any oil and gas developments in the Timor Sea, but has instead asked that it simply be awarded the revenue that would flow either to the ConocoPhillips entities or the Timor Sea Designated Authority as a result of their efforts. *See* Second Am. Compl. at 59. It is no wonder that East Timor's Prime Minister, Jose Ramos-Horta, has denounced this lawsuit as "a frustrating distraction from our task of nation building," and wondered at "the immorality that motivated the [Oceanic] action." Jose Ramos-Horta, *Suit a Distraction for East Timor's Nation Building*, Aust. Fin. Rev., Apr. 17, 2004, at 62.

To the extent that this lawsuit continues, it will continue to be a frustrating distraction from both Australia's and East Timor's efforts in the Timor Sea, and will additionally constitute a drain on private and public resources. Oceanic's claims will involve seeking incredibly broad discovery directed at individuals, corporations and past and present government officials located around the world. In addition to American citizens and corporations, Australian banks, Portuguese archives, Indonesian companies and individuals, and East Timorese public officials will be targeted with discovery or other investigative efforts. It is difficult to calculate the volume of documents or other information that Oceanic will seek, but it is clear already that Oceanic claims it will need seventy-five depositions. And all of these efforts will be directed at establishing the false proposition that ConocoPhillips affiliates bribed East Timorese officials, the unrealistic notion that but for those non-existent bribes both East Timor and Australia would have opted for new competition, and the fanciful possibility that Oceanic would have beat all other interested oil companies for the right to continue developing Timor Sea oil and gas deposits.

While the ConocoPhillips defendants will defend against Oceanic's cynical efforts, if necessary, the waste of time and resources such a project will require is staggering.

## JOINT CONFERENCE REPORT

Counsel for the parties conferred on October 13, 2006 at 3:00 p.m. by teleconference in accordance with Fed. R. Civ. P. 26(f) and Local Civil Rule 26. The parties reached agreement on some but not all of the matters set forth in Fed. R. Civ. P. 26(f), Local Rule 16.3. A succinct statement of all such agreements, as well as a description of the positions of each party on those matters as to which they disagree follows:

1. <u>Whether the Case is Likely to be Disposed of By Dispositive Motion; Whether, if a Dispositive Motion has Already been Filed, the Parties Should Recommend to the Court that Discovery or Other Matters Should Await a Decision on the Motion.</u>

The Court has ruled on Defendants' Motions to Dismiss the Second Amended Complaint. Plaintiffs do not believe the case is likely to be disposed of by summary judgment or by other potentially dispositive motion. Plaintiffs believe that discovery should now proceed, following the occurrence of the early meeting of counsel on October 13, 2006. Plaintiffs believe it is inappropriate to brief cases in a Joint Conference Report and reserve the right to respond to defendants' following case law discussion of discovery stays at an appropriate juncture.

Defendants believe that discovery should not proceed at this time for several reasons. First, Defendants' pending Motion for Reconsideration or, in the Alternative, Certification of Interlocutory Appeal of the Court's order, if granted, could dispose of the entire matter. In this district, "[i]t is well settled that discovery is generally considered inappropriate while a motion that would be thoroughly dispositive of the claims in the Complaint is pending." *Anderson v. United States Att'y's Office*, 1992 WL 159186, at *1 (D.D.C. June 19, 1992) (citing *Brennan v. Local Union No 639, Int'l Brotherhood of Teamsters*, 494 F.2d 1092, 1100 (D.C. Cir. 1974), *cert. denied*, 429 U.S. 1123 (1977). This is because "stay[ing] discovery pending the determination of a dispositive motion 'is an eminently logical means to prevent wasting the time and effort of all concerned, and to make the most efficient use of judicial resources.'" *Chavous*

04163/1983868.2                                        6

*v. Dist. of Columbia Financial Responsibility & Management Assistance Auth.*, 201 F.R.D. 1, 2 (D.D.C. 2001) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 84 F.R.D. 278, 282 (D. Del. 1979)). Defendants note that there is a pending motion to stay discovery until the Court has considered the pending Motion for Reconsideration or Certification that discusses these issues. Second, if the Motion for Reconsideration or Certification does not dispose of the case, Defendants also believe the action is likely to be disposed of on a motion to dismiss for failure to join an indispensable party under Fed. R. Civ. P. 19, or in the alternative to transfer the case to the Southern District of Texas pursuant to 28 U.S.C. § 1404, which the Defendants intend to file if reconsideration or certification is not granted. Defendants believe the same considerations that support staying discovery pending their motion for reconsideration or certification likewise support a stay of discovery pending a motion under Rule 19, if that motion is necessary.

Finally, in the event that the case is not dismissed as a result of the motions discussed above, Defendants anticipate moving for summary judgment and believe discovery should be staged to avoid unnecessary waste, as discussed below.

2. <u>The Date by Which Any Other Party Shall be Joined or the Pleadings Amended, and Whether Some or All of the Factual and Legal Issues can be Agreed Upon or Narrowed.</u>

Plaintiffs do not presently intend to join any other party, but this is subject to discovery of facts which may lead to the joinder of other parties. The factual and legal issues cannot be narrowed at this point.

Defendants believe that any additional parties should be joined within sixty days after the initial conference.

3. <u>Whether There is a Realistic Possibility of Settling the Case.</u>

Neither party believes at this time that there is a realistic possibility of settling the case. The Court had previously inquired as to the possibility of settlement discussions, but neither party believes that such discussions would be constructive at this time.

4. <u>Whether the Case Should be Assigned to a Magistrate Judge for all Purposes, Including Trial.</u>

Plaintiffs submit that the case should be assigned to a Magistrate Judge for purposes of discovery disputes only. Defendants submit that any determination regarding assignment of discovery disputes should be made by the Court on an issue-by-issue basis, if and when such discovery disputes arise.

5. <u>Whether the Case Could Benefit from the Court's Alternative Dispute Resolution (ADR) Procedures (or Some Other Form of ADR); What Related Steps Should be Taken to Facilitate Such ADR; and Whether Counsel Have Discussed ADR and Their Response to This Provision With Their Clients.</u>

The parties do not believe that ADR will be beneficial at this stage of the litigation, but will consider the possibility of ADR at or near the close of discovery.

6. <u>Whether the Case can be Resolved by Summary Judgment or Motion to Dismiss; Dates for Filing Dispositive Motions and/or Cross-Motions, Oppositions, and Replies; and Proposed Dates for a Decision on the Motions.</u>

Plaintiffs do not believe that their case would be amenable to resolution by summary judgment. Defendants submit that the issue of the timing of their anticipated summary judgment motion should be deferred to the date on which defendants intend to submit a discovery progress report to the Court, as requested in paragraph 8 below.

Defendants believe that the dismissal of Plaintiffs' claims will likely be the result of a summary judgment motion after discovery of liability-related discovery is completed. Defendants submit that it if this case proceeds to discovery it would be appropriate, first, to focus on liability issues; second, to address a motion for summary judgment on the question of liability; and, third, engage in discovery on damages issues if and to the extent that the claims survive summary judgment.

7. <u>Whether the Parties Should Stipulate to Dispense With The Initial Disclosures Required By Fed. R. Civ. P. 26(a)(1) and if not what, if any, Changes Should be Made in the Scope or Timing of those Disclosures.</u>

The parties agree to dispense with the Initial Disclosures provided for by Rule 26(a)(1).

8. <u>The Anticipated Extent of Discovery, How Long Discovery Should Take, What Limits Should be Placed on Discovery, Whether a Protective Order is Appropriate; and a Date for Completion of all Discovery, Including Answers to Interrogatories, Document Production, Request for Admissions, and Depositions.</u>

Plaintiffs submit that fact discovery should proceed now and close within eighteen months from the date of this joint conference report.

Defendants propose that, once discovery begins, it should be conducted for eight to ten months, at which point a joint report can be submitted by the parties for the Court's consideration as to a deadline for discovery cutoff.

The parties are willing to dispense with the limits on the number of depositions in Fed. R. Civ. P. 26-37. Plaintiffs estimate that approximately 75 depositions will be necessary. Defendants agree that depositions should not be limited to ten, but do not agree at this point that 75 depositions will be necessary for either side. Plaintiffs also submit that, because of the scope and magnitude of this action, other limitations on discovery in Fed. R. Civ. P. 26-37 should be dispensed with. Defendants do not agree that such other limitations that might exist in Rules 26-37 should be dispensed with. The parties agree that a protective order to address confidentiality issues would be appropriate in this case.

9. <u>Whether the Requirements of Exchange of Expert Witness Reports and Information Pursuant to Rule 26(a)(2), F. R. Civ. P. Should be Modified, and Whether and When Depositions of Experts Should Occur.</u>

Plaintiffs submit that each parties' expert reports should be due 60 days after close of fact discovery, with depositions of each parties' experts due 60 days thereafter; each parties' rebuttal expert reports and any further depositions due 60 days thereafter.

Defendants believe their reports will be primarily in the nature of responding to Plaintiffs' claims and expert submissions. In light of that fact, and the fact that Plaintiffs reports will presumably be developed over the course of discovery, Defendants suggest it would be appropriate to schedule expert discovery as follows: first, Plaintiffs' reports due 60 days after the close of fact discovery; second, Plaintiffs' experts' depositions due within 60 days of their

reports; third, Defendants' expert reports due within 60 days of the conclusion of plaintiffs' expert depositions; fourth, Defendants' expert depositions within 60 days of their reports.

10. <u>In Class Actions, Appropriate Procedures for Dealing with Rule 23 Proceedings.</u>

The parties agree that, because this is not a Rule 23 proceeding, there is no need for special class action procedures.

11. <u>Whether the Trial and/or Discovery Should be Bifurcated or Managed in Phases, Any Specific Proposal for Such Bifurcation.</u>

Plaintiffs do not believe that discovery or trial should be managed in phases or bifurcated. Plaintiffs believe that bifurcatation of discovery as to liability and damages would be artificial and inefficient, and would only cause added expenses and delay. For example, defendants' proposal would necessarily result in multiple depositions for a single witness, and would thus increase costs substantially given that numerous witnesses will be deposed in Australia. There is no likelihood that a party to this action would even be permitted to depose the same witnesses multiple times under the Letter of Request process required for examinations to take place in Australia.

As noted above, Defendants submit that bifurcation, in some form, will serve the interests of the parties and this Court in reaching a speedy and efficient resolution of this action. Specifically, Defendants propose that discovery relating to alleged damages be conducted only if and to the extent Plaintiffs claims survive a motion for summary judgment on the question of liability. (Defendants proposal would not apply to depositions of foreign third-party witnesses over whom the parties have no control; such witnesses need be deposed only once.) Such bifurcation would avoid the need to engage in burdensome discovery of sensitive financial, exploration, production and geophysical data that could be associated with a damages claim.

12. <u>The Date for the Pre-Trial Conference (Understanding that a Trial will take Place 30-60 Days Thereafter).</u>

Plaintiffs request that a Pre-Trial Conference be set in twenty-four months from the date of this joint conference report.

04163/1983868.2                                      10

Defendants request that the Court defer setting a date certain for the final Pre-Trial Conference in this case, until after receipt of the proposed joint report on the close of discovery discussed in paragraph 8 above.

13. <u>Whether the Court Should Set a Firm Trial Date at the First Scheduling Conference or Should Provide that a Trial Date will be Set at the Pre-Trial Conference from 30-60 Days After that Conference.</u>

Plaintiffs request that a trial date be set at the Pre-Trial Conference, within 30-60 days after the Pre-Trial Conference.

Defendants request that, in accordance with its foregoing proposed scheduling, the Court defer setting this deadline.

14. <u>Such Other Matters as the Parties Believe May Be Appropriate for Inclusion in a Scheduling Order.</u>

None.

| | |
|---|---|
| Dated: October 25, 2006 | QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP |
| | /s/ Dale H. Oliver<br>Dale H. Oliver (D.C. Bar #166975)<br>James J. Webster (D.C. Bar #481627)<br>Jon D. Corey (admitted *pro hac vice*) |
| | REES, BROOME & DIAZ, P.C. |
| | /s/ Robert E. Scully, Jr.<br>Robert E. Scully, Jr. (D.C. Bar #340828)<br>Attorneys for Plaintiffs Petrotimor Companhia de Petroleos, S.A.R.L. and Oceanic Exploration Company |
| | KIRKLAND & ELLIS LLP |
| Dated: October 25, 2006 | /s/ Brant W. Bishop<br>Thomas Yanucci (D.C. Bar #358989)<br>Michael Jones (D.C. Bar #417681)<br>Christopher Landau (D.C. Bar #425319)<br>Brant Bishop (D.C. Bar #459255) |
| | Attorneys for Defendant ConocoPhillips |