# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| OCEANIC EXPLORATION CO., *et al.*,<br><br>             Plaintiffs,<br><br>    v.<br><br>CONOCOPHILLIPS, *et al.*,<br><br>             Defendants. | Civil Action Number:  4:07-cv-00815 |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

*Of Counsel:*

Herbert M. Wachtell
John F. Lynch
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019
212.403.1000 (telephone)
212.403.2000 (facsimile)

Finis E. Cowan, Jr.
Collin J. Cox
YETTER & WARDEN LLP
Two Houston Center
909 Fannin, Suite 3600
Houston, Texas  77010
713.632.8000 (telephone)
713.632.8002 (facsimile)

[Additional counsel on next page]

Martin D. Beirne
BEIRNE, MAYNARD & PARSONS, LLP
1300 Post Oak Blvd., 25th Floor
Houston, Texas  77056
713.623.0887 (telephone)
713.960.1527 (facsimile)

*Attorney in charge for defendants ConocoPhillips and ConocoPhillips Company*

Ronald D. Krist
THE KRIST LAW FIRM, P.C.
One Corporate Plaza
2525 Bay Area Blvd., Suite 410
Houston, Texas 77058
281.283.8500 (telephone)
281.488.3489 (facsimile)

David A. Pluchinsky
BEIRNE MAYNARD & PARSONS L.L.P.
1300 Post Oak Blvd., 25th Floor
Houston, Texas  77056
713.623.0887 (telephone)
713.960.1527 (facsimile)

## Table of Contents

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS .................................................................................... 2

    A.    Background facts ...................................................................... 2

    B.    Oceanic's claim of wrongdoing .............................................. 4

PRIOR PROCEEDINGS ...................................................................................... 8

ARGUMENT ...................................................................................................... 12

    1.    OCEANIC'S RICO CLAIMS FAIL FOR LACK OF
           PROXIMATE CAUSE................................................................ 12

           A.    RICO plaintiffs must plead proximate cause ........................... 12

           B.    *Holmes* and *Anza* bar Oceanic's RICO claim ........................ 14

           C.    The Seventh Circuit's post-*Anza* "bidding" case
                confirms that Oceanic has no RICO claim ............................... 22

    2.    OCEANIC'S ROBINSON-PATMAN ACT CLAIM
           LIKEWISE FAILS FOR LACK OF PROXIMATE
           CAUSE......................................................................................... 24

    3.    OCEANIC'S COMMON-LAW CLAIMS LIKEWISE
           FAIL FOR LACK OF PROXIMATE CAUSE................................. 24

CONCLUSION...................................................................................................... 25

## Table of Authorities

**Cases**                                                                          **Page**

*All-Tone Communications* v. *American Information Tech.*,
No. 89-7883, 1991 WL 166532 (N.D. Ill. Aug. 26, 1991) ................................. 20–21

*Anza* v. *Ideal Steel*, 126 S. Ct. 1991 (2006)........................................ 2, 13, 14, 16, 20,
21, 22, 23, 24

*Associated General Contractors* v. *California State Council*,
459 U.S. 519 (1983).............................................................. 2, 13, 14, 16, 22, 24, 25

*Associated Tel. Directory Publishers* v. *Five D's Publishing*,
849 S.W.2d 894 (Tex. App. — Austin 1993, no writ)............................................ 25

*Bennett-Nelson* v. *Louisiana Board of Regents*,
431 F.3d 448 (5th Cir. 2005) ........................................................................... 12

*Blackburn* v. *City of Marshall*, 42 F.3d 925 (5th Cir. 1995) .......................................... 12

*City of Columbia* v. *Omni Outdoor Advertising, Inc.*, 499 U.S. 365 (1991) .......................... 15n.

*Collins* v. *Morgan Stanley Dean Witter*, 224 F.3d 496 (5th Cir. 2000)................................ 12, 20

*District Telecomm. Dev. Corp.* v. *District Cablevision, Inc.*,
638 F. Supp. 418 (D.D.C. 1985)........................................................................ 21

*Downstream Environmental* v. *Gulf Coast Waste Disposal Auth.*,
No. 05-1865, 2006 WL 1875959 (S.D. Tex. July 5, 2006) ................................. 24n.

*Gregory Marketing Corp.* v. *Wakefern Food Corp.*,
787 F.2d 92 (3d Cir. 1986) ............................................................................. 24

*Gulf Oil Trading Co.* v. *M/V Caribe Mar*, 757 F.2d 743 (5th Cir. 1985)................................ 24

*Hebert Abstract Co.* v. *Touchstone Properties*,
914 F.2d 74 (5th Cir. 1990) ..................................................................... 2n., 12

*Holmes* v. *SIPC*, 503 U.S. 258 (1992) .................................... 2, 13, 14, 16, 22, 24, 25

*In re Tobacco (Guatemala)*, 83 F. Supp. 2d 125 (D.D.C. 1999) .................................... 15

*International Brotherhood of Teamsters* v.
*Philip Morris Inc.*, 196 F.3d 818 (7th Cir. 1999) ............................................... 25

*James Cape & Sons Co.* v. *PCC Construction Co.*,
453 F.3d 396 (7th Cir. 2006) ............................................................. 20, 22, 23, 24

*Laborers Local 17* v. *Philip Morris, Inc.*, 191 F.3d 229
(2d Cir. 1999)...................................................................................... 25

*Lee & Lee Int'l* v. *Lee*, 261 F. Supp. 2d 665 (N.D. Tex. 2003) ...................... 25

*Petrotimor* v. *Commonwealth*,
(2003) 126 F.C.R. 354, 2003 WL 259335 (Austl.).................................... 9

*Service Employees* v. *Philip Morris Inc.*, 249 F.3d 1068 (D.C. Cir. 2001)................................. 15

*Sessions Tank Liners, Inc.* v. *Joor Mfg., Inc.*, 17 F.3d 295 (9th Cir. 1994).............................. 15n.

*Sizemore* v. *Georgia-Pacific Corp.*, No. 94-2894, 1996 WL 498410
(D.S.C. Mar. 8, 1996) ...................................................................... 15n.

*Sizemore* v. *Hardwood Plywood & Veneer Ass'n*, 114 F.3d 1177
(4th Cir. 1997)................................................................................. 15n.

*Southland Securities* v. *INSpire Insurance Solutions*,
365 F.3d 353 (5th Cir. 2004) ......................................................... 2n., 12

*Steamfitters Local Union No. 420* v. *Philip Morris, Inc.*,
171 F.3d 912 (3d Cir. 1999) ................................................................ 25

*Strates Shows, Inc.* v. *Amusements of America, Inc.*,
379 F. Supp. 2d 817 (E.D.N.C. 2005) .................................................... 20

*United States* v. *ITT Educational Svcs.*,
284 F. Supp. 2d 487 (S.D. Tex. 2003) ................................................... 12

## Statutes and rules

15 U.S.C. § 15(a) ............................................................................... 13

Federal Rule of Civil Procedure 12(b)(6) ................................................. 12

Federal Rule of Civil Procedure 12(c) ..................................................... 12

## Other authorities

*Australian Financial Review* (Apr. 17, 2004)............................................... 8

*East Timor:  Final Report of the Senate Foreign Affairs, Defence and
Trade References Committee* (Dec. 2000) .................................... 6n., 17n.

Exchange of Notes constituting an Agreement between the Government of
Australia and the United Nations Transitional Administration in East
Timor (UNTAET) concerning the continued Operation of the Treaty
between Australia and the Republic of Indonesia on the Zone of
Cooperation in an Area between the Indonesian Province of East Timor
and Northern Australia of 11 December 1989, 2000 Austl. T.S. No. 9
(Austl.-UNTAET, Feb 10, 2000)........................................................................ 7n.

J. Sutherland, *Law of Damages* (1882)...................................................................... 13

Shawn Donnan, "East Timor Prospects Oil Zone for Income,"
*Christian Science Monitor* (Nov. 3, 1999) .................................................. 6n., 18n.

Timor Sea Treaty, 2003 Austl. T.S. No. 13
(Austl.-East Timor, May 20, 2002)........................................................................ 7n.

## **Preliminary Statement**

In 1991, ConocoPhillips, after winning a competitive bidding process, was granted concession rights jointly by Australia and Indonesia to explore for and develop any oil and gas reserves that might exist in an area of the seabed between Australia and East Timor known as the Timor Gap. ConocoPhillips in 1995 discovered major reserves and commenced development. In 2002, its rights were confirmed by Australia and newly independent East Timor. Oceanic's claim is that a supposed bribery scheme of certain East Timorese officials, up-front of East Timor's independence in 2002, prevented the abrogation of ConocoPhillips' concessions and a re-opening of bidding — bidding that Oceanic supposedly would have won.[1]

The action is now before this Court upon transfer from the District Court for the District of Columbia. The remaining two defendants are ConocoPhillips and its subsidiary ConocoPhillips Company. Prior to transfer, the District of Columbia Court, upon Rule 12(b)(2) and 12(b)(6) motions, dismissed as co-defendants 22 originally named ConocoPhillips subsidiaries as well as the Timor Sea Designated Authority, a joint governmental entity of Australia and East Timor.

The District of Columbia Court further dismissed two of the original claims asserted in Oceanic's Second Amended Complaint against ConocoPhillips and ConocoPhillips Company. These two remaining defendants thereupon answered the Second Amended Complaint and now move pursuant to Rule 12(c) for judgment on the pleadings as to the claims that

---

[1]  "Oceanic" is used herein to refer both to Oceanic and its subsidiary Petrotimor. "ConocoPhillips" is used to refer to the parent company, its subsidiaries and its predecessor, Phillips Petroleum Company.

remain — claims under the RICO statute, the Robinson-Patman Act, as well as common-law claims of unfair competition and intentional interference with prospective economic advantage.

As demonstrated below, quite apart from the falsity of Oceanic's bribery allegations, which ConocoPhillips in its Answer has categorically denied, Oceanic's remaining causes of action are barred by the express holdings of no less than three decisions of the Supreme Court — *Associated General Contractors* v. *California State Council*, 459 U.S. 519 (1983), *Holmes* v. *SIPC*, 503 U.S. 258 (1992), and last year's decision in *Anza* v. *Ideal Steel*, 126 S. Ct. 1991 (2006) — as well as by firmly established common law, for lack of proximate cause in that there is a total absence of the required direct, non-speculative relationship between the claimed wrong and the purported injury.

### Statement of Facts[2]

#### A.   Background facts

East Timor — situated some 400 miles northwest of Darwin, Australia — occupies the eastern part of the island of Timor.  The western portion of the island is part of Indonesia.  (A map demonstrating the relative positions of Australia, East Timor and Indonesia is included in the Addendum to this memorandum.)

---

[2]   Except as otherwise noted, this Statement of Facts is drawn from the allegations on the face of plaintiffs' Second Amended Complaint and documents referenced therein.  Certain facts are based upon statements that plaintiff Oceanic Exploration Company has made in official SEC filings or upon public facts or statements of which this Court may take judicial notice.  Such sources are properly considered upon a motion under Rule 12(b)(6) or Rule 12(c).  *See Southland Securities* v. *INSpire Insurance Solutions*, 365 F.3d 353, 367 n.10 (5th Cir. 2004) (court can properly consider a party's SEC filings upon a motion to dismiss); *Hebert Abstract Co.* v. *Touchstone Properties*, 914 F.2d 74, 76 (5th Cir. 1990) (judgment on the pleadings may be rendered under Rule 12(c) based on the substance of the pleadings and any judicially noticed facts).  The documents referenced are submitted herewith as exhibits to the accompanying Affidavit of John F. Lynch (hereinafter, "Lynch Aff.").  For the convenience of the Court, a chronology is included in the addendum to this memorandum.

Before 1975, East Timor was a Portuguese colony. Portugal, however, gave up its colonial interest that year, and Indonesia promptly invaded. Indonesia then remained in control of East Timor until 1999 when, under United Nations auspices, a referendum was held in which the people of East Timor opted for independence. A UN entity — the United Nations Transitional Administration in East Timor ("UNTAET") — then administered East Timor until full independence was achieved and a new Constitution adopted on May 20, 2002. East Timor is one of the world's newest nations and one of its poorest on a per capita basis. Second Amended Complaint (hereinafter, "SAC") ¶¶ 57, 83, 100-01, 110.

For decades, a dispute had existed between Australia and its neighbors to the north as to the proper maritime boundary between them. In 1971, Australia and Indonesia then reached agreement upon a seabed boundary as between those two nations. But because East Timor was at that time still under Portuguese rule, that agreement did not cover the portion of the seabed between Australia and East Timor: the "Timor Gap." SAC ¶ 49; *see* Addendum Map.

Notwithstanding the lack of an agreed boundary as to the Timor Gap, in 1989 — *i.e.*, while East Timor was still under Indonesian control — Australia and Indonesia entered into a treaty for joint development of whatever oil and gas reserves might exist in the Timor Gap seabed. The treaty set up a binational body known as the Timor Gap Joint Authority to issue concessions to qualified oil companies for the exploration, development and production of any such oil and gas reserves. Prospective revenues, after distribution of the oil companies' interests, would be shared between Australia and Indonesia. SAC ¶¶ 72-75.

In 1991, the Joint Authority accordingly opened certain concession areas for competitive bidding. ConocoPhillips was a successful bidder for certain concessions. Oceanic — albeit ostensibly engaged in oil and gas development, and concededly having knowledge of the bidding process — chose not to bid. SAC ¶¶ 77-78, 80.

ConocoPhillips, pursuant to its concessions, began work in the Timor Gap area in 1991. Exploration resulted in the discovery of a large reserve of hydrocarbons. SAC ¶ 82. Major construction commenced on the infrastructure necessary to pump oil and gas from beneath the seabed and transport it to terminals on land — a $2.5 billion project. *See* First Amended Complaint (hereinafter, "FAC") ¶ 163.

As noted above, on May 20, 2002, East Timor became an independent republic, with its government under the new Constitution succeeding the interim UNTAET administration. *See* SAC ¶¶ 83, 100-01.

### B. Oceanic's claim of wrongdoing

The Second Amended Complaint paints a lurid picture. The incoming government of East Timor had supposedly determined that upon independence it would abrogate all oil and gas concessions entered into by the previous Australian/Indonesian Joint Authority and open them up for re-bidding. That would include the 1991 concessions awarded to ConocoPhillips. SAC ¶ 84. The new Constitution was supposedly explicit in "vitiat[ing] all prior interests, including those of ConocoPhillips, in East Timorese natural resources." SAC ¶ 88. ConocoPhillips was therefore supposedly desperate to avoid abrogation of its concessions. SAC ¶ 89.

For that reason, starting in 2000, ConocoPhillips allegedly bribed one Mari Alkatiri — an East Timorese official active in the UNTAET interim administration and then, upon independence, the first Prime Minister of East Timor — as well as associates of Alkatiri, to "reverse" the decision to abrogate ConocoPhillips' concessions. This sequence of bribery, it is alleged, culminated on East Timor's Independence Day (May 20, 2002) with a supposed payment of $2 million in cash to Alkatiri, allegedly arranged by ConocoPhillips' very CEO. SAC ¶¶ 1, 4, 93-94, 99-101, 103, 107.

-4-

Oceanic contends that, as a result of this alleged bribery, the concessions were not abrogated and re-opened for bidding; if they had been, Oceanic would have bid; and not only that, Oceanic would have gone on to win the bidding.  SAC ¶¶ 1, 6, 125, 190.[3]

The truth — or more accurately, the complete falsity — of these claims of bribery is not before this Court upon this motion.  ConocoPhillips' Answer to the Second Amended Complaint categorically denies those allegations.  Answer ¶¶ 1, 4, 93-94, 99-101, 103, 107.

Nonetheless, so that this Court may appreciate the context in which the present Rule 12(c) motion is being made, it may be helpful to set forth certain undisputed facts that demonstrate the baseless nature of the tale sought to be presented by Oceanic.  For it is clear here that ConocoPhillips had no reason to engage in any such bribery scheme.  A long line of statements by East Timorese political leaders demonstrates that ConocoPhillips' concessions were not in any jeopardy of abrogation by newly independent East Timor.  Thus:

- As early as 1998, long before the Complaint puts forward any suggestion of bribery of any East Timorese person, Mari Alkatiri himself — along with his co-leaders in the National Council for Timorese Resistance ("CNRT"), José Ramos-Horta and Joao Carrascalao — set forth in a public statement that the CNRT "supports the rights of the *existing* Timor Gap contractors and those of the Austra-

---

[3]     The Second Amended Complaint also contains allegations of historic corruption and bribery of *Indonesian* officials going back to the 1960s.  SAC ¶¶ 59-71.  Purportedly, those allegations have been included to bolster plaintiffs' attempt to establish a "pattern" under the RICO statute.  *See* SAC ¶ 155.  These allegations, however, do not go to the claimed gravamen of the present Complaint — to wit, "to recover damages for [Oceanic's] loss of the opportunity in the post-independence period for East Timor to compete or bid for rights to explore for and produce oil and natural gas from the seabed between East Timor and Australia."  SAC ¶ 1.  Accordingly, for purposes of the present motion, these historical allegations are irrelevant.

lian government to jointly develop East Timor's offshore oil reserves in cooperation with the people of East Timor."[4]

- On October 20, 1999 — still considerably before the claimed commencement of any supposed East Timor bribery scheme and now even after East Timor had voted for independence — the CNRT leaders once again confirmed this position, issuing a public statement assuring contractors that their rights would continue: "[W]e wish to assure all [Zone of Cooperation] contractors operating under current Production Sharing Contracts that their legal rights will continue through the full term of those contracts and that fiscal policies applicable to production sharing and taxation will be no more onerous than current policies as they relate to the contractors['] share."  The CNRT leaders forwarded a copy of that statement to ConocoPhillips itself.[5]

- The next month, José Ramos-Horta — who is today the Prime Minister of East Timor — reiterated the East Timorese leadership position on the continuation of the existing concessions:  "No mining company should have any concern whatsoever.  In the end it's in our national interest."[6]

- Then, in February 2000 — still upfront of any supposed inception of a bribery scheme — UNTAET (the United Nations agency administering East Timor)

---

[4]    Statement of the National Council for Timorese Resistance dated July 21, 1998 (Lynch Aff. Exh. 1); *East Timor: Final Report of the Senate Foreign Affairs, Defence and Trade References Committee* at 68 (Dec. 2000) (Lynch Aff. Exh. 2) (emphasis added).

[5]    Statement of the National Council for Timorese Resistance dated Oct. 20, 1999 (Lynch Aff. Exh. 3) (referenced at FAC ¶ 165); *East Timor: Final Report of the Senate Foreign Affairs, Defence and Trade References Committee* at 63 (Dec. 2000) (Lynch Aff. Exh. 2).

[6]    Shawn Donnan, "East Timor Prospects Oil Zone for Income," *Christian Science Monitor* (Nov. 3, 1999) (Lynch Aff. Exh. 4).

signed a formal Exchange of Notes with Australia providing that the terms of the Australian-Indonesian Timor Gap Treaty would *continue*, including the contracts under which the ConocoPhillips companies were developing oil and gas fields in the Timor Sea.[7]

- Finally — contrary to the contention in the Second Amended Complaint (¶ 88) that the new Constitution "vitiated all prior interests, including those of ConocoPhillips, in East Timorese natural resources" — the Complaint itself recognizes that the only interests that were vitiated by the Constitution were those "which are not confirmed . . . after the Constitution enters into force."  SAC ¶ 88. And the very *same day* that Constitution came into force, newly independent East Timor entered into a treaty with Australia that *confirmed* existing concessions, including those held by ConocoPhillips.[8]

Accordingly, it may readily be seen that the entire predicate of the Complaint — the supposed imperative to pay bribes to avoid the abrogation of ConocoPhillips' Timor Sea concessions — is made up of whole cloth.  There is no dispute that East Timor was in desperate need of energy revenues.  *See* SAC ¶ 110.  By 2002, ConocoPhillips had been engaged for over a decade in the exploration and development of oil and gas pursuant to the 1991 concessions.  The company had made major investments in that endeavor.  *See* SAC ¶ 89.  Revenues had already

---

[7]    Exchange of Notes Constituting an Agreement Between the Government of Australia and the United Nations Transitional Administration in East Timor (UNTAET) Concerning the Continued Operation of the Treaty between Australia and the Republic of Indonesia on the Zone of Cooperation in an Area Between the Indonesian Province of East Timor and Northern Australia of 11 December 1989, at 4, 2000 Austl. T.S. No. 9 (Austl.-UNTAET, Feb. 10, 2000) (Lynch Aff. Exh. 5); SAC ¶ 87.

[8]    Timor Sea Treaty, Annex F, 2003 Austl. T.S. No. 13 (Austl.-East Timor, May 20, 2002) (Lynch Aff. Exh. 6).

begun to flow to East Timor.  The concept that, in the absence of supposed bribery, East Timor would have been prepared to disrupt its ongoing receipt of those revenues by opening up a new bidding process is fanciful indeed and unsupported by any factual allegation in plaintiffs' pleading.  Moreover, it is clear from the face of the pleadings themselves that Australia was in no way willing to be a party to any abrogation of the existing concessions (*see* pages 16-17, *infra*), and the pleadings are bereft of *any* allegation of bribery by ConocoPhillips of any Australian person.

José Ramos-Horta is the present Prime Minister of East Timor.  He was a leader in the East Timorese fight for independence, is a Nobel Peace Prize laureate and was recently mentioned as a candidate for Secretary General of the United Nations.  The Complaint contains no allegation of wrongdoing on his part.  His publicly expressed view as to Oceanic's claims in this action of supposed bribery by ConocoPhillips of his predecessor Prime Minister, Mari Alkatiri, puts the issues upon this motion in context:

> The statement of claim filed by Petrotimor and Oceanic is a vexatious distraction at this difficult and crucial time of East Timor's national reconstruction — not least because of the *spurious allegations* against our Prime Minister, his family and members of our national parliament.
>
> \*   \*   \*
>
> I cannot fathom the *immorality* that motivated the Petrotimor-Oceanic Exploration action.  [*Australian Financial Review* (Apr. 17, 2004) (Lynch Aff. Exh. 7) (emphasis added).]

### Prior Proceedings

**Australia action.**  The earliest round in this sequence of litigation was a lawsuit that the present plaintiffs — Oceanic Exploration Company and Petrotimor Companhia de Petroleos, S.A.R.L. — commenced in Australia in August 2001.  No claim of supposed bribery of East Timorese officialdom was alleged in that lawsuit.  Rather, the predicate for Oceanic's claim of asserted rights in the Timor Gap was that Oceanic had received a concession from

*Portugal* — back in 1974, just before Portugal gave up its colonial interest in East Timor.  *See Petrotimor* v. *Commonwealth*, (2003) 126 F.C.R. 354, 368-69, 2003 WL 259335 (Austl.); Statement of Claim No. 1224/2001, *Petrotimor* v. *Commonwealth* (filed Aug. 21, 2001) (Austl.) (Lynch Aff. Exh. 8).  Oceanic, however, did not inform the Australian court in its pleading that Oceanic had been formally advised by the Portuguese government that whatever rights it might have been granted back in the 1970s had long since been terminated.[9]

On April 8, 2002, Oceanic interposed an Amended Statement of Claim in the Australian court reiterating the allegation that it was the current holder of valid concessions to the Timor Gap gas and oil rights from Portugal.  Amended Statement of Claim No. 1224/2001, *Petrotimor* v. *Commonwealth* (filed Apr. 8, 2002) (Austl.) (Lynch Aff. Exh. 9).  By this time, the Portuguese government had sent three separate letters notifying Oceanic that its claimed rights in the Timor Gap had been terminated.[10]  But again, Oceanic did not mention this in its Amended Statement of Claim.

The Australian court dismissed Oceanic's Portuguese concession claims in February 2003, declaring them non-justiciable under Australia's version of the act-of-state doctrine. *Petrotimor* v. *Commonwealth*, 126 F.C.R. 354, 369, 374 2003 WL 259335 (Austl.).

**United States action.**  Oceanic thereupon commenced the present litigation in the District Court for the District of Columbia on March 1, 2004 and filed a First Amended Complaint on May 26, 2004.  The suit was brought against no less than 24 ConocoPhillips entities,

---

[9]    Letter of May 30, 2001 from Emilio Aquiles de Oliveira to Charles N. Haas (Attachment 1 to the Notice of Supplemental Authority by Defendant Timor Sea Designated Authority for the Joint Petroleum Development Area, filed Sept. 21, 2004) (Lynch Aff. Exh. 10).

[10]    Letters of May 30, 2001, October 31, 2001 and March 21, 2002 (Attachments 1-3 to the Notice of Supplemental Authority by Defendant Timor Sea Designated Authority for the Joint Petroleum Development Area, filed Sept. 21, 2004) (Lynch Aff. Exh. 10).

the Australian/East Timorese Timor Sea Designated Authority, the previous Australian/Indonesian Joint Authority, as well as certain Indonesian entities.  The First Amended Complaint contained essentially the same allegations of supposed bribery of East Timorese officials — principally Mari Alkatiri — as are asserted in the present Second Amended Complaint. *E.g.*, FAC ¶¶ 176-77, 179, 193-94, 202.  But that First Amended Complaint did not rest upon any link between such claimed bribery and a supposed decision by newly independent East Timor not to re-open bidding for ConocoPhillips' concessions in the Timor Gap, or on any theory that the East Timorese Constitution had "vitiated" ConocoPhillips' interests.

Rather, the First Amended Complaint — like the Australian action before it — rested upon Oceanic's purported rights under a 1974 Portuguese concession.  Here again, Oceanic assured the American court that, by virtue of the Portuguese concession, it was the current holder of valid rights in the Timor Gap.  FAC ¶¶ 3, 66, 233, 272.  Again, however, Oceanic made no disclosure of the letters it had long since received from the Portuguese government itself that refute any such claim.[11]

Defendants moved to dismiss the First Amended Complaint under Rules 12(b)(1), 12(b)(2) and 12(b)(6).  Upon those motions, Judge Emmet G. Sullivan of the District Court in Washington dismissed that complaint in its entirety and granted Oceanic "*one final opportunity . . . to precisely respond to each and every argument raised by defendants' compelling motions to dismiss.*"  Order dated Feb. 9, 2005 at 1 (emphasis in original).  Judge Sullivan wrote

---

[11]    The same claim of current ownership of an existing, valid concession from Portugal has repeatedly been made by Oceanic in filings with the SEC:  filings that — with glaring disregard of Securities Exchange Act Rule 10b-5 — "omit to state [the] material fact" of the Portuguese government's communications to the contrary.  *See, e.g.*, Oceanic Form 10-KSB for 2005 (filed March 13, 2006) at 6, 27 (Lynch Aff. Exh. 11); Oceanic Form 10-KSB for 2004 (filed March 24, 2005) at 29 (Lynch Aff. Exh. 12).

that he was "troubled by the incongruity of the First Amended Complaint" and informed Oceanic that he would "view with great suspicion any claims emanating from Portugal's colonial concession." *Id.* at 1-2.

On March 1, 2005, Oceanic then filed its present Second Amended Complaint, which — in a patent attempt to salvage the action in the face of the District Court's directive — for the first time was predicated upon the theory that the claimed bribery scheme had operated to preclude the re-opening of bids for the Timor Gap rights and prevented Oceanic from participating in (and winning) such hypothetical re-bidding.  SAC ¶ 125.

Defendants once again moved to dismiss.  The District Court granted that motion as to 22 ConocoPhillips subsidiaries and as to the Timor Sea Designated Authority.[12]  Mem. Op. at 56.  The Court also dismissed Oceanic's Lanham Act and unjust enrichment claims against ConocoPhillips and ConocoPhillips Company but, based upon the grounds of challenge asserted in the Washington Federal Court by way of 12(b)(6) motion, the Court declined to dismiss Oceanic's RICO and Robinson-Patman Act claims or its common-law claims of unfair competition and intentional interference with prospective economic advantage.  Mem. Op. at 56.  Those grounds asserted in the District of Columbia Court upon defendants' Rule 12(b)(6) motions did not include the *Associated General Contractors*/*Holmes*/*Anza* Supreme Court holdings with respect to proximate cause and the need for direct injury that are the subject of the present Rule 12(c) motion.

---

[12]     Plaintiffs did not choose to include the Indonesian entities or the Australian/Indonesian Joint Authority as defendants in the current Complaint.

ConocoPhillips answered the Second Amended Complaint on October 10, 2006, and the pleadings are closed. On February 5, 2007, the District of Columbia Court transferred the case to this Court.

## Argument

The standard on this motion under Rule 12(c) for judgment on the pleadings is the same as the standard on a motion to dismiss under Rule 12(b)(6) for failure to state a claim. *Bennett-Nelson* v. *Louisiana Board of Regents*, 431 F.3d 448, 450 n.2 (5th Cir. 2005). Although a plaintiff's allegations are taken as true and considered in the most favorable light, the Court need not credit "conclusory allegations or unwarranted deductions of fact." *Collins* v. *Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). The Court also need not credit any "allegations of inferences that are contradicted by the facts pleaded or set out in the exhibits attached to or incorporated in the pleading." *United States* v. *ITT Educational Svcs.*, 284 F. Supp. 2d 487, 494 (S.D. Tex. 2003) (citing *Blackburn* v. *City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995)). Moreover, the Court may consider SEC filings as well as facts that are properly the subject of judicial notice. *See Southland Securities* v. *INSpire Insurance Solutions*, 365 F.3d 353, 367 n.10 (5th Cir. 2004) (SEC filings properly considered upon a motion to dismiss); *Hebert Abstract Co.* v. *Touchstone Properties*, 914 F.2d 74, 76 (5th Cir. 1990) (judgment may be rendered under Rule 12(c) based on pleadings and judicially noticed facts).

1.  **OCEANIC'S RICO CLAIMS FAIL FOR LACK OF PROXIMATE CAUSE.**

    A.  **RICO plaintiffs must plead proximate cause.**

    At common law, it is axiomatic in a tort action that proximate cause is required as between the claimed wrong and the claimed injury and that an essential element of proximate cause is that there be a direct, and not remote, connection between the wrong and the injury:

"Damages must be certain, both in their nature, and in respect to the cause from which they proceed." J. Sutherland, *Law of Damages* 94 (1882).

In 1983, in the *AGC* case (*Associated General Contractors*), the Supreme Court held that Congress intended these common-law requisites of proximate causation and directness of injury to apply to antitrust damages litigation. 459 U.S. at 534-35. The statutory provision creating a private right of action under the antitrust laws — Section 4 of the Clayton Act — permitted suit for damages for injury suffered "by reason of" anything forbidden by such laws. 15 U.S.C. § 15(a). Rejecting an argument that this language was broad enough to encompass indirect consequences of wrongful conduct, the Court rather concluded that the "by reason of" language meant that antitrust damage suits "would be subject to constraints comparable to well-accepted common-law rules applied in comparable litigation," including the essential elements of "proximate cause, directness of injury, [and] certainty of damages." *AGC*, 459 U.S. at 529, 532-33 (footnotes omitted).

In 1992, then, in *Holmes* v. *SIPC*, the Court — likewise rejecting a "but for" causation test — held that the RICO statute, which employs this same "by reason of" language, similarly adopted the common-law "demand" for a "direct relation between the injury asserted and the injurious conduct" alleged, characterizing this "requirement" as "one of [the] central elements" of proximate causation. 503 U.S. at 268-69. As the Court explained, a principal reason for this requirement of a "directness of relationship" is to ensure that it would be clear that the alleged misconduct caused the claimed injury. Otherwise, "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent[] factors." *Id.* at 269.

Just last year, then, in *Anza* v. *Ideal Steel*, the Supreme Court further delineated this requirement of "direct injury," giving emphasis to the requirement of certainty of damages

-13-

set forth in *AGC* and *Holmes* and the impermissibility of countenancing a complaint where the link between wrongful conduct and injury is speculative. Pointing to "the difficulty that can arise when a court attempts to ascertain the damages caused by some remote action," and "the speculative nature of the proceedings that would follow" if such a claim were permitted, the Court reversed the Second Circuit's holding that proximate cause had been adequately pled and set forth that: "The element of proximate causation recognized in *Holmes* is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation." *Anza*, 126 S. Ct. at 1997-98.

  **B.**  ***Holmes* and *Anza* bar Oceanic's RICO claim.**

    The proximate-cause principles that the Supreme Court laid down in *Holmes* and *Anza* bar Oceanic's RICO claim. *Anza* in particular makes this clear; indeed, the allegations before the Court in *Anza*, which were held insufficient to state a claim, bear a striking resemblance to those in the case at bar:

> *Anza*: claim that there was not a level playing field between competitors because defendant corruptly and illegally did not pay sales taxes to the government; plaintiff abided by the law and did, and was therefore supposedly at a competitive disadvantage.

> *This case*: claim that there was not a level playing field between competitors because defendants corruptly and illegally bribed government officials; Oceanic abided by the law and did not, and was therefore supposedly at a competitive disadvantage.

    Indeed, Oceanic's theory of causation is even weaker than the claim in *Anza* because here — in tracing the tortuous chain of supposed causation from claimed misconduct (the supposed bribery) to claimed injury (the fact that East Timor and Australia never re-opened the concession bidding so that plaintiff could supposedly bid for, and win, the right to develop the Timor Gap resources) — it would, among other things, become necessary to "deconstruct" the decision-making of two separate sovereigns: East Timor and Australia.

For, putting aside all of the other highly speculative elements of plaintiffs' proposed chain of causation, the decisional law establishes that any such attempt to deconstruct governmental decision-making is *in and of itself* too speculative for courts to engage in.  As set forth by the District Court of the District of Columbia in dismissing a RICO action brought by a foreign government asserting that it would have made different governmental decisions with respect to tobacco if not for fraudulent information furnished to it by the tobacco industry:  "*Few inquiries are more speculative than this*.  In other contexts, courts traditionally have been reluctant to deconstruct the reasons for governmental decision-making because of the great number of subjective influences at play."  *In re Tobacco (Guatemala)*, 83 F. Supp. 2d 125, 130 (D.D.C. 1999) (citations omitted) (emphasis added), *aff'd sub nom.*, *Service Employees* v. *Philip Morris Inc.*, 249 F.3d 1068 (D.C. Cir. 2001).[13]

And here, it is indisputable that Oceanic's claimed chain of causation is speculative in the extreme.  Oceanic's claim of injury necessarily entails the following chain of steps.  If defendants had not supposedly bribed East Timorese officialdom:

---

[13]     *See also City of Columbia* v. *Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 377 (1991) ("[W]e have consistently sought to avoid" the "deconstruction of the governmental process and probing of the official 'intent.'"); *Sessions Tank Liners, Inc.* v. *Joor Mfg., Inc.*, 17 F.3d 295, 300 (9th Cir. 1994) (legally inappropriate for courts to "deconstruct[] the decision-making process to ascertain what factors prompted . . . governmental bodies" to take particular actions); *Sizemore* v. *Georgia-Pacific Corp.*, No. 94-2894, 1996 WL 498410, at *9 (D.S.C. Mar. 8, 1996) ("The speculative chain of events set forth by plaintiffs is too tenuous as a matter of law to support the imposition of liability. . . .   The decisions of [governmental] regulatory organizations, which necessarily involve a complex mix of inputs and judgments . . . , break any purported causal link between submissions to those officials and alleged results flowing from the adoption of a particular code or regulatory provision."), *aff'd mem. sub nom.*, *Sizemore* v. *Hardwood Plywood & Veneer Ass'n*, 114 F.3d 1177 (4th Cir. 1997).

- East Timor would have determined to re-open bidding for the 1991 oil and gas concessions.

- Australia would have concurred in that determination.

- Oceanic would have determined to bid.

- Oceanic would have had the wherewithal to bid and would have been deemed a qualified bidder by Australia and East Timor.

- Oceanic would have won the bidding.

To say that this is a highly speculative series of steps is a massive understatement. This purported chain of causation cannot meet the direct injury test of the Supreme Court's *AGC/Holmes/Anza* trilogy.

**That East Timor would have determined to re-open bidding for the 1991 oil and gas concessions, and Australia would have concurred in that determination.** — Taking the first two links in Oceanic's causal chain, there is a total absence of any suggestion in the complaint that Australia would have been willing to acquiesce in any decision to re-open the concession bidding, even if East Timor itself had been so inclined. To the contrary, in its *First Amended Complaint*, Oceanic spells out in detail the irresistible pressures that Australia placed on East Timor beginning in October 2000 to honor the terms of the previous Australian-Indonesian Timor Gap Treaty — Australia being anxious to have the Timor Gap development proceed without interruption (including the construction by ConocoPhillips of a destination refinery at Darwin). FAC ¶¶ 175, 181-82, 196, 205 (reciting Australian pressures, including threats to cut off aid to East Timor if the existing arrangements in the Timor Gap were not continued). These pressures were assertedly so intense as to be termed "blackmail." FAC ¶ 205.[14]

---

[14]    Australia's pressures on East Timor to honor the terms of the Timor Gap Treaty did not involve any concern that East Timor would seek to re-open ConocoPhillips' concessions. As

(footnote continued)

Yet neither the First nor Second Amended Complaint contains any suggestion of ConocoPhillips' having bribed any Australian officials.

It is thus plain from plaintiffs' own allegations that Australia under *no* circumstances would have concurred with any desire by East Timor to interrupt progress by re-opening the Timor Gap concessions for re-bidding — and without Australia's concurrence, East Timor was patently in no position to do so unilaterally.

But, going further, the documentary materials properly before this Court upon this motion refute Oceanic's conclusory allegations that — even in the absence of the supposed bribes — *East Timor* would have had any intent to re-open the bidding and thereby interrupt, delay and jeopardize the flow of oil and gas revenues to *it* from ConocoPhillips' development of the Timor Gap.  Indeed, as noted above, as early as November 1999, East Timorese leader José Ramos-Horta reiterated the East Timorese leadership's position that the existing concessions

---

(footnote continued)

noted above at pages 5-7, the East Timorese leaders had already given repeated assurances that they had no such intention.  Rather, Australia's concern was that East Timor would seek to hold out *vis-à-vis Australia* for a larger share of the natural-resource revenues to be generated.  *See* FAC ¶¶ 175, 183.  *See also* Statement of the National Council for Timorese Resistance dated Oct. 20, 1999 (Lynch Aff. Exh. 3) ("[F]iscal policies applicable to production sharing and taxation will be no more onerous than current policies *as they relate to the contractors['] share.*") (emphasis added); *East Timor: Final Report of the Senate Foreign Affairs, Defence and Trade References Committee* at 71 (Dec. 2000) (Lynch Aff. Exh. 2) (Australia's "position was stated by a spokesman for Foreign Minister Alexander Downer on 11 July 2000, who said that Australia 'understands the discussion or debate is about the share of revenue . . .'" as between the two countries).  Discussions between Australia and East Timor took place amidst a background agreement that it was "very important that there [be] *a seamless transition or arrangements governing petroleum exploitation in the Timor Gap.*"  *Id.* at 72 (emphasis added).

would *continue* in post-independence East Timor: "No mining company should have any concern whatsoever. *In the end it's in our national interest.*"[15]  *See* pages 5-7, *supra*.

Obviously, it is not the function of this Court upon this motion to make any determination as to whether or not — absent the claimed East Timorese bribery scheme — the joint decision of Australia and East Timor to continue the existing concessions would have been any different.  But it simply cannot be gainsaid that Oceanic — even as to these first two purported causal steps — has fallen far short of pleading the "certainty of damages" required by the Supreme Court's holdings.  For, as set forth above, there is no suggestion in the Second Amended Complaint that Australia ever would have concurred in any abrogation of the concessions and disruption of the flow of hydrocarbons and payment of royalties.  And as to both Australia and East Timor, the legal doctrine of not even attempting to "deconstruct" the motives for governmental decision-making applies in full force.  So, even if there were nothing else, Oceanic's claim here necessarily founders on the very first two links of its purported causal chain.

**That Oceanic would have determined to bid.** — But the impermissibly speculative nature of plaintiffs' causal chain does not stop there.  The next step in the purported connection between the alleged bribery scheme and Oceanic's claimed injury is that Oceanic would have determined to take part in the hypothetical re-bidding.  For this, we have little more than the Second Amended Complaint's *ex post facto* unsupported conclusory claim to this effect (*see* SAC ¶¶ 1, 6, 190).  Moreover, it is conceded in the Second Amended Complaint that — although Oceanic was fully cognizant that bids were open for these very concessions back in 1991 — Oceanic made the conscious decision *not* to attempt to participate, supposedly reasoning that

---

[15]     Shawn Donnan, "East Timor Prospects Oil Zone for Income," *Christian Science Monitor* (Nov. 3, 1999) (Lynch Aff. Exh. 4) (emphasis added).

bidding would be inconsistent with efforts to enforce its 1974 Portuguese concession:  "Holding legitimate rights from Portugal, Oceanic had no reason [to] call into question its own rights by bidding for rights that it already [had]."  SAC ¶ 80.

But of course, if East Timor and Australia had re-opened bidding in *2002* — as Oceanic contends they would have done if not for the alleged bribery scheme — then that *same* rationale would have kept Oceanic out of that hypothetical second round of bids as well.  For, as set forth above, *see* pages 8-11, *supra*, in 2002 Oceanic was still trying to maintain the validity of its Portuguese concession in the Australian courts, and Oceanic did not abandon that claim until *2005*, after Judge Sullivan refused to give it credence in dismissing the First Amended Com-plaint in *this* action.  Order dated Feb. 9, 2005 at 1-2.  Accordingly, in 2002, Oceanic still "had no reason to call into question its own [Portuguese] rights by bidding for rights that it already" claimed to hold.

**That Oceanic would have had the wherewithal to bid and would have been deemed a qualified bidder by Australia and East Timor.** — And then we have the next step in Oceanic's purported chain of causation:  that it would have had the wherewithal to bid had the bidding been re-opened and that it would have been deemed a qualified bidder by Australia and East Timor.  This link in the chain is dubious in the extreme.  One has only to look to Oceanic's own SEC filings as to its business, resources and status at that time.  According to its own filings with the SEC, Oceanic was engaged in *no* exploration or development of any oil or gas property (Oceanic Form 10-KSB for 2002 (filed Mar. 26, 2003) at 3 (Lynch Aff. Exh. 13)).  It had *zero* "revenue from any oil and gas properties in 2002 and 2001" and did not expect to have any in 2003 (*id.*).  Its principal business was that of an *employment agency* in San Diego, based on as-sets it had purchased back in 2000 for the grand sum of $581,000 (Oceanic Form 10-KSB for 2001 (filed Mar. 29, 2002) at 2 (Lynch Aff. Exh. 14)).  Other than those personnel devoted to the

employment agency business, it apparently had only eight employees (*id.* at 3).  Its *total* assets at

the end of 2001 (before $1.1 million of liabilities) were $3.7 million (*id.* at 19).  The concept that

Australia and East Timor would ever hand over the construction and development of this multi-

billion-dollar natural-resources-development project of such critical import to the two nations to

a shell company such as Oceanic — a company possessing neither the financial, structural, nor

technological wherewithal to undertake such a project — defies credibility.

**That Oceanic would have won the hypothetical bidding.** — The unbelievably

speculative nature of the chain of causation does not even stop there, for Oceanic would still

have to establish that it would have won the hypothetical bidding.  On this point, this Court has

nothing more than three totally unsupported, repetitive and wholly conclusory assertions in the

Second Amended Complaint.  SAC ¶¶ 1, 6, 190.  These species of allegations need not be cred-

ited upon a motion for judgment on the pleadings.  *See*, *e.g.*, *Collins* v. *Morgan Stanley Dean*

*Witter*, *supra*, 224 F.3d at 498.

But, even beyond factual insufficiency as a pleading matter, the claim that

Oceanic would have won the hypothetical bidding if not for the alleged bribery is speculative *as*

*a matter of law* and cannot satisfy the requirement of proximate cause.  *See James Cape & Sons*

*Co.* v. *PCC Construction Co.*, 453 F.3d 396, 403 (7th Cir. 2006) (dismissing bid-rigging RICO

claim for lack of proximate cause:  "A court *could never be certain whether Cape would have*

*won* any of the contracts that were the subject of the conspiracy 'for any number of reasons un-

connected to the asserted pattern of fraud'") (quoting *Anza*, 126 S. Ct. at 1997) (emphasis

added); *Strates Shows, Inc.* v. *Amusements of America, Inc.*, 379 F. Supp. 2d 817, 829 (E.D.N.C.

2005) (claim that, if not for defendants' bribery, North Carolina would have held a competitive

bidding process and that plaintiff would have won was too indirect and speculative to satisfy

pleading requirement of proximate cause); *All-Tone Communications* v. *American Information*

-20-

*Tech.*, No. 89-7883, 1991 WL 166532, at *3-*4 (N.D. Ill. Aug. 26, 1991) (without any facts to show plaintiff could have prevailed in a hypothetical bidding process, allegations that plaintiff would have been awarded business through competitive bidding if not for defendants' bribery do not satisfy proximate-cause requirement); *District Telecomm. Dev. Corp.* v. *District Cablevision, Inc.*, 638 F. Supp. 418, 422 (D.D.C. 1985) (bidder who submitted second-best bid in an actual bidding contest for cable franchise and claimed it would have won if not for defendants' fraud could not satisfy proximate-cause requirement).

  Moreover, matter of law aside, as a matter of common sense — given the massive sums already invested in the project by ConocoPhillips and the Complaint's own allegations of ConocoPhillips' motivation to hold onto the concessions[16] — it requires a flight of fancy indeed to assume that a company such as Oceanic would have prevailed in a bidding contest against an incumbent, multinational giant such as ConocoPhillips or any other of the major international energy companies that might have been motivated to enter any such re-opened bidding.[17]

*  *  *

  As the Supreme Court wrote in *Anza*, "[o]ne motivating principle [for the directness requirement] is the difficulty that can arise when a court attempts to ascertain the damages caused by some remote action." 126 U.S. at 1997. The *Anza* Court then continued:

---

[16] On Oceanic's own allegations, ConocoPhillips "bid an extraordinarily high amount" to win its concessions back in 1991, and then went on to make such substantial investments in the area that it would have considered the loss of those concessions a "disaster of major proportions." SAC ¶¶ 78, 86.

[17] And this is all even quite apart from the highly speculative and totally uncertain inquiry that would be required to determine whether a company in Oceanic's position, after supposedly winning the hypothetical bidding, could then develop the contract areas at a profit — and how much.

> The injury Ideal alleges is its own loss of sales resulting from National's decreased prices for cash-paying customers.   National, however, could have lowered its prices *for any number of reasons unconnected to the asserted pattern of fraud*.   [*Id.* (emphasis added).]

So too, here:  there could be "any number of reasons unconnected to the asserted pattern of [bribery]" to explain why Oceanic today does not have the right to produce oil and gas in the Timor Gap:  governmental decision-making in Australia; governmental decision-making in East Timor; Oceanic's lack of capital; Oceanic's lack of capability to produce oil and gas; or else the extreme unlikelihood that Oceanic, even if it sought to take part in the hypothetical bidding that it posits and qualified to do so, would have overcome its disadvantages and outbid the much more substantial competitors it presumably would have had to compete against.

In sum, viewed separately, the likelihood that — if not for the supposed bribery — each of the steps in Oceanic's required causal chain would have taken place range from highly improbable to nil.  And viewed cumulatively, the super-speculative nature of Oceanic's entire chain of causation from supposed wrong to claimed injury cannot come close to satisfying the requirement of "direct relationship" and "certainty of damages" as mandated by *AGC*, *Holmes* and *Anza*.

### C.   The Seventh Circuit's post-*Anza* "bidding" case confirms that Oceanic has no RICO claim.

The post-*Anza* decision of the Seventh Circuit in *James Cape & Sons Co.* v. *PCC Construction Co.* — refusing to countenance a RICO complaint involving a competitive bidding context — is further instructive.  *Cape*, 453 F.3d 396, 403 (7th Cir. 2006).  Indeed, the rejected chain of causation in *Cape* was far *less* speculative than in the case at bar.  For, in *Cape*, unlike here:  (a) the wrongful conduct was not disputed — the defendants had previously pleaded guilty and been convicted of criminal bid-rigging; (b) there was no issue of whether governmental au-

thorities would decide whether or not to conduct a hypothetical bidding contest — a competitive bidding process had actually taken place; and (c) the aggrieved plaintiff had in fact participated in the bidding and there was no suggestion of any issue as to its wherewithal to perform.  *Id.* at 398-99.

Nonetheless, the Seventh Circuit affirmed dismissal of plaintiff's RICO claim at the pleading stage.  Reviewing the Supreme Court's decision in *Anza* — in particular its holding "that the relevant inquiry to determine proximate cause is 'whether the alleged violation led directly to the plaintiff's injuries'" and that "civil RICO plaintiffs must show that the alleged fraud directly harmed them, lest damages become too difficult to ascertain" (*id.* at 403) — the Court of Appeals held that dismissal was required:

> A court *could never be certain whether Cape would have won* any of the contracts that were the subject of the conspiracy "for any number of reasons unconnected to the asserted pattern of fraud."  It is entirely possible that Defendants would have won some bids absent the bid-rigging scheme . . . .  [*Id.* (quoting *Anza*, 126 S. Ct. at 1997) (citation omitted) (emphasis added).]

The Court further observed that "Cape cannot show what portion of its 'lost market share' is attributable to the bids lost to the bid-rigging scheme."  *Cape*, 453 F.3d at 403.  The Court accordingly affirmed dismissal of Cape's RICO claim for failure to allege proximate cause.  *Id*. at 404.

The Seventh Circuit's analysis in *Cape* maps precisely onto Oceanic's RICO claim.  As in *Cape*, this Court "could never be certain" whether, absent the alleged bribery, Australia and East Timor would have agreed to open the new round of bidding that Oceanic posits, nor whether Oceanic would have chosen to bid, had the wherewithal to do so, been qualified by the bidding authority and then gone on to win.  Likewise, as in *Cape*, "[i]t is entirely possible [that ConocoPhillips] would [still have the concession] absent the [alleged bribery] scheme."  And again, as in *Cape*, Oceanic "cannot show what portion of its [claimed injury] is attributable"

to the alleged bribery scheme, as opposed to multiple more likely reasons why Oceanic today has no involvement in the Timor Gap. *Id.* at 403.[18]

*    *    *

As in *Holmes*, *Anza*, and *Cape*, Oceanic's RICO claim fails on the pleadings for lack of proximate cause.

**2. OCEANIC'S ROBINSON-PATMAN ACT CLAIM LIKEWISE FAILS FOR LACK OF PROXIMATE CAUSE.**

Oceanic's Robinson-Patman Act claim must be dismissed for the same reasons. It is controlled by the same statutory provision — Section 4 of the Clayton Act — at issue before the Supreme Court in *AGC*. The requirements of proximate cause determined by the Supreme Court in *AGC* as well as *Holmes* and *Anza* apply in full force. *See, e.g., Gulf Oil Trading Co.* v. *M/V Caribe Mar*, 757 F.2d 743, 751 (5th Cir. 1985) (affirming refusal to allow assertion of a Robinson-Patman Act claim; "possibly speculative" injuries do not suffice; injury must be "direct," rather than "indirect" or "remote"); *Gregory Marketing Corp.* v. *Wakefern Food Corp.*, 787 F.2d 92, 98 (3d Cir. 1986) (applying *AGC* to affirm dismissal of "speculative" Robinson-Patman Act claim).

**3. OCEANIC'S COMMON-LAW CLAIMS LIKEWISE FAIL FOR LACK OF PROXIMATE CAUSE.**

Oceanic's common-law claims — unfair competition and intentional interference with prospective economic advantage — must be dismissed for like reasons. Each of these torts requires satisfaction of the long-settled common-law requirements of proximate cause — direct

---

[18]     *See also* the decision of Judge Rosenthal of this Court in *Downstream Environmental* v. *Gulf Coast Waste Disposal Auth.*, No. 05-1865, 2006 WL 1875959, at *6-*8 (S.D. Tex. July 5, 2006) (not a bidding case), applying *Anza* and dismissing plaintiff's RICO claim on the face of the complaint for lack of direct injury.

-24-

injury and certainty of damages — the very common-law requirements held by *AGC* and *Holmes* to have been incorporated into the antitrust and RICO federal statutes.  *See*, *e.g.*, *Lee & Lee Int'l* v. *Lee*, 261 F. Supp. 2d 665, 679 (N.D. Tex. 2003) ("To establish a claim of tortious interference with existing or prospective business relationships, Plaintiffs must prove . . . [that an] intentional act was a proximate cause of plaintiff's damage."); *Associated Tel. Directory Publishers* v. *Five D's Publishing*, 849 S.W.2d 894, 898 (Tex. App. — Austin 1993, no writ) (plaintiff seeking damages for unfair competition can only recover for "actual losses or injuries sustained as a natural and proximate result of the defendant's wrong").

Federal courts dismissing RICO and antitrust claims on grounds of remote and indirect injury have regularly gone on to dismiss state-law claims for the same reason.  *See*, *e.g.*, *Laborers Local 17* v. *Philip Morris, Inc.*, 191 F.3d 229, 243 (2d Cir. 1999) ("[A]nalogous principles to those that doomed plaintiffs' RICO causes of action also bar plaintiffs' common law fraud and special duty actions."); *Steamfitters Local Union No. 420* v. *Philip Morris, Inc.*, 171 F.3d 912, 934 (3d Cir. 1999) ("The same principles that lead us to conclude that plaintiffs' antitrust and RICO claims were properly dismissed lead [us] to the inevitable conclusion that their state law claims must also fail."); *International Brotherhood of Teamsters* v. *Philip Morris Inc.*, 196 F.3d 818, 827-28 (7th Cir. 1999) (dismissing claims asserted under laws of 11 states).

## Conclusion

Pursuant to Rule 12(c), judgment on the pleadings in favor of defendants ConocoPhillips and ConocoPhillips Company should be entered on all claims.

Dated:  March 13, 2007

Respectfully submitted,

BEIRNE, MAYNARD & PARSONS L.L.P.

_Of Counsel:_

Herbert M. Wachtell
John F. Lynch
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019
212.403.1000 (telephone)
212.403.2000 (facsimile)

Finis E. Cowan, Jr.
Collin J. Cox
YETTER & WARDEN LLP
Two Houston Center
909 Fannin, Suite 3600
Houston, Texas  77010
713.632.8000 (telephone)
713.632.8002 (facsimile)

Ronald D. Krist
THE KRIST LAW FIRM, P.C.
One Corporate Plaza
2525 Bay Area Blvd., Suite 410
Houston, Texas 77058
281.283.8500 (telephone)
281.488.3489 (facsimile)

David A. Pluchinsky
BEIRNE MAYNARD & PARSONS L.L.P.
1300 Post Oak Blvd., 25th Floor
Houston, Texas  77056
713.623.0887 (telephone)
713.960.1527 (facsimile)

_____ /s/ Martin D. Beirne _____
Martin D. Beirne
Texas State Bar No. 02055000
Southern District of Texas No. 3120
1300 Post Oak Blvd., 25th Floor
Houston, Texas  77056
713.623.0887 (telephone)
713.960.1527 (facsimile)

**_Attorney in charge for defendants Conoco-_**
**_Phillips and ConocoPhillips Company_**

## **Addendum**

## **STATEMENT OF FACTS — CHRONOLOGY**

| | |
|---|---|
| 1975 | Portugal gives up its colonial interest in East Timor and Indonesia promptly invades. |
| 1989 | Australia and Indonesia enter into a treaty for joint development of whatever oil and gas reserves might exist in the Timor Gap seabed. |
| 1991 | ConocoPhillips wins Timor Gap oil and gas concessions in a competitive bidding process conducted jointly by Australia and Indonesia. |
| 1995 | ConocoPhillips discovers a large reserve of hydrocarbons in the Timor Gap. |
| 1998-1999 | East Timorese leaders reassure existing Timor Gap contractors that the East Timorese have no intention of abrogating concessions granted to the contractors by Australia and Indonesia. |
| August 30, 1999 | The people of East Timor vote for independence in a referendum held under the auspices of the United Nations. |
| February 10, 2000 | The United Nations Transitional Administration in East Timor signs a formal Exchange of Notes with Australia, providing that existing Timor Gap concessions will continue, including ConocoPhillips' concessions. |
| 2000-2002 | Alleged sequence of bribery of East Timorese officials, supposedly culminating on East Timor's Independence Day — May 20, 2002 — with the payment of $2 million to East Timor's first Prime Minister, Mari Alkatiri. |
| May 20, 2002 | East Timor becomes an independent republic, and its new Constitution vitiates all prior interests "which are not confirmed . . . after the Constitution enters into force."  The same day, East Timor enters into the Timor Sea Treaty with Australia, confirming existing Timor Gap concessions, including those held by ConocoPhillips. |



"Timor-Leste" is the Portuguese name for East Timor.