UNITED STATES DISTRICT COURT          SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| Oceanic Exploration Company, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| *versus* | § | Civil Action H-07-815 |
| | § | |
| ConocoPhillips, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## Opinion on Dismissal

1.      *Introduction.*

One oil company accuses another of bribing foreign governmental officials not to reopen bidding on its mineral concessions.  It asserts that it would have bid and won, allowing it to recover a substantial part of the revenue earned by its competitor.  The claim fails because it does not plead facts that, if true, would show that its loss was proximately caused by the bribery.

2.      *East Timor.*

The island of Timor is about 400 miles northwest of Darwin, Australia.  Portugal became its sovereign in the sixteenth century.  By the Treaty of Lisbon, the Netherlands acquired the western half of the island in 1859.  During the Second World War, the Japanese occupied Timor.  In 1945, shortly after Japan surrendered, Indonesia – including West Timor – declared independence from the Netherlands.  The Republic of Indonesia was established in 1950, ending the Netherlands' control of West Timor.

In 1974, Portugal began to cede control over East Timor to its population.  The next year, East Timor declared its independence.  Nine days later Indonesia invaded.  For 25 years, Indonesia occupied East Timor.  This ended in 1999 when the United Nations mediated  an agreement between Indonesia, Portugal, and the United States for a referendum on independence for East Timor.  In 2002, after a vote for independence, Portugal and Indonesia recognized the sovereignty of East Timor, and it joined the United Nations.

3.     *The Oil.*

In 1972, Australia and Indonesia agreed jointly to exploit the minerals in the seabeds between their countries. Portugal, still in control of East Timor, declined to participate. The boundary between the zones of economic interest of East Timor and Australia remained undefined and became known as the Timor Gap.

In 1974, Portugal awarded Oceanic Exploration Company a concession to explore and produce oil and gas in the Timor Gap. Oceanic had been gathering information on the geology for several years, and it continued to research its potential after the concession. When Indonesia invaded East Timor, Oceanic lost its files on the geology. It says that the Indonesian army took its proprietary data, including maps showing probable large reservoirs of oil and gas.

In 1989, Indonesia and Australia agreed to share the subsea minerals in the Timor Gap. To this end, they created the Joint Authority to manage exploration and production. In 1991, it accepted bids, and ConocoPhillips successfully bid on blocks that were eventually found to have oil and gas. Oceanic chose not to bid.

From 1999 to 2002, East Timor began moving toward a new form of government under a transitional U.N. authority. In October of 2001, Oceanic asked the U.N. to honor the concession by Portugal from 1972 and to expand it to cover the Timor Gap. It refused.

When it became a separate nation, East Timor ratified the Timor Gap treaty between Indonesia and Australia. It also confirmed its contracts with ConocoPhillips, blocking the new round of bidding sought by Oceanic.

Oceanic says that ConocoPhillips bribed officials of the new government of East Timor to keep the treaty. Simultaneously, it asserts that Australia was threatening East Timor diplomatically to retain the arrangement under the treaty.

4.     *Litigation.*

In 2001, Oceanic sued ConocoPhillips in Australia to recover the original concession to it by Portugal. The Australian court dismissed the claim as a non-justiciable. It held that it had no jurisdiction over the validity of the Portugese concession – a predicate for Oceanic's success. Oceanic appealed to the High Court of Australia, but it withdrew the appeal before it was decided.

In March of 2004, Oceanic sued in the District of Columbia, seeking the same thing – a declaration that it properly holds a concession in the Timor Gap. Among the defendants were named twenty-four entities of ConocoPhillips. It also sued the Timor Gap Joint Authority

– an entity created by the original Timor Gap Treaty that no longer exists – and the Timor Sea Designated Authority.  Next, it included two Indonesian state-owned oil companies –    PT Pertaminia, BP MIGAS.  Last, in an insanity that has become common, it "named"  fifty Doe defendants.

Oceanic's legal theories covered:  (a) Racketeer Influenced and Corrupt Organizations Act, (b) Robinson-Patman Act, (c) Lanham Act, (d) misappropriation of trade secrets, (e) interference with contract, (f) prospective economic damage, (g) conversion, (h) unjust enrichment, and (i) unfair competition.  It sought $10.5 billion in damages, trebled  under RICO, and punitive damages.

By early 2005, Oceanic had disclaimed that it held a concession from Portugal.  Oceanic substituted its assumption that East Timor would have reopened bidding in 2001 if ConocoPhillips had not bribed the ministry.  Further, it pleaded that it would have both bid and won.

Ordering Oceanic to replead, the court in Washington said that this was Oceanic's final opportunity to state accurately its cause of action – its factual basis for its theory of liability.  It also held that Oceanic had abandoned its claim by contract to rights in the Timor Gap.

In the fall of 2006, the court dismissed Oceanic's twice-amended claims against all defendants except ConocoPhillips and one of its subsidiaries – ConocoPhillips Company.  It dismissed the claims against them for unjust enrichment and under the Lanham Act.  In February of 2007, the court transferred the case to Houston on ConocoPhillips' motion.

Oceanic's remaining claim is that ConocoPhillips bribed officials of East Timor not  to abrogate the concessions from the Joint Authority.  By adhering to the concession, it precluded further bidding.  If the ministry of East Timor had cancelled the concessions in favor of new bidding, Oceanic says it would have successfully bid and drilled.

5.    *Procedural Entanglements.*

Oceanic insists that ConocoPhillips cannot now urge some of the legal defects in Oceanic's motions because it induced Judge Emmet Sullivan to transfer the case to Houston with promises that it would not re-litigate issues.  Oceanic has sued the defendants.  The case has been transferred here – the whole case, not selected remnants.  Every ruling since early 2004 has been interlocutory, and that means that they may be revised until a final judgment is entered.  The earlier rulings are rulings of this court.

If ConocoPhillips is raising issues that have been addressed earlier in this case, Oceanic may explain why it should not be heard or, better, why it should not succeed substantively.

A.    *Causation.*

Oceanic's claim that the court twice rejected arguments to dismiss on the basis of causation is too broad.  The court agreed that Oceanic pleaded sufficiently "but-for" causation.  Here, ConocoPhillips moves to dismiss on the grounds Oceanic failed to prove "proximate" causation.   But-for causation means only that two events are causally connected – that ConocoPhillips' bribery could be causally connected to Oceanic's inability to bid on mineral resources in the Timor Gap.  Proximate causation is a legal test – whether ConocoPhillips' bribery is legally sufficient to result in liability.

ConocoPhillips seeks a ruling on a new issue; it has kept its promise not to re-litigate., if that is what it was.  No earlier ruling exists for this court to respect.  Further, even if Judge Sullivan had decided the issue, this court could still rehear it and reach a different conclusion, with humility.  *Loumar, Inc., v. Smith*, 698 F.2d 759, 762 (5th Cir. 1983).

B.    *Discovery.*

Oceanic posits that material facts are in genuine dispute, obliging the court to allow it to rummage through the defendants' files and memories.  Oceanic wants to inquire whether (a) it would have qualified to bid for concessions from the free East Timor, and (b) its bids would have won.

The rules anticipate confusion between motions for judgment on the pleadings and for summary judgment.  If resolution of the motion requires the court to consider facts other than those properly pleaded, then the motion is for a summary judgment.  In neither case does the court find facts that are adjudicative – essential to recovery.

Although ConocoPhillips disagrees with Oceanic's facts, its motion does not request a resolution of them.  It seeks judgment because Oceanic has pleaded facts that do not show a direct casual connection between ConocoPhillips' acts and Oceanic's injury.  Specifically, ConocoPhillips argues that, assuming its bribery, the injury to Oceanic is not cogently consequent.

If ConocoPhillips were moving for summary judgment, the facts Oceanic wants to know before addressing its motion are not material.  It wants to discover what qualifications East Timor would have imposed on bidders if it had had a new auction.  The only evidence of that

non-fact would be the qualifications the nation has had for bidders in parallel auctions since independence. That includes a nearly insuperable requirement that Oceanic establish the administrative, geologic, and economic similarity between auctions.

The fact of its ability to have won the bid has two components. Oceanic would need to ascertain the unknowable evaluation that would have been made by other companies in arriving at their bids. Oceanic would need to "discover" what bid it would have made if it had been allowed to participate. This seems to be something that Oceanic would know.

C.     *Motions Striking Motions.*

Oceanic moves to strike ConocoPhillips' motion on the pleadings – it does not want ConocoPhillips re-litigating issues or disguising its motion for summary judgment. The basis for Oceanic's motion to strike in either case is wrong. The rules allows the court to strike "from a pleading" an insufficient defense or redundant, immaterial, impertinent, or scandalous matters. Oceanic moved to strike the whole pleading. The motion to strike will be denied.

6.     *Causation.*

ConocoPhillips seeks judgment on the pleadings, arguing that Oceanic has pleaded facts that cannot show that it was proximately harmed by the bribery of officials in East Timor after independence. It suggests that the complaint's data do not describe a direct injury – that it is speculative to link ConocoPhillips' bribery with Oceanic's assumed injury.

Oceanic pleads that ConocoPhillips bribed the first ministry of East Timor, causing the government to adhere to its antecedent's treaty arrangements. It also pleads that the government of Australia was pressuring the new country not to disturb its settled economic arrangements for the development of the Timor Gap.

Oceanic argues that it was cheated of an opportunity to bid; but that opportunity would only have existed if East Timor had repudiated the commitments of its predecessors in sovereignty. Oceanic has no entitlement in a new nation's choice of political and economic relations – none. Oceanic does not have an auction that was corrupted by ConocoPhillips. It has policy decisions by a nation about its present and future contracts with a company that had invested in its future. Oceanic acts as if it had a *right* to a new auction.

With some irony, Oceanic says that ConocoPhillips violated its rights by convincing East Timor to maintain their business relationship; yet it insists that it was permissible for it

to try to convince East Timor to breach its agreements with ConocoPhillips. Oceanic's premise is that it had a right to an abrogation.

Oceanic's facts must be that if ConocoPhillips had not bribed East Timor: (a) East Timor would have chosen to abrogate the concessions, (b) Australia would have acquiesced, (c) East Timor would have reopened bidding, (d) Oceanic would have been permitted to bid, (e) Oceanic would have won the bid, and (f) Oceanic would have correctly developed the concession so that it was profitable.

Proximate cause is an analytical tool used by the law to define a party's responsibility for the consequences of its acts to those (a) injuries that could have reasonably been anticipated and (b) losses that can be reasonably ascertained. *Holmes v. SIPC*, 503 U.S. 258, 268 (1992). It reconciles justice, reason, and practicality.

 The less direct an injury, the more difficult it is to ascertain both causation and damages.  In a case involving illegal market sharing among building contractors, a carpenters' union sued for their injury from the anti-competitive actions.  The union asserted a causal connection between an antitrust violation and harm to the union.  It also pleaded that the contractors intended to harm it.   These were not enough to satisfy the requirement for legal causation – proximate cause.  The sequence of events from the collusion to the union's injury was complicated and imprecise. Without the clarity that is likely to come from immediacy, the injuries to the union could not rationally be said to flow from the acts of the contractors.  The union had no standing at law. *Associated General Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 540 (1983).

Oceanic says that ConocoPhillips intended to injure it, and that there is a causal connection between the bribes and its damage.  This is not enough.  The damage must be traceable directly to the bribes, with a minimum of intervening events or alternative plausible causes.

Oceanic's asserts abstract operative facts – bribery, hostility, causation, and damage. It supports the abstractions with over 50 pages of trivia   The details are not cogent; we are left with a metaphysical leap from this list of gossip and debris of ConocoPhillips' working in the region to Oceanic's particular interpretation of why it lost in Timor.  For instance, Oceanic pleads that the president of ConocoPhillips flew to East Timor to hand an official a suitcase of cash.  Implausibility aside, Oceanic simply can not link this fact with its injury.  That is, it can not possibly have an idea why the president of an international corporation would personally deliver cash in a briefcase to an official of East Timor.  It has assumptions – nothing more.

Simply put, Oceanic complains that ConocoPhillips paid bribes to preserve its existing, legitimate investment from arbitrary cancellation, while Oceanic lobbied East Timor to expropriate ConocoPhillips' concession for its benefit.

7.    *The Links.*

A.    *East Timor Abrogates.*

After Oceanic shows that ConocoPhillips bribed officials of East Timor expressly to keep the concessions, it must show that, absent the bribes, East Timor would have unilaterally abrogated concession from Australia and Indonesia. To attribute a decision by a government at a high level to single person is fanciful. To reconstruct a collective decision-making process in the absence of a single input – bribes – and predict what would have happened otherwise is on the impossible edge of difficult.

Oceanic insists that it can know what decisions would have been made by leaders – whom it says are corrupt – in a small, newly-independent nation of the South East Pacific that had just emerged after years of war and occupation. It could only guess, and its prediction would be speculative. Governmental decisions are complex and constrained.    *See generally* Theodore C. Sorensen, *Decision-Making in the White House: The Olive Branch or the Arrows* (Columbia University Press 1963).

B.    *Australia Acquiesces.*

ConocoPhillips' concessions were granted by a joint authority created by Indonesia and Australia. They worked together to avoid conflict over their disputed maritime boundary and over ownership of the subsea minerals. No concessions had ever been granted directly by East Timor.

It is debatable whether East Timor could have abrogated the concessions. The concessions were within the disputed maritime territory. In 2002, Australia withdrew from the jurisdiction of the International Court of Justice for all disputes on maritime boundaries; therefore, no international organization could have decided the matter. Australia had as much interest in the efficient development of the area as East Timor, and it was unlikely to permit East Timor to disrupt the arrangements and its revenue from the current concessions voluntarily. East Timor was not economically, diplomatically, or militarily in a position to force the issue. Oceanic has asserted that Australia was pressuring East Timor, a concession that ConocoPhillips was not the only factor in the decision.

The present and future concessions in the Timor Gap depend in large part on Australia. Oceanic can only speculate what might have happened if East Timor had tried to have an independent policy on the Timor Gap.

Parenthetically, because Indonesia incorporates West Timor, that nation has an interest in the actions of other nations and their claims to the adjoining seabed. East Timor, then, would have founds itself with two much larger neighbors affected by the consequence of a renunciation of ConocoPhillips' concession.

C.    *East Timor Auctions.*

If East Timor had abrogated the concession and if Australia had acquiesced, Oceanic cannot know what East Timor would have likely done; yet it says East Timor would have reopened bidding.

East Timor might have abrogated the concession only to renegotiate with the companies with existing operations. It might have granted the development to the company of its choice without notice or bids.

Investors avoid countries – and other businesses – that do not honor their contracts. When countries foul the rules, both domestic and foreign investment shrinks. East Timor knows that.

D.    *Oceanic Qualifies.*

Oceanic says that if East Timor had allowed bidding, it would have won. Oceanic cannot show that. In 2001 and 2002 – the years of the missing auction – Oceanic did no exploration or development. (Oceanic Form 10-KSB for 2002 (filed Mar. 26, 2003) at 3)). Its principal business was being an employment agency in San Diego. It had eight employees with total assets of $3.7 million. It says that it has affiliates that would have supplied it with financial strength.

East Timor may well not have allowed a company like Oceanic to bid because reviewing bids and evaluating companies is an important, expensive task for it. A successful bid that cannot be used responsibly causes a country to re-offer the concession, and in the meantime, competent bidders may have bought prospects from other offering countries. Oceanic can only speculate that it would have been allowed to bid.

E.    *Oceanic Wins.*

Oceanic needs to be able to prove that it would have won an auction that was not held against competitors whom it does not know.  Assuming that it could rely on the kindness of strangers for the money, its geology was taken in the Indonesian occupation in 1974, as it says.  Although Oceanic's fieldwork may have been profoundly insightful, other competitors have newer fieldwork and well data.

Oceanic does not have its own bid to show what it would have done; it made no unsolicited offer to East Timor, but it did request a new auction.  Since 1991, Oceanic has not told East Timor, Australia, or Indonesia its plan for bid price, source of financing, or other parts of what it must have done to win.  Neither Oceanic nor its competitors can know what they would have bid.

F.    *Oceanic Develops Profitably.*

Oceanic calculates its damages based on what ConocoPhillips has accomplished in the Timor Gap.  If it had won the auction in 2001, Oceanic would have had to develop the fields discovered by ConocoPhillips as successfully as it has done.   It is unlikely that it could have done better than ConocoPhillips.  Without ConocoPhillips' geology, capital, geologists, engineers, sources of supply, and the rest of its enterprises, Oceanic cannot rationally compare its prospects with the historic achievement of ConocoPhillips.

Theoretically, Oceanic could have won the auction and then sold its concession to ConocoPhillips or another company, taking an override.  Of course, East Timor is at least as sophisticated as Oceanic, and it could have limited the winning bidders rights of alienation.  Oceanic does not know.

8.    *Conclusion.*

Oceanic speculates that absent the bribery:

- East Timor would have chosen to abrogate the concessions.
- Australia would have acquiesced.
- East Timor would have reopened bidding.
- Oceanic would have been permitted to bid.
- Oceanic would have won the bid.
- Oceanic would have profitably developed the concession.

To recover, Oceanic must show what would have happened absent the bribe to a high degree of probability. It can not. Assuming ConocoPhillips bribed officials of East Timor not to reopen bidding, the decision was made not by any one official but by an entity representing all of East Timor. This court will not imagine the decision-making process of East Timor, Australia, Indonesia, Oceanic, and dozens of oil companies.

In Oceanic's long complaint – twice amended, not counting its practice run in the Australian courts – it has not pleaded facts that, if true, show its injury is connected to the acts it describes. If ConocoPhillips acted corruptly in East Timor, Oceanic was injured in common with oil companies, consumers, and the rule of law everywhere.

Assuming its facts – as opposed to assumptions and contentions, legal theories, and demands – to be true, Oceanic Exploration Company's pleadings do not show that the wrongful acts of ConocoPhillips and ConocoPhillips Company proximately caused the harm it claims.

Oceanic may well have been the victim of international politics in 1974 when it lost its Portugese concession to the Indonesian invasion. It cannot recover for its losses to political risk 30 years ago – not from Indonesia, not from ConocoPhillips.

Oceanic Exploration Company and Petrotimor Companhia de Petroleos, S.A.R.L. will take nothing from ConocoPhillips and ConocoPhillips Company.


Signed on April 16, 2008, at Houston, Texas.



_____
Lynn N. Hughes
United States District Judge